**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| QUEST SOLUTION, INC.;<br>HTS IMAGE PROCESSING, INC.;<br>HTS (USA) INC., | |
| *Plaintiffs*, | Civil Action No. _____ |
| v. | **JURY DEMAND** |
| REDLPR, LLC;<br>SAGY AMIT;<br>JEREMY JAMES MC MICHAEL BARKER, | <u>**COMPLAINT**</u> |
| *Defendants*. | |

Plaintiffs Quest Solution, Inc., HTS Image Processing, Inc., and HTS (USA) Inc. (collectively, "HTS") bring this Complaint against Defendant REDLPR, LLC ("RedLPR"), Defendant Sagy Amit ("Amit"), and Defendant Jeremy James Mc Michael Barker ("Barker"), and allege as follows:

<u>**INTRODUCTION**</u>

1. This action is brought to remedy the unlawful conduct of Defendants in the misappropriation and retention of HTS' confidential, proprietary and trade secret information.

2. HTS is a leader in the License Plate Recognition (LPR) industry. HTS' LPR technologies can be found in major international airports, shopping centers, and other prominent destinations in over 50 countries.

3. HTS' industry leading LPR solutions incorporate and reflect over 20 years of research and development (R&D).

4. In addition to its technical advantages, HTS' operations leverage decades of industry knowledge, reputation, and strategic business development.

5. In early 2018, two HTS employees – Sagy Amit and Jeremy Barker – conspired to use HTS' confidential trade secrets and other proprietary information to develop a direct competitor to HTS (formed soon thereafter as RedLPR).

6. In addition to misappropriating HTS' trade secrets, Amit and Barker misused their positions as HTS employees to actively sabotage HTS' business interests and tarnish HTS' longstanding and hard-earned reputation as a leading LPR provider.

7. Shockingly, Amit and Barker engaged in this unlawful conduct ***while still employed by HTS***.

8. Despite collecting salaries and presenting themselves as HTS' representatives, Amit and Barker spent months brazenly stealing HTS' trade secrets, building a competing organization, and actively damaging HTS' business and reputation from within.

9. In August 2018, Amit resigned from HTS. Barker, however, remained an HTS employee.

10. Unbeknownst to HTS, ***this conduct was part of a deliberate, calculated plot coordinated by Amit and Barker to conceal their underlying intentions – namely, sabotaging HTS' interests for the benefit of RedLPR***.

11. While Amit formalized RedLPR's business operations, Barker remained "on the inside" within HTS for over two months. During this time, Barker provided Amit with frequent updates regarding HTS' ongoing internal business activities.

12. While remaining an HTS employee, Barker gathered valuable information regarding new business opportunities HTS was pursuing, while simultaneously spreading false information to HTS' customers and damaging HTS' reputation.

13. In October 2018, with RedLPR ready for business, Barker resigned from HTS and immediately joined Amit as a co-founder of RedLPR.

14. Amit and Barker's use of HTS' trade secrets is apparent in nearly every aspect of RedLPR's operations.

15. For example, RedLPR has used specifications of HTS' proprietary imaging units, software applications, and LPR servers to recreate products virtually indistinguishable from those offered by HTS.

16. RedLPR has also utilized HTS' confidential business plans and other internal documents to systematically target HTS' customers and submit project bids that undercut those submitted by HTS.

17. Additionally, RedLPR has directly targeted HTS' customers to whom Amit and Barker previously communicated knowingly false, disparaging information regarding HTS.

18. These actions have caused substantial and irreparable harm to HTS, including lost revenues, reputational harm, and other business interruptions.

19. HTS now seeks to hold Defendants accountable, stop them from further exploiting HTS' trade secrets, and put an immediate halt to the substantial and irreparable harm and

damages Defendants have caused, and continue to cause HTS as a result of their unlawful activities.

## **THE PARTIES**

20. Quest Solution, Inc. is a Delaware corporation having a principal place of business at 1865 West 2100 South, Salt Lake City, Utah 84119.

21. HTS Image Processing, Inc. is a Delaware corporation having a principal place of business at 1865 West 2100 South, Salt Lake City, Utah 84119. HTS Image Processing, Inc. is a wholly owned subsidiary of Quest Solution, Inc.

22. HTS (USA) Inc. is a Delaware corporation having a principal place of business at 1865 West 2100 South, Salt Lake City, Utah 84119. HTS (USA) Inc. is a wholly owned subsidiary of Quest Solution, Inc.

23. Defendant REDLPR, LLC ("RedLPR") is a Mississippi limited liability company having a mailing address at 3599 Old Brandon Rd., Pearl, Mississippi, 39208 and a principal place of business at 164 J Street, Chula Vista, California 92614.

24. Defendant Sagy Amit ("Amit") is an individual residing at 164 J Street, Chula Vista, California 92614. Upon information and belief, Amit is the Founder and Vice President of Marketing of RedLPR.

25. Defendant Jeremy James Mc Michael Barker ("Barker") is an individual residing at 93 Fox Hollow, Irvine, California 92614. Upon information and belief, Barker is the Founder and LPR Evangelist of RedLPR.

26. Upon information and belief, Defendants are and were at all relevant times the agents, affiliates, alter egos, partners, assignees, successors-in-interest, or principals of each other

or were otherwise responsible for or participated in the performance of the wrongful acts alleged herein, and thereby are jointly and severally responsible for such acts and incurred liability therefore.

## JURISDICTION AND VENUE

27. This court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 in that this case arises under various federal statutes, including 18 U.S.C. § 1836 *et seq.*, and its state law claims are part of the same case or controversy.

28. This Court has supplemental jurisdiction over all causes of action asserted herein, pursuant to 28 U.S.C. § 1367.

29. Defendants Amit and Barker had regular and systematic contacts with HTS' headquarters in the State of Utah throughout all times relevant to this action. In their respective employment roles with HTS, Amit and Barker communicated frequently with HTS' management in Utah regarding HTS' business and operations. Amit and Barker also made regular visits to Utah, for in-person meetings with HTS' management as well as to conduct business and sales activities with HTS' customers in Utah. Additionally, Amit and Barker have expressly aimed tortious activities toward the State of Utah and established sufficient minimum contacts with Utah by, among other things, willfully misappropriating HTS' trade secrets within Utah with the knowledge that HTS and is located in Utah and is harmed in Utah as a result of these activities.

30. Accordingly, this Court has personal jurisdiction over Defendants Amit and Barker.

31. Defendant RedLPR transacts business within Utah and contracts to supply services or goods within Utah. For example, RedLPR has entered into contracts and transacted business in Utah in connection with its participation in the Building Owners and Managers

Association (BOMA) International Annual Conference & Expo at the Salt Palace Convention Center in Salt Lake City, Utah on June 22-25, 2019. Additionally, RedLPR has expressly aimed tortious activities toward the State of Utah and established sufficient minimum contacts with Utah by, among other things, willfully misappropriating HTS' trade secrets within Utah with the knowledge that HTS and is located in Utah and is harmed in Utah as a result of these activities.

32. Accordingly, this Court has personal jurisdiction over Defendant RedLPR.

33. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events, acts, omissions, and injuries giving rise to the claims occurred in this judicial district.

## FACTUAL BACKGROUND

*HTS is a Leader in LPR Industry*

34. Founded in 1992, HTS is a recognized leader in the License Plate Recognition (LPR) industry.

35. HTS' technologies are deployed in over 50 countries, providing automation for traffic, logistics, and security applications.

36. HTS' LPR solutions for parking garages are deployed throughout the US and worldwide. HTS' technologies can be found in major international airports, shopping centers, and other high-profile destinations.

37. These technologies enable parking garage owners to improve security, enhance automation, and improve profitability.

### HTS' Pioneering Technologies and R&D

38. HTS' pioneering technologies reflect over 20 years of research and development (R&D) and incorporate numerous unique features not found in competing products.

39. Among HTS' offerings are proprietary imaging units, including specialized cameras and illumination devices optimized for LPR applications. These imaging units enable HTS' systems to accurately capture image(s) under challenging conditions.

40. HTS also develops a suite of proprietary software applications, including image processing applications and management platforms.

41. Additionally, HTS' develops and sells servers, terminals, and other computing devices configured and optimized for use in LPR applications.

42. Each of these technologies incorporate technical trade secrets developed by HTS, including technical know-how, secrets, and other confidential information not known outside HTS.

43. HTS expended significant effort and expense to preserve and maintain the confidentiality of its trade secrets. HTS personnel and other relevant parties are required to acknowledge HTS' ownership of the trade secrets and agree to maintain the confidentiality of the trade secrets.

44. HTS' technical trade secrets hold enormous value to HTS. These trade secrets are not known outside HTS and provide HTS with a significant competitive advantage against its competitors.

### HTS' Business Advantage

45. In addition to its cutting-edge technology, HTS' leverages decades of industry knowledge and experience to facilitate new business opportunities.

46. For example, HTS' longstanding industry contacts enable it to learn of numerous upcoming projects and other prospective business opportunities.

47. HTS' established reputation as an industry leader also provides it access to business opportunities other LPR companies are not privy to.

48. HTS' longstanding industry knowledge also informs the proposals it prepares for upcoming projects. HTS draws heavily on its past experiences across thousands of LPR installations when preparing new proposals.

49. HTS also maintains numerous internal business plans, documents, and other materials. Among these materials is HTS' internal 'sales pipeline' document which details hundreds of current and future business opportunities HTS is positioning itself to obtain.

50. HTS' pipeline also includes detailed technical specifications, pricing information, cost of goods sold (COGS) information, and other related parameters.

51. The pipeline also includes internal HTS insight – gained from decades of experience and hundreds of industry relationships – regarding HTS' expected likelihood of being selected for a given project, and other related notes.

52. HTS' pipeline is effectively a strategic 'X-ray' of its entire business operations and prospects.

53. HTS expended significant effort and expense to preserve and maintain the confidentiality of its business trade secrets, including its sales pipeline. HTS personnel and other relevant parties are required to acknowledge HTS' ownership of the trade secrets and agree to maintain the confidentiality of the trade secrets.

54. The content of HTS' business trade secrets, including its sales pipeline, are not known to or discoverable by the public. They hold tremendous value to HTS and would be incredibly valuable to any competitor.

### HTS Hires Barker

55. On or about October 29, 2013, HTS hired Jeremy Barker as a support engineer[1].

56. Upon information and belief, Barker had no experience in the parking industry prior to his employment with HTS.

57. During 2017, Barker was promoted to Vice President of Sales & Marketing of HTS.

58. Throughout his employment, Barker had access to and knowledge of HTS' trade secrets, including the described technical trade secrets and business trade secrets.

59. At all relevant times, Barker knew these trade secrets held significant value to HTS.

60. Barker further knew that the use or acquisition of these trade secrets by anyone outside HTS would cause significant harm to HTS.

61. Additionally, Barker knew of HTS' prominent reputation within the LPR industry and understood how this reputation was central to HTS' ongoing business development efforts.

### HTS Hires Amit

62. On or about August 16, 2016, HTS hired Sagy Amit as its Director of Sales-West[2].

63. Upon information and belief, Amit had no experience in the LPR industry prior to his employment with HTS.

---

[1] Barker was initially hired by HTS (USA) Inc. which was later acquired by HTS Image Processing, Inc., followed by Quest Solution, Inc. Barker's role, responsibilities, and obligations continued uninterrupted across each acquisition.

[2] Amit was initially hired by HTS (USA) Inc. which was later acquired by HTS Image Processing, Inc., followed by Quest Solution, Inc. Amit's role, responsibilities, and obligations continued uninterrupted across each acquisition.

64. Throughout his employment, Amit had access to and knowledge of HTS' trade secrets, including the described technical trade secrets and business trade secrets.

65. At all relevant times, Amit knew the trade secrets held significant value to HTS.

66. Amit further knew that the use or acquisition of these trade secrets by anyone outside HTS would cause significant harm to HTS.

67. Additionally, Amit knew of HTS' prominent reputation within the LPR industry and understood how this reputation was central to HTS' ongoing business development efforts.


*Amit and Barker Gain Intimate Knowledge of HTS' Trade Secrets*

68. As noted, Amit and Barker had direct access to HTS' trade secrets throughout their employment.

69. For example, Amit participated in the development of HTS' imaging units, including cameras optimized for use in LPR applications.

70. Barker also gained internal knowledge of HTS' technical products and R&D practices over his five-year employment with HTS.

71. Additionally, both Amit and Barker had intimate involvement in and knowledge of HTS' internal 'sales pipeline.'

72. Access to HTS' pipeline provided Amit and Barker with detailed knowledge of the current and future business opportunities HTS was positioning itself to obtain.

73. The pipeline also provided Amit and Barker with detailed knowledge of hundreds of available business opportunities that were not publicly known or otherwise discoverable.

74. HTS' pipeline also provided Amit and Barker with detailed technical specifications, pricing information, cost of goods sold (COGS) information, sale margins per customer, and other related parameters used by HTS to prepare and submit bids for LPR projects.

75. Additionally, HTS' pipeline provided Amit and Barker with internal HTS insight – gained from decades of experience and hundreds of industry relationships – regarding HTS' expected likelihood of being selected for a given project, and other related notes.

76. As noted, HTS' pipeline is effectively a strategic 'X-ray' of its business operations. The content of HTS' pipeline is not known to or discoverable by the public. It holds tremendous value to HTS and would be incredibly valuable to any competitor.

77. HTS expended significant effort and expense to preserve and maintain the confidentiality of its trade secrets, including the information contained within HTS' pipeline. HTS personnel and other relevant parties are required to acknowledge HTS' ownership of the trade secrets and agree to maintain the confidentiality of the trade secrets.

*Amit and Barker Plot Their Departure from HTS; Begin Work on RedLPR*

78. In 2018, Amit and Barker hatched a plan to depart HTS and establish RedLPR as a direct competitor.

79. Upon information and belief, Amit and Barker took action in furtherance of these plans while both were still employed by HTS.

80.  Amit and Barker also used HTS' resources – including its trade secrets - to facilitate this objective.

81. Upon information and belief, Amit and Barker initially considered departing HTS at the same time. However, Amit and Barker were concerned that formalizing certain aspects of

RedLPR may take several months, during which time they would not have direct knowledge of HTS' sales pipeline (if neither were employed by HTS).

82. Additionally, Amit and Barker were concerned that departing HTS together would raise suspicions that they had planned and taken actions towards establishing RedLPR while still employed by HTS.

83. As a result, Amit and Barker agreed to conduct their departure from HTS in two stages:

84. First, Amit would resign from HTS, while Barker remained employed there. During this time, Amit would further formalize RedLPR while Barker remained "on the inside" within HTS, with ongoing access to its updated sales pipeline and other trade secrets.

85. Then, once RedLPR was ready for business, Barker would resign from HTS and immediately join Amit at RedLPR.

86. Upon information and belief, Amit and Barker concluded that this 'two-step' plan would reduce suspicion regarding their activities while employed at HTS.

87. Amit and Barker also believed this approach would provide them with ongoing access to HTS' sales pipeline and other trade secrets until the moment RedLPR was open for business. In doing so, Amit and Barker expected to use HTS' sales pipeline as the 'playbook' for targeting RedLPR's first customers.

***Amit and Barker Sabotage HTS' Business Operations and Reputation While Employed By HTS***

88. In addition to using HTS' resources and trade secrets to establish RedLPR, Amit and Barker leveraged their roles as HTS employees to sabotage HTS' business interests.

89. Throughout 2018, Amit and Barker engaged in actions intended to harm HTS' reputation with its existing and prospective customers and other business partners.

90. For example, unbeknownst to HTS, both Amit and Barker conveyed knowingly false information to HTS' existing and prospective customers regarding HTS' management, operations, and financial position.

91. Throughout 2018, Amit and Barker also failed to take numerous actions which they were expected and obligated to under the terms of their employment with HTS.

92. Upon information and belief, Amit and Barker intentionally engaged in this conduct to tarnish HTS' longstanding and hard-earned reputation as a leading provider of LPR technologies.

93. This conduct was a further component of Amit and Barker's plan to harm HTS' business for the benefit of RedLPR.

94.  By sowing doubt and dissatisfaction among HTS' customers, Amit and Barker expected these customers to be more receptive to purchasing RedLPR's offerings in lieu of HTS'.


***Amit Resigns from HTS to Formalize RedLPR; Barker Remains at HTS***

95. On or about August 10, 2018, Amit resigned from HTS.

96. Upon information and belief, Amit did so to further formalize the operations of RedLPR.

97. Upon information and belief, Barker was aware of Amit's plan to establish and operate RedLPR as a direct competitor to HTS and to use HTS' trade secrets in doing so.

98. Barker remained employed by HTS after August 10, 2018.

99. Despite knowing that Amit was establishing and operating RedLPR as a direct competitor to HTS and using HTS' trade secrets in doing so, Barker maintained regular communications with Amit after August 10, 2018.

100.    Upon information and belief, Barker – while still employed by HTS - provided Amit with HTS' trade secrets. Barker did so knowing Amit and RedLPR would use such trade secrets to compete with HTS.

101.    During this time, Barker also continued to sabotage HTS' business opportunities and relationships in the manner described above, including by spreading knowingly false information regarding HTS and failing to perform numerous duties required in connection with his role at HTS.

### Barker Resigns from HTS; Joins Amit at RedLPR

102.    On or about October 16, 2018, Barker resigned from HTS.

103.    Upon information and belief, Barker did so in coordination with Amit and in accordance with their plan to establish RedLPR as a direct competitor to HTS.

104.    On or about October 31, 2018, Amit and Barker registered the domain www.RedLPR.com as the website of RedLPR.

105.    On or about January 4, 2019, Amit and Barker formed REDLPR, LLC as a Mississippi Limited Liability Company.

### RedLPR Misappropriates HTS' Trade Secrets to Divert Business From HTS

106.    Beginning prior to their respective resignations from HTS, Amit and Barker utilized HTS' trade secrets to establish RedLPR. Having established RedLPR, Amit, Barker, and RedLPR continued to utilize HTS' trade secrets for the benefit of RedLPR.

107.    For example, upon information and belief, RedLPR utilized HTS' technical trade secrets, including specifications of HTS' proprietary imaging units, software applications,

14

and LPR server devices to produce RedLPR-branded products, each of which is virtually indistinguishable from a product offered by HTS.

108.     Amit, Barker, and RedLPR also utilized HTS' business trade secrets, including its sales pipeline, to aggressively target HTS' existing and prospective customers. Using the details of hundreds of prospective business opportunities that HTS was attempting to achieve, Amit and Barker systematically targeted these same opportunities.

109.     Using the confidential information contained in HTS' pipeline – including detailed price quotes, cost margins, and HTS' projected outcome, Amit, Barker, and RedLPR aggressively targeted numerous sales opportunities with bids designed to undercut HTS.

110.     Amit, Barker, and RedLPR did so despite knowing these trade secrets were not known to the public and were maintained securely and confidentially by HTS, as outlined above.

### *RedLPR Undercuts HTS To Win Projects*

111.     In only a few months, RedLPR has used HTS' technical trade secrets to bring a suite of LPR products to market. As noted, these products are indistinguishable from products developed by HTS over decades of R&D.

112.     RedLPR has also used HTS' business trade secrets to quickly and aggressively target HTS' existing and prospective customers. For example, RedLPR has used confidential information from HTS' sales pipeline to prepare sales proposals that undercut offers HTS has submitted to the same customers.

113.     RedLPR has also targeted existing and prospective HTS' customers to whom Amit and Barker had previously conveyed false, defamatory information regarding HTS.

114. RedLPR's activities have caused millions of dollars in damage to HTS. These damages include lost sales and the devaluing of HTS' trade secrets and reputation for excellence developed for over 20 years.

### *RedLPR, Amit, and Barker Misappropriate HTS' Business Trade Secrets to Poach HTS' Customers and Interfere with HTS' Business Relationships*

115. Upon information and belief, RedLPR, Amit, and Barker have unlawfully used and continue to use HTS' business trade secrets to benefit RedLPR and harm HTS.

116. For example, upon information and belief, RedLPR has used HTS' confidential customer and prospective customer information, and aggressively pursued such customers to choose RedLPR's offerings over HTS.

117. By way of further example, upon information and belief, RedLPR has used HTS' confidential sales pipeline, pricing information, and other proprietary information to 'undercut' HTS' agreements by offering such customers preferential proposals and/or pricing.

118. These (and other) trade secrets were not known to the public and were confidentially disclosed by HTS to Amit and Barker, as outlined above.

119. Upon information and belief, RedLPR, Amit, and Barker knowingly misappropriated HTS' business trade secrets by targeting HTS' customers in the manner outlined above.

### *HTS Suffers Substantial Losses as a Result of RedLPR, Amit, and Barker's Actions*

120. RedLPR, Amit, and Barker's actions have caused tremendous, irreparable harm to HTS.

121.    For example, HTS has lost numerous business opportunities and key customers as a result of RedLPR, Amit, and Barker's actions.

122.    Losing such customers and the revenues they represent has caused substantial business disruption to HTS.

123.    These lost revenues – which are directly attributable to RedLPR, Amit, and Barker's actions – have caused substantial delays in HTS' technical development, product manufacturing and delivery, and sales efforts.

124.    Upon information and belief, Amit, Barker, and RedLPR continue to unlawfully exploit HTS' trade secrets for their own gain.


## CAUSES OF ACTION

### COUNT I

### TRADE SECRET MISAPPROPRIATION UNDER
### THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836 *et seq.*)

125.    HTS realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 124 above.

126.    At all relevant times, HTS owned and possessed certain confidential, proprietary and trade secret information as alleged above, including but not limited to the technical trade secrets and business trade secrets enumerated herein.

127.    HTS' technical trade secrets and business trade secrets constitute legally-recognized trade secrets and proprietary and confidential information protected under federal law, and more particularly the Defend Trade Secrets Act, as defined under 18 U.S.C. § 1839(3).

128.     Such confidential, proprietary and trade secret information relate to HTS' products and services which are used in, or intended for use in, interstate or foreign commerce.

129.     As detailed herein, HTS has taken numerous reasonable measures to keep such information secret and confidential, including maintaining such information on secure computer systems to assure it is not discoverable by or disseminated to the general public; limiting access to such information to key personnel, and periodically monitoring communication systems to prevent dissemination.

130.     Such confidential, proprietary and trade secret information derives independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of such information.

131.     In violation of HTS' rights, Defendants RedLPR, Amit, and Barker misappropriated such confidential, proprietary and trade secret information in the improper and unlawful manner as alleged above.

132.     At the time that HTS' confidential, proprietary and trade secret information was disclosed to Defendants Amit and Barker, Amit and Barker knew or had reason to know that the trade secret was protected confidential, proprietary information having significant economic value to HTS and giving rise to a duty to maintain the secrecy of HTS' trade secrets.

133.     At the time that Defendant Barker disclosed HTS' confidential, proprietary and trade secret information to Defendant Amit, Amit knew or had reason to know that the trade secrets were acquired through improper and unlawful means, under circumstances giving rise to a duty to maintain the secrecy of HTS' trade secrets.

134.     At the time that Defendants Amit and Barker disclosed HTS' confidential, proprietary and trade secret information to Defendant RedLPR, RedLPR knew or had reason to know that the trade secrets were acquired through improper and unlawful means, under circumstances giving rise to a duty to maintain the secrecy of HTS' trade secrets.

135.     As a direct and proximate result of Defendants' conduct, HTS has suffered and continues to suffer the disruption of its operations and the loss of customers and potential customers, loss of revenues, dilution of good will, injury to its reputation, misappropriation of its trade secrets, and devaluation of its trade secrets and business.

136.     Defendants' misappropriation of HTS' confidential information and trade secrets has caused and will continue to cause HTS substantial injury, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its trade secrets and business. Defendants have been unjustly enriched by their misappropriation of HTS' confidential information and trade secrets.

137.     Defendants' misappropriation of HTS' trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive. HTS is entitled to an award of exemplary damages and reasonable attorneys' fees.

138.     Because HTS' remedy at law is inadequate, HTS seeks – in addition to damages – a temporary, preliminary, and permanent injunctive relief to protect its trade secrets as well as HTS' legitimate business interests. HTS will continue to suffer irreparable harm absent injunctive relief.

## COUNT II

## MISAPPROPRIATION OF TRADE SECRETS UNDER
## UTAH STATE LAW (Utah Code Ann. § 13-24-1 *et seq.*)

139.     HTS realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 138 above.

140.     The rights and interests of HTS in its confidential information, described above, constitute trade secrets as defined by the Utah Uniform Trade Secrets Act, Utah Code Ann. § 13-24-1 *et seq.*

141.     HTS owns the rights, title and interest in and to the trade secrets that Defendants used and continue to use in developing, promoting, and operating RedLPR.

142.     Because of HTS' reliance on the Defendant Amit and Defendant Barker's ongoing obligations to preserve the confidentiality of HTS' trade secrets, HTS provided Amit and Barker with access to and knowledge of HTS' trade secrets and confidential information.

143.     Such trade secrets were and are primary assets of HTS and have actual and potential independent economic value for HTS. HTS has carefully guarded its trade secret information and has taken reasonable steps to maintain its secrecy. There has been no disclosure of the trade secrets and confidential information by HTS.

144.     Defendants had knowledge that HTS regarded the trade secret information as trade secrets and of their legal obligation and duty to preserve the confidentiality of HTS' trade secrets and confidential information and to limit their use.

145.     Upon information and belief, Defendants knowingly, willfully and maliciously violated their obligations to HTS' by misappropriating HTS' trade secrets to develop, promote, and facilitate RedLPR's business.

146.     As a direct and proximate result of Defendants' conduct, HTS has suffered and continues to suffer the disruption of its operations and the loss of customers and potential customers, loss of revenues, dilution of good will, injury to its reputation, misappropriation of its trade secrets, and devaluation of its trade secrets and business.

147.     Defendants' misappropriation of HTS' confidential information and trade secrets has caused and will continue to cause HTS substantial injury, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its trade secrets and business. Defendants have been unjustly enriched by their misappropriation of HTS' confidential information and trade secrets.

148.     Defendants' misappropriation of HTS' trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive. HTS is entitled to an award of exemplary damages and reasonable attorneys' fees.

149.     Because HTS' remedy at law is inadequate, HTS seeks – in addition to damages – a temporary, preliminary, and permanent injunctive relief to protect its trade secrets as well as HTS' legitimate business interests. HTS will continue to suffer irreparable harm absent injunctive relief.

## COUNT III

**BREACH OF FIDUCIARY DUTIES**
**(AS TO DEFENDANTS AMIT AND BARKER)**

150.     HTS realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 149 above.

151.     At all pertinent times referenced herein, Defendants Amit and Barker held executive-level roles within HTS with access to confidential information, trade secrets, business plans, property and other assets of HTS.

152.     In his role as Director of Sales-West of HTS, Defendant Amit owed and continues to owe HTS a fiduciary duty to not steal, misappropriate or convert HTS' confidential information, trade secrets, business plans, property and other assets of HTS. Defendant Amit further owed HTS his undivided and unqualified loyalty and was obligated to carry out his corporate duties in good faith, without theft or misappropriation, and for the benefit HTS.

153.     Additionally, Defendant Amit was obligated not to spread knowingly false, disparaging information to HTS' existing and prospective customers. Defendant Amit was also obligated to spend his working time and efforts, in addition to HTS' resources, to benefit HTS, and was prohibited from engaging in conduct that would harm or damage HTS' business.

154.     Each of the referenced obligations are imposed by operation of law and were also agreed upon by HTS and Defendant Amit.

155.     In his role as Vice President of Sales & Marketing of HTS, Defendant Barker owed and continues to owe HTS a fiduciary duty to not steal, misappropriate or convert HTS' confidential information, trade secrets, business plans, property and other assets of HTS. Defendant Barker further owed HTS his undivided and unqualified loyalty and was obligated to carry out his corporate duties in good faith, without theft or misappropriation, and for the benefit HTS.

156.     Additionally, Defendant Barker was obligated not to spread knowingly false, disparaging information to HTS' existing and prospective customers. Defendant Barker was also obligated to spend his working time and efforts, in addition to HTS' resources, to benefit HTS, and was prohibited from engaging in conduct that would harm or damage HTS' business.

157.     Each of the referenced obligations are imposed by operation of law and were also agreed upon by HTS and Defendant Barker.

158.     These obligations are imposed by operation of law and were also agreed upon by HTS and Defendant Barker.

159.     By operation of law, and by agreement, the fiduciary duties and other obligations owed by Defendants Amit and Barker to HTS required that Amit and Barker, in the performance of their duties for HTS, to refrain, *inter alia*, from: pursuing private business interests that conflict with business interests of HTS, deriving a personal profit at the expense of HTS, doing anything that might waste, or in any way diminish the value of, the trade secrets, confidential information, property, or any other assets of HTS, usurping for their own benefit or advantage business opportunities rightly belonging to HTS, acquiring, converting or misappropriating property, assets or interests in which HTS has an interest or a reasonable expectation of such interest, including trade secrets, confidential information, property, assets, or business opportunities, interfering with the conduct of the business of HTS, including the relationship between HTS and its customers, partners and contacts, and engaging individually or collectively in a business or endeavor which competes with HTS and violates HTS' legal rights and its rights in HTS' confidential information, trade secrets, business plans, property and other assets of HTS.

160.    Upon information and belief, and unknown to HTS, Defendants Amit and Barker embarked upon a calculated and intentional plan to misappropriate, convert and steal confidential information, trade secrets, business plans, property and other assets of HTS. HTS' trade secrets include, *inter alia*, confidential technical specifications, sales pipeline documents, business plans, and other valuable proprietary information.

161.    Defendant Amit is now actively employed in a competing business as Founder and Vice President of Marketing of Defendant RedLPR, performing essentially the same functions he fulfilled for HTS and targeting the very same business, economic and customer demographics.

162.    Defendant Barker is now actively employed in a competing business as Founder and LPR Evangelist of Defendant RedLPR, performing essentially the same functions he fulfilled for HTS and targeting the very same business, economic and customer demographics.

163.    Defendants Amit and Barker breached their respective aforesaid obligations and duties to HTS by establishing a competing business and intentionally misappropriating, converting, and stealing confidential information, trade secrets, business plans, property and other assets of HTS on behalf of themselves and Defendant RedLPR.

164.    Defendants Amit and Barker willfully, wantonly and maliciously breached their fiduciary duties and obligations to HTS in the manner set forth above.

165.    HTS has been damaged and continues to be damaged by the foregoing acts perpetrated by Defendants.

166.    Specifically, without limitation, HTS has been and continues to be damaged in the following manner: loss of customers, business, contacts and proprietary information, as a

result of Defendant Amit and Barker's wrongful acts and diversion of opportunities from HTS; interference with the conduct and business of HTS by virtue of Defendants' misconduct and affirmative actions; interference with the conduct and business of HTS by the wrongful, diversion and solicitation of HTS' customers, contacts and/or partners; and, use of the confidential information, trade secrets, business plans, property and other assets of HTS.

167.     The acts and conduct of Defendants as alleged above were and are intentional, willful, wanton and malicious.

168.     As a result of the Defendant Amit and Barker's breach of their fiduciary duties to HTS, HTS has been damaged. HTS is entitled to an award of exemplary damages and reasonable attorneys' fees.

## COUNT IV

## TORTIOUS INTERFERENCE WITH
## ECONOMIC RELATIONS UNDER UTAH LAW

169.     HTS realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 168 above.

170.     By the above-alleged acts, Defendants Amit, Barker, and RedLPR have interfered and continue to interfere with HTS' existing and prospective business relationships with customers and potential customers.

171.     Upon information and belief, Defendants Amit, Barker, and RedLPR, with full knowledge of HTS' business relationships, intentionally interfered and continue to interfere with those relationships by, *inter alia* operating and promoting RedLPR and using HTS' trade secrets, confidential information, and property to develop and promote products

and services virtually indistinguishable from those provided by HTS, and by using HTS' trade secret information to directly target and solicit HTS' current and potential customers.

172.     Additionally, Defendants Amit, Barker, and RedLPR, with full knowledge of HTS' business relationships and industry reputation, intentionally interfered and continue to interfere with those relationships by communicating knowingly false, defamatory information to HTS' existing and prospective customers regarding HTS' management, operations, and financial position.

173.     Upon information and belief, the unlawful and improper acts of Defendants, as alleged above, also prevented and continue to prevent customers and other third parties from entering into business relationships with HTS.

174.     Upon information and belief, Defendants' conduct was motivated solely by malice and/or to inflict injury on HTS by unlawful means.

175.     As a direct and proximate result of Defendants' conduct, Defendants have and continue to injure HTS by denying business to and diverting business opportunities from HTS, which HTS would have otherwise had and from which it would have derived benefits and/or other tangible success.

176.     Upon information and belief, by their acts alleged above, Defendants have made and will make substantial profits and gains to which they are not in law or equity entitled.

177.     Defendants' tortious interference with HTS' business relationships has caused and will continue to cause HTS substantial injury, including, but not limited to actual damages, lost benefits, harm to its reputation, and the diminution in value of its business. Defendants have been unjustly enriched by their unlawful conduct.

178.     Defendants' tortious interference with HTS' business relationships was intentional, knowing, willful, malicious, fraudulent, and oppressive. HTS is entitled to an award of exemplary damages and reasonable attorneys' fees.

179.     Upon information and belief, Defendants intend to continue to interfere with HTS' business existing and prospective business relationships unless restrained and enjoined by this Court.


**COUNT V**

**UNJUST ENRICHMENT**

180.     HTS realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 179 above.

181.     By the unlawful conduct alleged above, Defendants Amit, Barker, and RedLPR have been unjustly enriched to the detriment of HTS' business and professional expectancies.

182.     Defendants Amit, Barker, and RedLPR have unlawfully taken and retained from HTS the value of its trade secrets and confidential information, intellectual property, existing and prospective business relationships, and other property, without just compensation to HTS.

183.     Upon information and belief, by the above-alleged acts, Defendants Amit, Barker, and RedLPR have made and will make substantial profits and gains to which they are not in law or equity entitled.

184.     As a direct and proximate result of Defendants' above-alleged acts, HTS has suffered irreparable harm and damage and is suffering monetary damages in an amount to be determined at trial.

185.     The circumstances surrounding Defendants' acts are such that equity and good conscience require Defendants to make full restitution to HTS for their unjust enrichment.

186.     Defendants' conduct, as-alleged above, was intentional, knowing, willful, malicious, fraudulent, and oppressive. HTS is entitled to an award of exemplary damages and reasonable attorneys' fees.


**COUNT VI**

**UNFAIR COMPETITION**

187.     HTS realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 186 above.

188.     HTS has invested substantial labor, skill, and expenditures in developing its valuable property rights and benefits in its proprietary technology and business intelligence, and other valuable assets.

189.     Defendants misappropriated HTS' substantial labor, skill, and expenditure in bad faith by, *inter alia*, intentionally, knowingly, willfully, and maliciously violating their obligations and using and disclosing HTS' valuable and proprietary rights and benefits in HTS' proprietary technology and business intelligence for Defendants' own commercial advantage.

190.     As a direct and proximate result of Defendants' conduct, HTS has suffered and continues to suffer the disruption of its business relationships and the loss of customers and potential customers, dilution of good will, injury to its reputation, misappropriation of its skills and expenditures, and devaluation of its valuable property rights, benefits, and business.

191.     Defendants' misappropriation of HTS' substantial skills and expenditures has caused and will continue to cause HTS substantial injury, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its valuable proprietary rights and benefits. Defendants have been unjustly enriched by their misappropriation of HTS' substantial skills and expenditures.

192.     Defendants' misappropriation of HTS' substantial skills and expenditures was intentional, knowing, willful, malicious, fraudulent, and oppressive. HTS is entitled to an award of exemplary damages and reasonable attorneys' fees.

193.     Because HTS' remedy at law is inadequate, HTS seeks – in addition to damages – a temporary, preliminary, and permanent injunctive relief to protect its substantial skills and expenditures and valuable proprietary rights and benefits as well as HTS' legitimate business interests. HTS will continue to suffer irreparable harm absent injunctive relief.

## COUNT VII

## BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

194.     HTS realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 193 above.

195.     Defendants Amit and Barker's employment by HTS imposes an obligation of good faith and fair dealing on them.

196.     Defendants owed HTS a duty to deal fairly and in good faith, including but not limited to, a duty to refrain from reducing the goodwill of HTS, to maintain the secrecy and refrain from misappropriating and unlawfully using and disclosing HTS' trade secrets and confidential information, and to avoid from tortuously interfering with HTS' business relationships.

197.    By the acts described above, Defendants breached these duties by, *inter alia*, misappropriating and unlawfully using and disclosing HTS' trade secrets and confidential information to establish, develop, and promote competing products and services and to solicit existing and prospective customers away from HTS.

198.    As a direct and proximate result of Defendants' breaches, HTS was deprived of the benefit of the terms of Amit and Barker's employment with HTS and as well as Amit and Barker's respective obligations to deal fairly and in good faith with HTS.

199.    Defendants' conduct, as alleged-above, has caused and will continue to cause HTS substantial injury, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its business.

200.    Defendants' conduct, as-alleged above, was intentional, knowing, willful, malicious, fraudulent, and oppressive. HTS is entitled to an award of exemplary damages and reasonable attorneys' fees.

201.    Upon information and belief, Defendants intend to continue their conduct unless restrained and enjoined by this Court.


## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable by right.


## DEMAND FOR RELIEF

Plaintiff requests that the Court find in its favor and against Defendants, and that the Court grant Plaintiff the following relief:

a.    Awarding damages as described in each of the above claims, in favor of Plaintiff and against Defendants in amounts to be determined at trial;

b. Granting a temporary restraining order, and preliminary and permanent injunction against Defendants, enjoining them from violating their legal and contractual duties to Plaintiff, from accessing, using or disclosing Plaintiff's trade secrets and from any further infringement of Plaintiff's intellectual property;

c. Awarding punitive damages in favor of Plaintiff and against Defendants in an amount to be determined at trial;

d. Awarding Plaintiff pre-judgment and post-judgment interest, and its attorneys' fees, costs and other expenses incurred in this action;

e. Granting Plaintiff such other and further relief as the Court may deem just and proper under the circumstances.

June 24, 2019

RESPECTFULLY SUBMITTED,

*/s/ H. Dickson Burton*

H. Dickson Burton (USB #4004)
James C. Watson (13395)
TRASKBRITT, PC
230 South 500 East, Suite 300
Salt Lake City, UT 84102
Telephone: (801) 532-1922
Fax: (801) 531-9168
HDBurton@traskbritt.com
JCWatson@traskbritt.com

Ariel Reinitz *(Pro Hac Vice to be Filed)*
FISHERBROYLES, LLP
445 Park Avenue, Ninth Floor
New York, NY 10022
(646)494-6909
Ariel.Reinitz@FisherBroyles.com

*Attorneys for Plaintiffs*
*HTS*