Glenn R. Bronson (USB #7362)
GRBronson@traskbritt.com
James C. Watson (USB #13395)
JCWatson@traskbritt.com
TRASKBRITT, PC
230 South 500 East, Suite 300
Salt Lake City, UT 84102
Telephone: (801) 532-1922
Fax: (801) 531-9168

Ariel Reinitz (*admitted Pro Hac Vice*)
Ariel.Reinitz@FisherBroyles.com
R. Mark Halligan (*admitted Pro Hac Vice*)
RMark.Halligan@FisherBroyles.com
FISHERBROYLES, LLP
445 Park Avenue, Ninth Floor
New York, NY 10022
(646)494-6909

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| QUEST SOLUTION, INC.; HTS IMAGE PROCESSING, INC.; HTS (USA) INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> REDLPR, LLC; SAGY AMIT; JEREMY BARKER; RIVERLAND TECHNOLOGIES LLC, <br> *Defendants*. | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS REDLPR, LLC'S, SAGY AMIT'S AND JEREMY BARKER'S MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 2:19-cv-00437-CW-DBP <br><br> District Judge Clark Waddoups <br> Magistrate Judge Dustin B. Pead |

Plaintiffs Quest Solution, Inc., HTS Image Processing, Inc., and HTS (USA) Inc. (collectively, "HTS") submit this memorandum of law in opposition to the Motion for Summary Judgement filed by defendants RedLPR, LLC, Sagy Amit, and Jeremy Barker (ECF Nos. 49-50, hereinafter the "Motion" or "MSJ"). For the reasons described herein, the MSJ should be denied.

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................I

TABLE OF AUTHORITIES .........................................................................................II

INTRODUCTION ......................................................................................................... 1

BACKGROUND AND PROCEDURAL HISTORY.................................................... 3

RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS ................. 4

STANDARD OF REVIEW ......................................................................................... 19

ARGUMENT ............................................................................................................... 20

    I.    THE REDLPR DEFENDANTS' MOTION FAILS BECAUSE THERE ARE NUMEROUS DISPUTES OF MATERIAL FACT AS TO TRADE SECRET MISAPPROPRIATION ....................................................... 20

        A.   HTS Has Sufficiently Identified Its Trade Secrets ........................................ 20

        B.   Defendants Learned of and Used HTS' Software-Related Trade Secrets ..................... 20

        C.   HTS Possesses Trade Secrets Relating to Its Cameras and Computers ........................ 21

        D.   HTS Possesses Trade Secrets Relating to Its Vendors ................................... 23

        E.   HTS Possesses Trade Secrets Relating to Its Customers and Pricing........................... 25

        F.   HTS Took Reasonable Efforts to Protect Its Trade Secrets ........................... 26

        G.   Amit and Barker Were Obligated to Maintain the Confidentiality of HTS' Trade Secrets 28

        H.   Defendants Misappropriated HTS' Trade Secrets ........................................ 29

        I.   Quest Solution Inc. and HTS Image Processing, Inc. Have Standing to Assert Claims Against Defendants........................................................................................ 32

    II.   THE MOTION FAILS BECAUSE THERE ARE DISPUTES OF MATERIAL FACT AS TO BREACH OF FIDUCIARY DUTY WHICH IS NOT PREEMPTED BY THE UTSA ................................................... 32

    III.  THE MOTION FAILS BECAUSE THERE ARE DISPUTES OF MATERIAL FACT AS TO TORTIOUS INTERFERENCE WHICH IS NOT PREEMPTED BY THE UTSA ....................................... 35

    IV.  THE MOTION FAILS BECAUSE THERE ARE DISPUTES OF MATERIAL FACT AS TO UNJUST ENRICHMENT WHICH IS NOT PREEMPTED BY THE UTSA ............................................ 36

    V.   THE MOTION FAILS BECAUSE THERE ARE DISPUTES OF MATERIAL FACT AS TO UNFAIR COMPETITION WHICH IS NOT PREEMPTED BY THE UTSA ........................................... 37

    VI.  THE MOTION FAILS BECAUSE THERE ARE DISPUTES OF MATERIAL FACT AS TO BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ......................................... 37

CONCLUSION........................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adamson v. Multi Cmty. Diversified Servs., Inc.*,
  514 F.3d 1136, 1145 (10th Cir. 2008) ................................................................................. 19

*Anderson v. Liberty Lobby, Inc.*,
  447 U.S. 242, 255 (1986) ..................................................................................................... 19

*Bimbo Bakeries USA, Inc. v. Sycamore*,
  No. 2:13-cv-00749 DN, 2017 U.S. Dist. LEXIS 57861, at *6-7 (D. Utah Mar. 29, 2017) ............. 23, 25

*Burlington N. & Santa Fe Ry. Co. v. Grant*,
  505 F.3d 1013, 1022 (10th Cir. 2007) ................................................................................. 19

*First Am. Title Ins. Co. v. Nw. Title Ins. Agency, LLC*,
  No. 2:15-cv-00229-DN, 2016 U.S. Dist. LEXIS 162893, at *61-62 (D. Utah Nov. 23, 2016) ........ 28, 38

*Hammerton, Inc. v. Heisterman*,
  No. 2:06-CV-00806 TS, 2008 U.S. Dist. LEXIS 38036, at *28 (D. Utah May 8, 2008) ................ 27, 31

*John Bean Techs. Corp. v. B GSE Grp., LLC*,
  No. 1:17-cv-142-RJS-DAO, 2020 U.S. Dist. LEXIS 146261, at *20 (D. Utah Aug. 13, 2020)............ 27

*Rivendell Forest Prods, Ltd. v. Georgia-Pacific Corp.*,
  28 F.3d 1042, 1045 (10th Cir. 1994) ................................................................................... 24

*Rost ex rel. K.C. v. Steamboat Springs RE-2 School Dist.*,
  511 F.3d 1114, 1118-19 (10th Cir. 2008) ............................................................................ 19

*SCO Grp., Inc. v. Novell, Inc.*,
  578 F.3d 1201, 1218 (10th Cir. 2009) ................................................................................. 19

**Statutes**

Fed. R. Civ. P. 56(d) ................................................................................................................ 4

## **INTRODUCTION**

> Doc Brown: *Here's a red-letter date in the history of science, November 5, 1955. Yes, of course, November 5, 1955.*
>
> Marty McFly: *What? I don't get it. What happened?*
>
> Doc: *That was the day I invented time travel. I remember it vividly. I was standing on the edge of my toilet, hanging a clock. The porcelain was wet, I slipped, hit my head on the edge of the sink. And when I came to, I had a revelation. A vision. A picture in my head. A picture of this. **This is what makes time travel possible. The flux capacitor!***
>
> Marty: *The flux capacitor?*
>
> Doc: *It's taken me almost 30 years and my entire family fortune to realize the vision of that day. My god, has it been that long?*
>
>           *- Back To The Future* (Universal Pictures, 1985)

With discovery in this case still ongoing, Defendants prematurely move for summary judgment. As described in HTS' concurrent motion under Rule 56(d), the Court should allow discovery to be completed before ruling on this Motion. But even on the incomplete record of discovery to date, Defendants' Motion fails.

The MSJ hinges on several incredible premises. *First*, Defendants suggest that HTS – a technology pioneer in the license plate recognition (LPR) industry – developed *no* protectible trade secrets during almost 30 years of R&D and business activities.

*Second*, defendants Amit and Barker – both former HTS employees – claim they never had *any obligation whatsoever* to maintain the confidentiality of *any* information they had access to while employed by HTS.

*Third*, Defendants argue that they established their new venture (RedLPR) – which provides identical products to those provided by HTS – without using *any* information

originating from HTS.

Defendants' Motion fails because each of these premises is *false*. Defendants are well aware that HTS developed a body of valuable technical and business trade secrets. And HTS implemented reasonable measures to protect its trade secrets, including by imposing confidentiality obligations on Amit and Barker.

Most notably, Defendants themselves all but admit to misappropriating HTS' trade secrets. RedLPR claims to provide highly accurate LPR algorithms that process images from multiple LPR cameras to identify the "best" image for LPR applications. In a recent public presentation, Defendants' identify this feature as their "flux capacitor" and claim it uniquely differentiates them from other LPR solutions.

Yet, while working for HTS, Defendants described the *same* feature – namely, HTS' 'SeeFusion' algorithm – as being *HTS'* "secret sauce." Defendants also referred to 'SeeFusion' as *HTS'* "flux capacitor" which gave HTS a unique advantage over its competitors.

Notably, RedLPR appears to have taken slides from an HTS presentation (referring to the 'SeeFusion' algorithm) and re-purposed it for RedLPR:

        

**HTS Presentation** (Ex. 1-I at 16)        **RedLPR Presentation** (Ex. 1-P at 1)

As the above slides reflect, RedLPR is, in essence, an entity unlawfully built on decades

of HTS' technical and business efforts.

Ironically, perhaps, through their conduct Defendants *have* achieved a form of time travel: By misappropriating HTS' trade secrets and other valuable information, Defendants avoided *decades* of independent technical and business efforts. By unlawfully building their own business on the fruits of HTS' efforts, Defendants were able to bring identical products to market within *months* of their resignations. If anything, *this* ability – to condense decades of development down to mere months – is RedLPR's true "flux capacitor."

For these reasons, and others presented below, Defendants' MSJ should be denied.

## BACKGROUND AND PROCEDURAL HISTORY

Founded in 1992, HTS is a leader in the license plate recognition ("LPR") industry. HTS' technologies are deployed in over 50 countries, providing automation for traffic, logistics, and security applications.

Over decades of operation, HTS developed numerous proprietary technologies not found in competing products. These technologies include proprietary imaging units, image processing algorithms, software applications, and other technologies that enable HTS to perform accurate license plate recognition under challenging conditions.

HTS also developed and maintained numerous proprietary business plans, documents, and other materials. This information includes detailed internal pricing information reflecting HTS' relationships with its vendors and customers and internal plans and projections regarding prospective business opportunities.

HTS technical and business trade secrets hold tremendous value to HTS. HTS maintained this information confidentially and took reasonable precautions to protect it.

Defendants Amit and Barker are former HTS employees. During their employment, both Amit and Barker had access to HTS' technical and business trade secrets.

After working for HTS for several years, Amit and Barker resigned from HTS and formed RedLPR. Months later, RedLPR began promoting hardware and software products virtually indistinguishable from those offered by HTS.

 In a recent public presentation, RedLPR highlighted certain features – including its purported multi-camera image processing algorithm – as differentiating it from other LPR providers. Notably, while still working for HTS, Amit described the *same* features as HTS' "secret sauce" and the "flux capacitor" that enabled *HTS* to achieve better LPR accuracy than its competitors.

### RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

As detailed in HTS' concurrent motion under Fed. R. Civ. P. 56(d) (incorporated herein by reference), discovery in this case remains ongoing and Defendants' MSJ is thus submitted to be premature. For this reason as well, HTS cannot present numerous facts essential to rebut Defendants' Motion. Nevertheless, even on the incomplete record of discovery to date, the MSJ fails and must be denied.

For purposes of its opposition to the instant motion, HTS responds as follows to the numbered "Statement of Undisputed Material Facts" ("SUMF") presented in the MSJ, without conceding any other facts not specifically enumerated below.

> *1. Amit and Barker's employment agreements with HTS contain no confidentiality obligations and HTS never requested that Amit and Barker retain the confidentiality of any information.*

<u>HTS' Response</u>: Denied. *First*, Both Amit's and Barker's original employment

agreements dictate:

> Upon termination of your employment *you shall* return to the company all equipment, materials and documents given to you by the company or generated during your employment with the company.

ECF Nos. 49-6 at 2 (Amit original employment agreement, exhibit to Amit Decl. in support of MSJ) and 49-37 at 2 (Barker original employment agreement, exhibit to Barker Decl. in support of MSJ) (emphasis added).

*Second*, in early 2018 HTS forwarded updated employment documents to Amit and Barker, including an "HTS USA Inc. Employee Agreement" (the "2018 Employee Agreement") and "HTS USA Inc. Employee Handbook" (the "Employee Handbook"). *See* attached <u>Exhibit 1-A</u>[1] (email from Ben Kemper to Amit and Barker dated February 28, 2018 and accompanying documents).

The 2018 Employee Agreement includes the following provisions:

**2. Confidential Information.**
A. *Company Information*. I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the exclusive benefit of the Company, or to disclose to any person, firm or entity without written authorization of an authorized officer (other than myself), any Confidential Information of the Company. I understand that my unauthorized use or disclosure of Confidential Information during my employment will lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that "Confidential Information" means any non-public information that relates to the actual or anticipated business or research and development of the Company, proprietary information, technical data, formulae, trade secrets or know-how, including, but not limited to, research, business plans, marketing plans, product plans, products, services, suppliers, customer lists and customers (including, but not limited to, customers of the Company on whom I call or with whom I become acquainted during the term of my employment), markets, software, source code, developments, development environment, specifications, flow charts, inventions, operations, procedures, methods, processes, compilations of

---

[1] Unless otherwise indicated, the cited exhibits correspond to those accompanying the enclosed Declaration of Ariel Reinitz (<u>Exhibit 1</u> to this Memorandum).

data, technology, designs, drawings, engineering, devices, hardware configuration information, marketing, finances or other business information.

[...]

B. *Acknowledgments*. I acknowledge that during my employment with the Company, I will have access to Confidential Information, all of which shall be made accessible to me only in strict confidence; that unauthorized disclosure of Confidential Information will damage the Company's business; that Confidential Information would be susceptible to immediate competitive application by a competitor of the Company's; that the Company's business is substantially dependent on access to and the continuing secrecy of Confidential Information; that Confidential Information is novel, unique to the Company and known only to me, the Company

[…]

D. *Third Party Information*. I recognize that the Company may have received and in the future may receive from third parties associated with the Company, e.g., the Company's customers, suppliers, licensors, licensees, partners, or collaborators ("Associated Third Parties") their confidential or proprietary information ("Associated Third Party Confidential Information"). By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties. I agree at all times during my employment with the Company and thereafter, to hold in the strictest confidence, and not to use or to disclose to any person, firm or corporation any Associated Third Party Confidential Information, except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information during my employment will lead to disciplinary action, up to and including immediate termination and legal action by the Company.

[…]

**5. *Returning Company Documents*.** Upon separation from employment with the Company or on demand by the Company during my employment, I will immediately deliver to the Company, and will not keep in my possession, recreate or deliver to anyone else, any and all Company property, including, but not limited to, Confidential Information, Associated Third Party Confidential Information, as well as all devices and equipment belonging to the Company (including computers, handheld electronic devices, telephone equipment, and other electronic devices), Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, photographs, charts, all documents and property, and reproductions of any of the aforementioned items that were developed by me pursuant to my

employment with the Company, obtained by me in connection with my employment with the Company, or otherwise belonging to the Company, its successors or assigns, including, without limitation, those records maintained pursuant to Section 3.C.

*Id.* (emphasis in original).

The "Employee Handbook" further specifies (p. 10):

**Protecting Company Information**. Protecting our Company's confidential information is the responsibility of every employee and we all share a common interest in making sure it is not improperly or accidentally disclosed. Do not discuss the Company's confidential business with anyone who does not work for us. In addition, all employees must strictly observe the terms of the Employee Agreement which was signed at the time of hire.

*Id.* (emphasis in original).

Amit and Barker acknowledged receipt of the 2018 Employee Agreement and the Employee Handbook. Both further completed the accompanying "I9" and "W4" documents. *See, e.g.,* attached Exhibit 1-B (email correspondence between Amit and HTS management on March 14, 2018; Amit: "Please find attached my employment documents signed. Let me know if you need anything else.").

After acknowledging receipt of the 2018 Employee Agreement and the Employee Handbook, Amit and Barker continued working HTS for approximately five months (Amit) and seven months (Barker), respectively. *See, e.g.*, ECF Nos. 50-2 ¶¶ 5, 96 (Amit MSJ Decl., indicating Amit resigned from HTS on August 10, 2018) and 50-22 ¶ 26 (Barker MSJ Decl., indicating Barker resigned from HTS on October 16, 2018).

*Third*, while working for HTS, Amit and Barker received documents and other materials conspicuously designated as confidential. For example, Amit was provided with information regarding HTS' "sales pipeline" from then-CEO John Whiteman with the note "FYI and *of course confidential*." Exhibit 1-C (emphasis added). By way of further example, Exhibit 1-D is

an email sent to both Amit and Barker containing internal HTS company presentations. The attached presentations – HTS' "Roadmap 2018" (Exhibit 1-E) and HTS' "Competitors Comparison 2018" (Exhibit 1-F) – are both prominently designated as "COMPANY SENSITIVE – FOR INTERNAL USE ONLY" on their respective cover pages.

*Fourth*, Amit and Barker acknowledged their confidentiality obligations in correspondence with each other and with other parties. For example, Amit and Barker exchanged numerous documents prominently designated as "Confidential" such as HTS' "2016 Core Price List Jan 12 2016" spreadsheet (the "HTS Pricelist"). *See* Exhibit 1-J, Exhibit 1-K (further discussed below). Similarly, in correspondence with certain customers, Amit sent detailed HTS pricing information prominently designated as "For Internal Use Only" and "Confidential." *See* Exhibit 1-L, Exhibit 1-M, Exhibit 1-N (further discussed below).

> *2. HTS cannot show any non-public information about the cameras and computers it sells from which HTS derives any economic benefit. The manufacturers and technical specifications of the cameras and computers sold by HTS are public information and/or industry knowledge.*

HTS' Response: Denied. Defendants acknowledge Hitron Systems, Inc. ("Hitron") is a camera vendor to HTS. ECF No. 57-2 ¶¶ 26, 30 (Amit MSJ Decl.). And both Hitron and HTS acknowledged the need for an NDA in connection with the discussions between them. *See* enclosed email thread between HTS and Hitron in July 2017 (Exhibit 1-O), where Hitron identifies "NDA - please advise when we can receive the doc for review" as necessary to "mov[e] forward on the LPC cameras." HTS responds offering an "NDA template for your review/signature" and attaches "HTS – NDA.DOC." *Id*.

Amit and Barker were privy to and involved in the design and development of these cameras, as reflected in 100's of emails between HTS and Hitron. Exhibit 1-T shows search

results for the term "Hitron" in emails produced by Defendants, showing hundreds of emails between HTS and Hitron *after* HTS forwarded the referenced NDA.

These communications covered the design, development, configuration, and maintenance of HTS' "N70" and "dual head" cameras. *See, e.g.*, <u>Exhibit 1-U</u> (email between Hitron and HTS – including Amit and Barker – re: camera design and development). Attached to the referenced email is a "project checklist" which specifies numerous design and development activities undertaken by HTS and Hitron in the development of various LPR cameras including HTS' "N70" camera. <u>Exhibit 1-V</u>. These activities include the design, development, and configuration of specific infrared (IR) filters, IR boards, IR LEDs, I/O interfaces and schematics, firmware development, circuit design, alarm triggers, embedded processors / analytics chips, sensors, sun shields, and pole mount adaptors, for HTS' cameras. *Id*. None of this subject matter constitutes "public information" or "industry knowledge."

Other internal HTS documents further reflect that HTS' camera development was not "public information." For example, HTS' "Roadmap 2018" (<u>Ex. 1-E</u>, designated "COMPANY SENSITIVE – FOR INTERNAL USE ONLY") contains:

- detailed internal analysis of HTS' 'slow speed' cameras, including "N50," "N60," and "N70" models;

- analysis of HTS' 'slow speed' cameras with respect to multiple industry 'verticals,' including a detailed itemization of features missing from HTS' current 'slow speed' camera offerings;

- assessments reflecting the importance for HTS to develop and implement enhancements that address the identified missing features in HTS' 'slow speed' cameras, and the complexity involved in such development; and

- the sequence in which HTS planned to develop and implement such

  enhancements to its 'slow speed' cameras.

*Id.*, *e.g.*, in Sections 1.3, 5.2. The "Roadmap 2018" document also contains corresponding

information regarding HTS' high speed and mobile cameras. *Id*. As noted, HTS designated this

information as "for internal use only" and "company sensitive." None of it is believed to be

"public" or industry knowledge."

> *3. HTS has no secrets related to its vendor identities, relationships, or pricing.*

HTS' Response: Denied. HTS maintained several documents containing trade secrets

related to its vendors, relationships and pricing. For example, on January 16, 2017, Amit sent

Barker HTS' "2016 Core Price List Jan 12 2016" spreadsheet (the "HTS Pricelist"). Exhibit 1-J.

The HTS Pricelist (Exhibit 1-K) contains HTS' retail pricing, cost of goods sold ("COGS"),

discounted pricing, and profit margins for specific imaging units, lane controllers, embedded

imaging units, peripherals, controller cabinets, communications peripherals, triggers, power

supplies, illumination units, and profiling sensors, reflecting HTS' relationships and pricing with

respect to multiple vendors including Hitron, MAV, Advantech, Vecow, and ASUS. This

document is prominently designated as "Confidential" in multiple places. *Id*. Other pricing data

Amit and Barker had access to was also designated confidential. *See, e.g.*, Ex. 1-F at 4 (Section

2.1 "Prices").

> *4. Defendants do business with only one HTS vendor and Amit's relationship with that vendor preceded his HTS employment.*

HTS' Response: As detailed in HTS' accompanying motion under Rule 56(d), HTS has

sought discovery regarding Defendants' vendor relationships but has not yet received responsive documents from Defendants on this issue. Thus, HTS cannot yet present facts (which are uniquely in Defendants' possession) essential to rebut Defendants' assertions regarding their vendor relationships.

> *5. Defendants never learned or used any non-public aspects of HTS' software. In any event, RED's software was independently developed by Riverland.*

HTS' Response: Denied. Defendant Amit's original employment agreement lists "[p]rovide input and feedback regarding…new product development" among his job responsibilities. ECF No. 49-6 at 1 (Amit original employment agreement). And both Amit and Barker received documents containing details of confidential, non-public aspects of HTS' software.

Enclosed as Exhibit 1-D is an email sent to both Amit and Barker containing internal HTS presentations. These presentations – HTS' "Roadmap 2018" (Ex. 1-E) and HTS' "Competitors Comparison 2018" (Ex. 1-F) are both designated as "COMPANY SENSITIVE – FOR INTERNAL USE ONLY." And both documents contain substantial *non-public* information regarding HTS' software. For example, these documents provide detailed analysis of HTS' software offerings (including its OCR engine) with respect to multiple industry verticals and describe development plans for software enhancements and new features and products. *See, e.g.*, Ex. 1-E, Sections 1.2, 1.4, 3.1, 3.3, 3.4, 4.1, 5.2.

Additionally, Defendants *did* have detailed knowledge of various proprietary features embodied in HTS' software. For example, in correspondence with HTS customer DESIGNA on October 12, 2017, Amit references HTS' 'SeeFusion' algorithm which provides "the ability to

take multiple images from multiple cameras and automatically identify the best readable image."
Exhibit 1-G. Amit describes the SeeFusion algorithm as "HTS proprietary 'secret sauce' that
makes [HTS'] accuracy rates in the U.S. better than most." *Id*. Amit also refers to the SeeFusion
algorithm as HTS' "Flux-Capacitor," and includes a graphical representation of the 'flux
capacitor' from the *Back to the Future* film. *Id*.

In correspondence with other customers, Amit highlights HTS' unique ability to process
images from infrared and color cameras as a feature that "sets HTS apart" from its competitors.
*See* attached Exhibit 1-H (email to HTS customer Access Control Group). In the same email,
Amit attaches an HTS presentation entitled "LPR – A Holistic View" (the "HTS Presentation").
Exhibit 1-I.

The HTS Presentation includes a slide depicting several HTS' dual camera installations
(with infrared and color cameras). *Id*. at 16. This slide and prominently designates this feature as
HTS' "Secret Sauce" and "Flux Capacitor" (with an image referencing *Back To The Future*). *Id*.

With respect to Defendants' assertions regarding non-moving co-defendant Riverland
(who has only recently been joined and has moved to dismiss – *see* ECF No. 44), HTS'
discovery with respect to Riverland has not yet commenced. And, as outlined in HTS'
accompanying motion under Rule 56(d), HTS has sought discovery regarding Defendants'
dealings with Riverland but has not yet received responsive documents from Defendants on this
issue. Thus, HTS cannot yet present facts (which are uniquely in Defendants' possession)
essential to rebut Defendants' assertions regarding Riverland or Defendants' dealings with
Riverland.

In any event, RedLPR's assertion that its software was developed by Riverland does not
preclude the possibility that such software incorporates HTS' trade secrets. Riverland executed

an NDA with HTS in June 2018. *See* ECF Nos. 57-4 ¶ 14 (Byerly MSJ Decl., describing execution of the NDA between HTS and Riverland) and 49-51 (copy of the NDA). The NDA contemplates HTS and Riverland exchanging "Proprietary Information" including "technical data," "product roadmaps," "software," and "intellectual property," including relating to "camera design." *Id.*

> *6. HTS has no secrets related to its customer identities, relationships, or pricing. These customers are well known and easily identifiable by industry participants.*

HTS' Response: Denied. Numerous aspects of HTS' pricing and customer relationships are maintained confidentially. For example, on January 16, 2017, Amit sent Barker HTS' "2016 Core Price List Jan 12 2016" spreadsheet (the "HTS Pricelist"). Ex. 1-J. The HTS Pricelist is prominently designated "Confidential" in multiple places and includes considerable confidential information regarding HTS' pricing for specific customers and for specific products, as well as detailed cost of goods sold ("COGS") for numerous products, components, and services. Ex. 1-K. Other pricing data Amit and Barker had access to was also designated confidential. *See, e.g.*, Ex. 1-F at 4 (Section 2.1 "Prices").

Additionally, Defendants knew HTS maintained confidential pricing information. For example, in correspondence with one HTS customer, Amit sent an HTS pricing document containing detailed pricing and discount information. Exhibit 1-L. This pricelist is prominently designated as "For Internal Use Only" and "Confidential." Exhibit 1-M. In correspondence with another customer (in reference to the enclosed pricing information), Amit emphasized:

**"PLEASE KEEP THIS PROPOSAL CONFIDENTIAL!"** Exhibit 1-N. (emphasis in original).

*7. RED does business with only five HTS customers and was able to identify these customers using basic industry resources.*

<u>HTS' Response</u>: As detailed in HTS' accompanying motion under Rule 56(d), HTS has sought discovery regarding Defendants' customer relationships but has not yet received responsive documents from Defendants on this issue. Thus, HTS cannot yet present facts (which are uniquely in Defendants' possession) essential to rebut Defendants' assertions regarding their customer relationships.

*8. HTS failed to protect the confidentiality of its alleged trade secrets. Among other things, HTS: (i) did not require vendors, customers, or employees to sign confidentiality agreements; (ii) discussed, memorialized, and disseminated vendor and customer pricing in non-confidential documents; and (iii) freely permitted employees to store HTS files, documents, and information on personal devices without restriction.*

<u>HTS' Response</u>: Denied. As discussed above, HTS *did* utilize confidentiality agreements in its dealings with its employees and vendors. HTS also invoked confidentiality in its communications with customers. HTS did not "freely permit" its employees to do anything and *did* restrict how employees could utilize HTS' documents and other information. ECF Nos. 49-6 at 2 and 49-37 at 2 (Amit/Barker original employment agreements, requiring each to return "all [company]…materials and documents" upon termination).

As also outlined above, in early 2018 HTS forwarded updated employment documents to Amit and Barker, including an the "2018 Employee Agreement" and the "Employee Handbook." <u>Ex. 1-A</u>. These documents include detailed confidentiality provisions. *Id*. Defendants acknowledged receipt of these documents and completed accompanying employment paperwork. <u>Ex. 1-B</u>. They then continued working HTS for approximately five months (Amit) and seven months (Barker), respectively. *See, e.g.*, ECF Nos. 50-2 ¶¶ 5, 96 and 50-22 ¶ 26.

14

As also detailed above, HTS' communications with its vendors were conducted confidentially. For example, in communications with camera vendor Hitron (with whom Defendant RedLPR admits it now works), both Hitron and HTS acknowledged the need for an NDA which HTS sent to Hitron before the discussions progressed. <u>Ex. 1-O</u>.

As noted above, HTS also designated certain information it sent to customers as confidential. *See* <u>Ex. 1-M</u>, <u>Ex. 1-N</u>.

Other internal HTS documents further reflect that HTS maintained its internal information and documents as confidential. *See, e.g.*, <u>Ex. 1-E</u> (HTS' "Roadmap 2018," designated "COMPANY SENSITIVE – FOR INTERNAL USE ONLY").

> *9. Plaintiffs fail to show Defendants used any alleged trade secrets and/or caused any damages. In addition to not identifying any lost customers or sales, Plaintiffs fail to show that any lost sales were due to Defendants' allegedly unlawful conduct as opposed to (i) HTS Management's conduct; or (ii) Defendant's lawful post-employment competition.*

<u>HTS' Response</u>: Denied. Defendant Amit's recent presentation refutes this and shows Defendants use HTS' trade secrets.

In November 2020, Amit gave a detailed 30-minute video presentation of RedLPR's offerings on the "IPVM" website. A recording of the video is available at https://ipvm.com/reports/lpr-f20 (subscription required). <u>Exhibit 1-P</u> includes screenshots of several slides presented by Amit during this presentation (the "RedLPR Presentation").

During the RedLPR Presentation, when presenting the slide with the heading "Multiple cameras increase accuracy" (<u>Ex.1-P</u> at 1) Amit describes that:

> *So what do we do differently?* So we design our own cameras. And we typically use multiple cameras per lane, meaning that we take an infrared camera and we take a color camera. As you can see we also designed a color camera that has while light illumination. So that becomes very useful at

15

> night. And you can see the result at the bottom. So this is the RedLPR
> license plate *and the color image can be read with a color camera then the
> infrared image can be read, and they go into our algorithm and we basically
> pick the best picture out of the best image between the cameras*…

Exhibit 1 ¶ 28 (emphasis added). The referenced slide shows several examples of RedLPR's

multi-camera installations. Ex.1-P at 1. Also attached as Exhibit 1-Q are screenshots from

RedLPR's website depicting other RedLPR installations that utilize the same multi-camera

configurations.

As Amit described during the RedLPR Presentation, RedLPR differentiates itself by

using "multiple cameras per lane" (color and infrared) and processing the license plate images

from each camera through its algorithm which "picks the best picture" among the captured

images. Ex. 1 ¶ 28. The slide Defendants presented when discussing this feature also

prominently designates this feature as RedLPR's "flux capacitor" (an apparent reference to the

component that enabled time travel in the *Back to the Future* films). Ex.1-P at 1, Ex. 1 ¶¶ 15-17.

As detailed above, while working for HTS, Amit notably described the *same* feature as

being *HTS'* "Flux-Capacitor" and the "secret sauce" that differentiated *HTS* from its competitors.

*See, e.g.*, Ex. 1-G (describing HTS' 'SeeFusion' algorithm as the "secret sauce" that "take[s]

multiple images from multiple cameras and automatically identify the best readable image) and

Ex. 1-I at 16 (presenting a near-identical slide to the one used by RedLPR, showing HTS' multi-

camera installations and referring to this feature as HTS' "Secret Sauce" and "Flux Capacitor").

Moreover, as detailed in HTS' accompanying motion under Rule 56(d), HTS has sought

discovery regarding Defendants' use of HTS' trade secrets and the damage caused as a result

(including lost customers and sales) but has not yet received responsive documents from

Defendants on this issue. Thus, HTS cannot yet present facts (which are uniquely in Defendants'

possession) essential to rebut Defendants' assertions regarding the full extent of their

misappropriation of HTS' trade secrets and the resulting damage to HTS.

> *10. Plaintiffs fail to show that Defendants disclosed any alleged trade secrets to Riverland.*

HTS' Response: Defendant Riverland has only recently been joined in this case and has since moved to dismiss. ECF No. 44. As detailed in HTS' accompanying motion under Rule 56(d), HTS has sought discovery regarding Defendants' communications with Riverland but has not yet received responsive documents from Defendants on this issue. Thus, HTS cannot yet present facts (which are uniquely in Defendants' possession) essential to rebut Defendants' assertions regarding their communications with Riverland.

> *11. Plaintiffs fail to show that Amit or Barker disparaged HTS during their employment or that any such alleged disparagement damaged Plaintiffs.*

HTS' Response: Denied. In emails to customers during his employment, Amit disparaged HTS. For example, shortly before his resignation, Amit emailed an HTS customer:

> If it makes you feel any better, you are not the only customer awaiting equipment from HTS…"A Sorrow shared is a Sorrow Halved" type of thing…"
> Personally, this is the worse situation a sales person can be in…

Exhibit 1-R.

Moreover, as detailed in HTS' accompanying motion under Rule 56(d), HTS has sought discovery regarding Defendants' communications concerning HTS but has not received responsive documents from Defendants on this issue. Thus, HTS cannot yet present facts (which are uniquely in Defendants' possession) essential to rebut Defendants' assertions concerning their communications regarding HTS.

> *12. During this litigation, Plaintiffs failed and refused to sufficiently identify any allegedly misappropriated trade secrets.*

HTS' Response: Denied. HTS has provided detailed identification of its trade secrets, including in response to Defendants' interrogatories. These responses specifically describe the trade secrets at issue and identify documents containing such trade secrets. *See, e.g.*, Exhibit 1-S (HTS' interrogatory responses).

> *13. Plaintiffs fail to show that Amit or Barker competed with Plaintiffs while they were employed by HTS.*

HTS' Response: As detailed in HTS' accompanying motion under Rule 56(d), HTS has sought discovery regarding Defendants' activities while employed by HTS but has not received responsive documents from Defendants on this issue. Thus, HTS cannot yet present facts (which are uniquely in Defendants' possession) essential to rebut this assertion.

> *14. Amit and Barker were never employed by Quest or HTS Image.*

HTS' Response: Both Amit and Barker's original employment agreements (with HTS (USA), Inc. d/b/a HTS Americas) specify various professional responsibilities and obligations with respect to Hi-Tech Solutions Ltd. ("HTS LTD"), then the parent company of HTS (USA), Inc. ECF Nos. 49-6 (Amit original employment agreement) and 49-37 (Barker original employment agreement). HTS Image Processing, Inc. subsequently acquired HTS (USA), Inc. and certain assets of HTS LTD. ECF No. 57-2 ¶ 75. Quest Solution, Inc. then acquired HTS Image Processing, Inc. *See id.* and ECF No. 49-25.

## STANDARD OF REVIEW

"Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Rost ex rel. K.C. v. Steamboat Springs RE-2 School Dist.*, 511 F.3d 1114, 1118-19 (10th Cir. 2008) (quotations and citation omitted).

"A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Schutz v. Thorne*, 415 F.3d 1128, 1132 (10th Cir. 2005).  The burden of proving the nonexistence of a genuine issue of material fact is on the moving party.  *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008).

"When considering a motion for summary judgment, the court must not weigh evidence or assess credibility." *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1022 (10th Cir. 2007) (concluding that "'[c]redibility facts are jury functions, not those of a judge'") (quoting *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 255 (1986)).  And the Court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Schutz*, 415 F.3d at 1132.  "If the evidence presented on a dispositive issue is subject to conflicting, reasonable interpretations, summary judgment is improper." *SCO Grp., Inc. v. Novell, Inc.*, 578 F.3d 1201, 1218 (10th Cir. 2009).

## ARGUMENT

I.   **The RedLPR Defendants' Motion Fails Because There Are Numerous Disputes of Material Fact as to Trade Secret Misappropriation**

Defendants' Motion fails because numerous aspects of HTS' trade secret

misappropriation claims are disputed.

### A.  HTS Has Sufficiently Identified Its Trade Secrets

HTS has provided detailed identification of its trade secrets, including in response to

Defendants' interrogatories. These responses specifically describe the trade secrets at issue and

identify documents containing such trade secrets. *See, e.g.,* HTS' Response to SUMF (above) ¶

12 and <u>Ex. 1-S</u> (HTS' interrogatory responses).

### B.  Defendants Learned of and Used HTS' Software-Related Trade Secrets

Defendants Amit and Barker had detailed knowledge of various proprietary features

embodied in HTS' software. *See* HTS' Response to SUMF (above) ¶ 5.

For example, in various communications and presentations, Amit references HTS'

'SeeFusion' algorithm which provides "the ability to take multiple images from multiple cameras

and automatically identify the best readable image." <u>Ex. 1-G</u>. Amit describes the SeeFusion

algorithm as "HTS proprietary 'secret sauce' that makes [HTS'] accuracy rates in the U.S. better

than most." *Id*. Amit also refers to the SeeFusion algorithm as HTS' "Flux-Capacitor." *Id*.

In correspondence with other customers, Amit highlights HTS' unique ability to process

images from infrared and color cameras as a feature that "sets HTS apart" from its competitors.

<u>Ex. 1-H</u>. And an attached presentation includes a slide depicting several HTS' multi-camera

installations (with infrared and color cameras), identifying this feature as HTS' "Secret Sauce"

and "Flux Capacitor" (with an image referencing *Back to the Future*). <u>Ex. 1-I</u> at 16.

Defendant Amit's original employment agreement lists "[p]rovide input and feedback

regarding…new product development" among his job responsibilities. ECF No. 49-6 at 1 (Amit

original employment agreement). And both Amit and Barker received documents containing details of confidential, non-public aspects of HTS' software.

For example, Both Amit and Barker received internal HTS presentations including HTS' "Roadmap 2018" (Ex. 1-E, designated "COMPANY SENSITIVE – FOR INTERNAL USE ONLY"). This presentation contains substantial *non-public* information regarding HTS' software. For example, the Roadmap 2018 provides detailed analysis of HTS' software offerings (including its OCR engine) with respect to multiple industry verticals and describes development plans for software enhancements and new features and products. *See, e.g.*, *id*. Sections 1.2, 1.4, 3.1, 3.3, 3.4, 4.1, 5.2.

Accordingly, Defendants *did* learn of HTS' software-related trade secrets. And, as further described below, Defendants used these software-related trade secrets, including by offering software embodying HTS' 'SeeFusion' algorithm which Defendants themselves acknowledge is *HTS'* "secret sauce" and "flux capacitor."

At minimum, this evidence creates a genuine dispute of material fact as to Defendants' knowledge and use of HTS' software-related trade secrets, sufficient to defeat Defendants' Motion.

### C.  HTS Possesses Trade Secrets Relating to Its Cameras and Computers

Defendants acknowledge Hitron is a camera vendor to HTS. ECF No. 57-2 ¶¶ 26, 30. And both Hitron and HTS acknowledged the need for an NDA in connection with the technical discussions between them concerning camera design and development. *See, e.g.,* HTS' Response to SUMF (above) ¶ 2 and Ex. 1-O.

Amit and Barker were privy to and involved in the design and development of these cameras, as reflected in hundreds of emails between HTS and Hitron. Ex. 1-T. These communications covered the design, development, configuration, and maintenance of HTS'

"N70" and "dual head" cameras. *See, e.g.*, Exs. 1-U, 1-V ("project checklist" specifying design and development activities undertaken by HTS and Hitron in the development of LPR cameras including HTS' "N70" camera). These activities include the design, development, and configuration of specific infrared (IR) filters, IR boards, IR LEDs, I/O interfaces and schematics, firmware development, circuit design, alarm triggers, embedded processors / analytics chips, sensors, sun shields, and pole mount adaptors, for HTS' cameras. *Id*. None of this subject matter constitutes "public information" or "industry knowledge."

Other internal HTS documents further reflect that HTS' camera development was not "public information." For example, HTS' "Roadmap 2018" (Ex. 1-E, designated "COMPANY SENSITIVE – FOR INTERNAL USE ONLY") contains:

- detailed internal analysis of HTS' 'slow speed' cameras, including "N50," "N60," and "N70" models;

- analysis of HTS' 'slow speed' cameras with respect to multiple industry 'verticals,' including a detailed itemization of features missing from HTS' current 'slow speed' camera offerings;

- assessments reflecting the importance for HTS to develop and implement enhancements that address the identified missing features in HTS' 'slow speed' cameras, and the complexity involved in such development; and

- the sequence in which HTS planned to develop and implement such enhancements to its 'slow speed' cameras.

*Id*., *e.g.*, in Sections 1.3, 5.2. The "Roadmap 2018" document also contains corresponding information regarding HTS' high speed and mobile cameras. *Id*. As noted, HTS designated this information as "for internal use only" and "company sensitive." None of it is believed to be

"public" or industry knowledge."

Accordingly, HTS *does* have protectible trade secrets relating to its cameras and computers. At minimum, the referenced evidence creates a genuine dispute of material fact as to HTS' possession of trade secrets relating to its cameras and computers, sufficient to defeat Defendants' Motion.

### D.  HTS Possesses Trade Secrets Relating to Its Vendors

 HTS maintained several documents containing trade secrets related to its vendors, relationships and pricing. *See* HTS' Response to SUMF (above) ¶ 3. For example, HTS' "2016 Core Price List Jan 12 2016" spreadsheet (the "HTS Pricelist") contains HTS' retail pricing, cost of goods sold ("COGS"), discounted pricing, and profit margins for specific imaging units, lane controllers, embedded imaging units, peripherals, controller cabinets, communications peripherals, triggers, power supplies, illumination units, and profiling sensors, reflecting HTS' relationships and pricing with respect to multiple vendors including Hitron, MAV, Advantech, Vecow, and ASUS. Ex. 1-K. This document is prominently designated as "Confidential" in multiple places. *Id*. Other pricing data Defendants had access to was also designated confidential. *See, e.g.*, Ex. 1-F at 4 (Section 2.1 "Prices").

Defendants claim that the identities of HTS' vendors are "well-known" and suggest this precludes HTS possessing any vendor-related trade secrets. MSJ at 25-27. Defendants miss the point. "[A] trade secret can be a 'compilation' that derives independent value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." *Bimbo Bakeries USA, Inc. v. Sycamore*, No. 2:13-cv-00749 DN, 2017 U.S. Dist. LEXIS 57861, at *6-7 (D. Utah Mar. 29, 2017) "A compilation can be made up of known elements, if the combination itself is outside the general knowledge and not ascertainable by proper means." *Id*.

Here, the HTS Pricelist constitutes a protectible compilation which is valuable to HTS and is not known to others who can obtain value from it (e.g., competing LPR providers). Even if the HTS Pricelist includes certain "well-known" elements such as the names of various vendors, it contains considerable non-public information including HTS' COGS, profit margins, discounted pricing, and other *internal* HTS information.

In any event, this document – reflecting numerous aspects of HTS' business relationships with vendors and customers over years of dealings – constitutes a protectible compilation which is not known and could not be readily ascertained by the public. "The Tenth Circuit has been clear that when the plaintiff asserts trade secret protection under a compilation theory, an analysis of the individual trade secret components in isolation is improper." *Id.* (citing *Rivendell Forest Prods, Ltd. v. Georgia-Pacific Corp.*, 28 F.3d 1042, 1045 (10th Cir. 1994)).

The same holds for HTS' Sales Pipeline. *See* MSJ at 7 and Ex. A22 to Amit MSJ Decl. (ECF No. 50-13). The Sales Pipeline aggregates detailed information relating to over 100 LPR projects HTS was attempting to secure. This information includes considerable *non-public* information relating to *internal* assessments HTS computed relating to each project. In any event, the Sales Pipeline is a protectible trade secret because it constitutes a compilation which is not known and could not be readily ascertained by the public. This information held significant value to HTS – as reflected in the dollar amounts associated with the various listed projects – and was not known to others who can obtain value from it (*e.g.*, competing LPR providers).

Accordingly, HTS *does* have protectible trade secrets relating to its vendors. At minimum, the above-identified evidence creates a genuine dispute of material fact as to HTS' possession of trade secrets relating to its vendors, sufficient to defeat Defendants' Motion.

### E.  HTS Possesses Trade Secrets Relating to Its Customers and Pricing

Numerous aspects of HTS' pricing and customer relationships are maintained confidentially. *See* HTS' Response to SUMF (above) ¶ 6. For example, HTS' "2016 Core Price List Jan 12 2016" spreadsheet (the "HTS Pricelist") is prominently designated as "Confidential" in multiple places . Ex. 1-K. The "HTS Pricelist includes considerable confidential information regarding HTS' pricing for specific customers and for specific products, as well as detailed cost of goods sold ("COGS") for numerous products, components, and services. *Id. See also* Ex. 1-F at 4 (Section 2.1 "Prices") (additional pricing data designated as confidential).

As outlined above, the HTS Pricelist constitutes a protectible compilation which is valuable to HTS and is not known to others who can obtain value from it. Even if the HTS Pricelist includes certain "well-known" elements such as the names of various customers, it contains considerable non-public information including HTS' COGS, profit margins, discounted pricing, and other internal HTS information. In any event, this compilation of information – reflecting numerous aspects of HTS' business relationships with numerous vendors and customers over years of dealings – constitutes a protectible compilation which is not known and could not be readily ascertained by the public. "[W]hen the plaintiff asserts trade secret protection under a compilation theory, an analysis of the individual trade secret components in isolation is improper." *Bimbo Bakeries USA, Inc.* U.S. Dist. LEXIS 57861, at *6-7.

Additionally, Defendants' own correspondence reflects their knowledge that HTS maintained confidential pricing information. For example, in correspondence with various HTS customers, Amit sent HTS pricing documents containing detailed pricing and discount information and prominently designated as "For Internal Use Only" and "Confidential." Exs. 1-L, 1-M. In correspondence other customers regarding pricing information, Amit emphasized: "**PLEASE KEEP THIS PROPOSAL CONFIDENTIAL!**" Ex. 1-N.

Accordingly, HTS *does* have protectible trade secrets relating to its customers and pricing. At minimum, the above-identified evidence creates a genuine dispute of material fact as to HTS' possession of trade secrets relating to its customers and pricing, sufficient to defeat Defendants' Motion.

### F.  HTS Took Reasonable Efforts to Protect Its Trade Secrets

HTS utilized confidentiality agreements in its dealings with its employees and vendors. HTS also invoked confidentiality in its communications with customers. *See* HTS' Response to SUMF (above) ¶¶ 1, 6, 8.

With respect to Amit and Barker, their original employment agreements obligate them to return "all [company]…materials and documents" upon termination." ECF Nos. 49-6 at 2 and 49-37 at 2.

Additionally, in early 2018 HTS forwarded updated employment documents to Amit and Barker, including an the "2018 Employee Agreement" and the "Employee Handbook." Ex. 1-A. These documents include detailed confidentiality provisions. *Id*. Amit and Barker acknowledged receipt of these documents and completed accompanying employment paperwork. Ex. 1-B. Amit and Barker then continued working HTS for approximately five months (Amit) and seven months (Barker), respectively. *See, e.g.*, ECF Nos. 50-2 ¶¶ 5, 96 and 50-22 ¶ 26.

As also detailed above, HTS' communications with its vendors were conducted confidentially. For example, in communications with camera vendor Hitron, both Hitron and HTS acknowledged the need for an NDA which HTS sent to Hitron before discussions progressed. Ex. 1-O.

As noted above, HTS also designated certain information it sent to customers as confidential. *See* Ex. 1-M, Ex. 1-N.

Other internal HTS documents further reflect that HTS maintained its internal

information and documents as confidential. *See, e.g.*, Ex. 1-E (HTS' "Roadmap 2018,"

designated "COMPANY SENSITIVE – FOR INTERNAL USE ONLY").

Defendants argue that HTS did not take "adequate precautions" to protect its trade

secrets. MSJ at 28. However, "efforts to maintain the secrecy of a trade secret need only be

reasonable under the circumstances." *John Bean Techs. Corp. v. B GSE Grp., LLC*, No. 1:17-cv-

142-RJS-DAO, 2020 U.S. Dist. LEXIS 146261, at *20 (D. Utah Aug. 13, 2020) (quotations

omitted). "[R]easonable efforts does not mean all conceivable efforts, nor are heroic measures

required. Thus, a plaintiff can meet this requirement even though a defendant manages to point

out aspects of plaintiff's procedures that could have been stronger." *Id*. (cleaned up) (finding

reasonable a plaintiff's use of various proprietary notices, company policies, and confidentiality

disclaimers, provisions, and agreements).[2]

Here, HTS utilized proprietary notices, company policies, and confidentiality disclaimers,

provisions, and agreements in its dealings with its employees, vendors, and customers, as

outlined above. These efforts were eminently reasonable under the circumstances. In any event,

the above-referenced evidence creates a question of fact as to the reasonableness of these

precautions, sufficient to defeat Defendants' Motion. "At bottom, Defendants' arguments

amount to claiming [plaintiffs] could have implemented stronger measures to protect [its] trade

secrets. But if a plaintiff were required to prove it could do nothing more to protect its trade

secrets to establish it took reasonable efforts to maintain their secrecy, plaintiffs would rarely, if

---

[2] In any event, "the presence of an express confidentiality or non-disclosure agreement is not
necessarily required for a trade secret owner's efforts to be reasonable under the circumstances.
In fact, Utah courts expressly allow a trade secret misappropriation action to proceed where the
secret was conveyed to the defendant under an implied agreement limiting disclosure."
*Hammerton, Inc. v. Heisterman*, No. 2:06-CV-00806 TS, 2008 U.S. Dist. LEXIS 38036, at *28
(D. Utah May 8, 2008) (quotations omitted).

ever, prevail on a [trade secret misappropriation] claim." *Id*.

### G. Amit and Barker Were Obligated to Maintain the Confidentiality of HTS' Trade Secrets

Amit and Barker did have confidentiality obligations to HTS. *See* HTS' Response to SUMF (above) ¶ 1.

Amit and Barker's original employment agreements obligate them to return "all [company]…materials and documents" upon termination." ECF Nos. 49-6 at 2 and 49-37 at 2. And in early 2018 HTS forwarded updated employment documents to Amit and Barker, including an the "2018 Employee Agreement" and the "Employee Handbook." Ex. 1-A. These documents include detailed confidentiality provisions. *Id*. Amit and Barker acknowledged receipt of these documents and completed accompanying employment paperwork. Ex. 1-B. Amit and Barker then continued working HTS for approximately five months (Amit) and seven months (Barker), respectively. *See, e.g.*, ECF Nos. 50-2 ¶¶ 5, 96 and 50-22 ¶ 26.

"Documents such as the Employee Handbook… can create contractual obligations[.]" *First Am. Title Ins. Co. v. Nw. Title Ins. Agency, LLC*, No. 2:15-cv-00229-DN, 2016 U.S. Dist. LEXIS 162893, at *61-62 (D. Utah Nov. 23, 2016). "[T]he employee's performance of service pursuant to the employer's offer constitutes both the employee's acceptance of the offer and the employee's consideration for the contract. In short, the employee's retention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employment supplies the necessary consideration for the offer." *Id*. (cleaned up).

Here, Amit and Barker received the 2018 Employee Agreement and the Employee Handbook, acknowledged receipt of these documents, completed related employment paperwork, and then continued working for HTS for substantial periods of time. This conduct

28

"constitutes [Amit's and Barker's] acceptance" of HTS' offer. *Id*. The confidentiality obligations

contained in the 2018 Employee Agreement and the Employee Handbook are thus binding on

Amit and Barker.

Additionally, while working for HTS, Defendants received documents and other

materials conspicuously designated as confidential. For example, Amit was provided with

information regarding HTS' "sales pipeline" from then-CEO John Whiteman with the note "FYI

and *of course confidential*." Ex. 1C (emphasis added). By way of further example, Ex. 1-D is an

email sent to both Amit and Barker containing internal HTS company presentations. The

attached presentations – HTS' "Roadmap 2018" (Ex. 1-E) and HTS' "Competitors Comparison

2018" (Exhibit 1-F) – are both prominently designated as "COMPANY SENSITIVE – FOR

INTERNAL USE ONLY."

And Defendants also acknowledged their confidentiality obligations in correspondence

with each other and with other parties. For example, Amit and Barker exchanged numerous

documents prominently designated as "Confidential" such as HTS' "2016 Core Price List Jan 12

2016" spreadsheet (the "HTS Pricelist"). Exs. 1-J, 1-K. Similarly, in correspondence with certain

customers, Amit sent detailed HTS pricing information prominently designated as "For Internal

Use Only" and "Confidential." Exs. 1-L, 1-M, 1-N.

Accordingly, Amit and Barker *were* obligated to maintain the confidentiality of HTS'

trade secrets. At minimum, the above-identified evidence creates a genuine dispute of material

fact as to Amit's and Barker's obligations to maintain the confidentiality of HTS' trade secrets,

sufficient to defeat Defendants' Motion.

### H.  Defendants Misappropriated HTS' Trade Secrets

Defendants *did* misappropriate HTS' trade secrets. *See* HTS' Response to SUMF

(above) ¶ 9. For example, Amit's recent presentation on the IPVM website shows Defendants

use HTS' trade secrets.

During the RedLPR Presentation in November 2020, Amit presented a slide titled

"Multiple cameras increase accuracy" (Ex.1-P at 1) and explained:

> *So what do we do differently?* So we design our own cameras. And we typically use multiple cameras per lane, meaning that we take an infrared camera and we take a color camera. As you can see we also designed a color camera that has while light illumination. So that becomes very useful at night. And you can see the result at the bottom. So this is the RedLPR license plate *and the color image can be read with a color camera then the infrared image can be read, and they go into our algorithm and we basically pick the best picture out of the best image between the cameras…*

Exhibit 1 ¶ 28 (emphasis added). The referenced slide shows several examples of RedLPR's

multi-camera installations (Ex. 1-Q shows further examples of such installations).

As Amit described during the RedLPR Presentation, RedLPR differentiates itself by

using "multiple cameras per lane" (color and infrared) and processing the license plate images

from each camera through its algorithm which "picks the best picture" among the captured

images. Ex. 1 ¶ 28. The slide Defendants presented when discussing this feature also

prominently designates this feature as RedLPR's "flux capacitor."[3]

Notably, while working for HTS, Amit described the ***same*** feature as being ***HTS'*** "Flux-

Capacitor" and the "secret sauce" that differentiated ***HTS*** from its competitors. *See, e.g.*, Ex. 1-G

(describing HTS' 'SeeFusion' algorithm as the "secret sauce" that "take[s] multiple images from

multiple cameras and automatically identify the best readable image) and Ex. 1-I at 16

(presenting a near-identical slide to the one used by RedLPR, showing HTS' multi-camera

installations and prominently referring to this features as HTS' "Secret Sauce" and "Flux

_____

[3] During the RedLPR Presentation, Amit further emphasized that this feature enhanced the accuracy of RedLPR's license plate recognition (LPR) capabilities. *See, e.g.*, Ex. 1-P at 2 ("What separates the Men from the Boys? A. Live Demonstration – **Accuracy**") (emphasis in original).

Capacitor").

A side-by-side comparison of the referenced slide from the HTS Presentation and the one used by Amit in the RedLPR Presentation is illustrative:

 

**HTS Presentation** (<u>Ex. 1-I</u> at 16)          **RedLPR Presentation** (<u>Ex. 1-P</u> at 1)

RedLPR's identification of the <u>same algorithm</u> that *Amit himself* previously identified as HTS' "secret sauce" and "flux capacitor" is textbook evidence of misappropriation. RedLPR's use of the same slides and terminology (down to the *Back To The Future* references) further underscores this claim. In any event, this evidence at minimum creates a genuine dispute of material fact as to Defendants' misappropriation of HTS' trade secrets, sufficient to defeat Defendants' Motion.[4]

---

[4] Moreover, "[i]n the absence of direct evidence, courts generally allow use of circumstantial evidence to prove misappropriation of trade secrets because requiring direct evidence would foreclose most trade-secret claims from reaching the jury [as] corporations rarely keep direct evidence of their use ready for another party to discover." *Hammerton, Inc. v. Heisterman*, 2008 U.S. Dist. LEXIS 38036, at *32. "Thus, a plaintiff may prove use of its trade secrets by showing (1) access by the defendant to the trade secret and (2) similarity in the respective designs or products of the defendant and the trade secret owner." As detailed above, HTS has shown Defendants' access to its trade secrets and the similarities between HTS and RedLPR's products. This is sufficient to create a genuine dispute of materials fact regarding misappropriation, sufficient to defeat Defendants' Motion.

I.   **Quest Solution Inc. and HTS Image Processing, Inc. Have Standing to Assert Claims Against Defendants**

Defendants' suggest that Quest Solution Inc. and HTS Image Processing, Inc. lack standing to assert trade secret claims against them because these entities have "no relationship with Amit and Barker." MSJ at 31. Yet both Amit and Barker's original employment agreements (with HTS (USA), Inc. d/b/a HTS Americas) specify various professional responsibilities and obligations with respect to Hi-Tech Solutions Ltd. ("HTS LTD"), then the parent company of HTS (USA), Inc. ECF Nos. 49-6 (Amit original employment agreement) and 49-37 (Barker original employment agreement). HTS Image Processing, Inc. subsequently acquired HTS (USA), Inc. and certain assets of HTS LTD. ECF No. 57-2 ¶ 75. Quest Solution, Inc. then acquired HTS Image Processing, Inc. *See id.* and ECF No. 49-25. Accordingly, there exists, at minimum a genuine dispute of material fact as to whether Defendants' misappropriation of HTS' trade secrets is actionable by Quest Solution Inc. and/or HTS Image Processing, Inc., sufficient to defeat Defendants' Motion. The same holds regarding the other claims in this case.

II.   **The Motion Fails Because There Are Disputes of Material Fact as to Breach of Fiduciary Duty Which is Not Preempted by the UTSA**

Defendants argue that summary judgment is appropriate as to HTS' breach of fiduciary duty claim because, they claim, "Plaintiffs cannot show any disparagement." MSJ at 32. But Defendants *did* disparage HTS. Shortly before his resignation, Amit emailed HTS customers:

> If it makes you feel any better, you are not the only customer awaiting equipment from HTS…"A Sorrow shared is a Sorrow Halved" type of thing…"
> Personally, this is the worse situation a sales person can be in…

Ex. 1-R. This, at minimum, creates a genuine dispute of material fact as to Defendants' breach of their fiduciary duties, sufficient to defeat Defendants' Motion.

Defendants also suggest that HTS' breach of fiduciary duty claims are preempted by its trade secret misappropriation claims. In doing so, Defendants misstate the substance of HTS' breach of fiduciary duty claim, which explicitly encompasses non-trade secret subject matter. *See, e.g.*, ECF No. 39 ¶¶ 177, 180 (Defendants "owed and continue[] to owe HTS a fiduciary duty to not steal, misappropriate or convert HTS'… property and other assets of HTS."). *See also id.* ¶ 184:

> [T]he fiduciary duties and other obligations owed by Defendants Amit and Barker to HTS required that Amit and Barker, in the performance of their duties for HTS, to refrain, *inter alia*, from: pursuing private business interests that conflict with business interests of HTS, deriving a personal profit at the expense of HTS, doing anything that might waste, or in any way diminish the value of, the… property, or any other assets of HTS, usurping for their own benefit or advantage business opportunities rightly belonging to HTS, acquiring, converting or misappropriating property, assets or interests in which HTS has an interest or a reasonable expectation of such interest, including… property, assets, or business opportunities, interfering with the conduct of the business of HTS, including the relationship between HTS and its customers, partners and contacts, and engaging individually or collectively in a business or endeavor which competes with HTS and violates HTS' legal rights and its rights in HTS'… property and other assets of HTS.

Accordingly, contrary to Defendants' assertion, HTS' breach of fiduciary duty claims are *not* "dependent" on its trade secret misappropriation claims, and are thus not preempted.

Evidence of Defendants' misuse of HTS' non-trade secret property (in breach of their fiduciary duties) is also evident from other slides presented during the RedLPR Presentation described above. Several of the slides used by Defendants in the RedLPR Presentation appear to be copied almost *word-for-word* from the HTS Presentation.

For example:



HTS Presentation (Ex. 1-I at 2)



RedLPR Presentation (Ex. 1-P at 3)



HTS Presentation (Ex. 1-I at 4)

RedLPR Presentation (Ex. 1-P at 4)



HTS Presentation (Ex. 1-I at 15)



RedLPR Presentation (Ex. 1-P at 5)



**HTS Presentation** (Ex. 1-I at 27)          **RedLPR Presentation** (Ex. 1-P at 6)

This, at minimum, creates a genuine dispute of material fact as to Defendants' breach of their fiduciary duties, sufficient to defeat Defendants' Motion.

Moreover, as outlined in HTS' accompanying motion under Rule 56(d), HTS has sought discovery regarding Defendants' communications concerning HTS but has not received responsive documents from Defendants on this issue. Thus, HTS cannot yet present facts (which are uniquely in Defendants' possession) essential to rebut this assertion.

III.   **The Motion Fails Because There Are Disputes of Material Fact as to Tortious Interference Which is Not Preempted by the UTSA**

Defendants argue that HTS' tortious interference claims are preempted by its trade secret misappropriation claims. MSJ at 36. In doing so, Defendants misstate the substance of HTS' tortious interference claims, which explicitly encompasses non-trade secret subject matter. *See, e.g.*, ECF No. 39 ¶ 196 (Defendants "intentionally interfered… with [HTS'] relationships by… operating and promoting RedLPR and using HTS'… property to develop and promote products and services virtually indistinguishable from those provided by HTS…"), ¶ 197 (Defendants… intentionally interfered and continue to interfere with [HTS'] relationships by communicating

knowingly false, defamatory information to HTS' existing and prospective customers regarding HTS' management, operations, and financial position."). Accordingly, HTS' tortious interference claims do *not* "rely" on its trade secret misappropriation claims and are thus not preempted.

Moreover, as outlined in Section III (above), Defendants' unlawfully used HTS' non-trade secret property to develop and promote products and services virtually indistinguishable from those provided by HTS (as reflected in the slides presented during the RedLPR Presentation described above, which appear to be copied directly from the HTS Presentation). And Defendants concede they do business with at least five HTS customers. ECF No. 57-2 ¶ 51 (Amit MSJ Decl.). This, at minimum, creates a genuine dispute of material fact as to Defendants' tortious interference with HTS' relationships, sufficient to defeat Defendants' Motion.

Moreover, as outlined in HTS' accompanying motion under Rule 56(d), HTS has sought discovery regarding Defendants' communications concerning HTS but has not received responsive documents from Defendants on this issue. Thus, HTS cannot yet present facts (which are uniquely in Defendants' possession) essential to rebut this assertion.

IV.     **The Motion Fails Because There Are Disputes of Material Fact as to Unjust Enrichment Which is Not Preempted by the UTSA**

Defendants argue that HTS' unjust enrichment claims are preempted by its trade secret misappropriation claims. MSJ at 37-38. In doing so, Defendants misstate the substance of HTS' unjust enrichment claims, which encompass non-trade secret subject matter. *See, e.g.*, ECF No. 39 ¶ 207 ("Defendants…have unlawfully taken and retained from HTS the value of its… existing and prospective business relationships, and other property, without just compensation to HTS."). Accordingly, HTS' unjust enrichment claims are *not* "predicated on" on its trade secret misappropriation claims and are thus not preempted.

Moreover, as outlined in HTS' accompanying motion under Rule 56(d), HTS has sought discovery regarding Defendants' activities concerning HTS' property but has not received responsive documents from Defendants on this issue. Thus, HTS cannot yet present facts (which are uniquely in Defendants' possession) essential to rebut this assertion.

## V.  The Motion Fails Because There Are Disputes of Material Fact as to Unfair Competition Which is Not Preempted by the UTSA

Defendants argue that HTS' unfair competition claims are preempted by its trade secret misappropriation claims. MSJ at 38-39. In doing so, Defendants misstate the substance of HTS' unfair competition claims, which encompass non-trade secret subject matter. *See, e.g.*, ECF No. 39 ¶ 213 ("HTS has invested substantial labor, skill, and expenditures in developing its valuable property rights and benefits in… other valuable assets."). Accordingly, HTS' unfair competition claims are *not* reliant on its trade secret misappropriation claims and are thus not preempted.

Moreover, as outlined in HTS' accompanying motion under Rule 56(d), HTS has sought discovery regarding Defendants' activities concerning HTS' property but has not received responsive documents from Defendants on this issue. Thus, HTS cannot yet present facts (which are uniquely in Defendants' possession) essential to rebut this assertion.

## VI.  The Motion Fails Because There Are Disputes of Material Fact as to Breach of Implied Covenant of Good Faith and Fair Dealing

Defendants argue that HTS' claims for breach of the implied covenant of good faith and fair dealing fail because – Defendants claim – Amit and Barker's agreements with HTS' contain no confidentiality obligations. This premise is *false*.

As outlined in detail above, both Amit's and Barker's original employment agreements dictate contained confidentiality obligations to HTS. *See* HTS' Response to SUMF (above) ¶ 1,

ECF Nos. 49-6 at 2 and 49-37 at 2 ("Upon termination of your employment *you shall* return to the company all equipment, materials and documents given to you by the company or generated during your employment with the company.") (emphasis added).

And in early 2018 HTS forwarded updated employment documents to Amit and Barker, including an the "2018 Employee Agreement" and the "Employee Handbook." Ex. 1-A. These documents include detailed confidentiality provisions. *Id*. Amit and Barker acknowledged receipt of these documents and completed accompanying employment paperwork. Ex. 1-B. Amit and Barker then continued working HTS for approximately five months (Amit) and seven months (Barker), respectively. *See, e.g.*, ECF Nos. 50-2 ¶¶ 5, 96 and 50-22 ¶ 26.

"Documents such as the Employee Handbook… can create contractual obligations[.]" *First Am. Title Ins. Co. v. Nw. Title Ins. Agency, LLC*, No. 2:15-cv-00229-DN, 2016 U.S. Dist. LEXIS 162893, at *61-62 (D. Utah Nov. 23, 2016). "[T]he employee's performance of service pursuant to the employer's offer constitutes both the employee's acceptance of the offer and the employee's consideration for the contract. In short, the employee's retention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employment supplies the necessary consideration for the offer." *Id*. (cleaned up).

Here, Amit and Barker received the 2018 Employee Agreement and the Employee Handbook, acknowledged receipt of these documents, completed related employment paperwork, and then continued working for HTS for substantial periods of time. This conduct "constitutes [Amit's and Barker's] acceptance" of HTS' offer. *Id*. The confidentiality obligations contained in the 2018 Employee Agreement and the Employee Handbook are thus binding on Amit and Barker.

Moreover, while working for HTS, Amit and Barker received documents and other materials conspicuously designated as confidential. For example, Amit was provided with information regarding HTS' "sales pipeline" from then-CEO John Whiteman with the note "FYI and *of course confidential*." Ex. 1-C (emphasis added). By way of further example, Ex. 1-D is an email sent to both Amit and Barker containing internal HTS company presentations. The attached presentations – HTS' "Roadmap 2018" (Ex. 1-E) and HTS' "Competitors Comparison 2018" (Exhibit 1-F) – are both prominently designated as "COMPANY SENSITIVE – FOR INTERNAL USE ONLY."

Additionally, Amit and Barker acknowledged their confidentiality obligations in correspondence with each other and with other parties. For example, Amit and Barker exchanged numerous documents prominently designated as "Confidential" such as HTS' "2016 Core Price List Jan 12 2016" spreadsheet (the "HTS Pricelist"). Exs. 1-J, 1-K. Similarly, in correspondence with certain customers, Amit sent detailed HTS pricing information prominently designated as "For Internal Use Only" and "Confidential." Exs. 1-L, 1-M, 1-N.

Accordingly, Defendants' Motion fails as to HTS' claims for breach of the implied covenant of good faith and fair dealing because Amit and Barker *were* obligated to maintain the confidentiality of HTS' trade secrets. At minimum, the above-identified evidence creates a genuine dispute of material fact as to Amit's and Barker's obligations, sufficient to defeat Defendants' Motion.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendants' Motion for Summary Judgment in its entirety.

March 5, 2021

RESPECTFULLY SUBMITTED,

/s/ Ariel Reinitz
Ariel Reinitz *(admitted Pro Hac Vice)*
R. Mark Halligan (*admitted Pro Hac Vice*)
FISHERBROYLES, LLP
445 Park Avenue, Ninth Floor
New York, NY 10022
(646)494-6909
Ariel.Reinitz@FisherBroyles.com
RMark.Halligan@FisherBroyles.com

Glenn R. Bronson (USB #7362)
James C. Watson (USB #13395)
TRASKBRITT, PC
230 South 500 East, Suite 300
Salt Lake City, UT 84102
Telephone: (801) 532-1922
Fax: (801) 531-9168
GRBronson@traskbritt.com
JCWatson@traskbritt.com

*Attorneys for Plaintiffs*