Nathan D. Thomas, State Bar No. 11965
  NThomas@joneswaldo.com
Elizabeth M. Butler, State Bar No. 13658
  ebutler@joneswaldo.com
JONES WALDO HOLBROOK &
McDONOUGH, P.C
170 S. Main Street, Suite 1500
Salt Lake City, Utah 84101-1644
(t) 801.534.7377
(f) 801.328.0537

LEVI Y. SILVER, *Pro Hac Vice*
  lsilver@swsslaw.com
SOLOMON WARD SEIDENWURM &
SMITH, LLP
401 B Street, Suite 1200
San Diego, California 92101
(t) 619.231.0303
(f) 619.231.4755

*Attorneys for Defendants REDLPR, LLC, Sagy
Amit and Jeremy James McMichael Barker*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| QUEST SOLUTION, INC.; HTS IMAGE PROCESSING, INC.; HTS (USA), INC., <br><br> Plaintiffs, <br><br> v. <br><br> REDLPR, LLC; SAGY AMIT; JEREMY JAMES MC MICHAEL BARKER; RIVERLAND TECHNOLOGIES LLC, <br><br> Defendants. | Case No. 2:19-cv-00437-CW-DBP <br><br> **DEFENDANTS REDLPR, LLC, SAGY AMIT, AND JEREMY JAMES MCMICHAEL BARKER'S REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** <br><br> District Judge Clark Waddoups <br><br> Magistrate Judge Dustin B. Pead <br><br> <span style="color:red">**REDACTED VERSION**</span> |

Defendants REDLPR, LLC ("RED"), Sagy Amit ("Amit"), and Jeremy James

McMichael Barker ("Barker") (collectively, "Defendants") respectfully submit this Reply in

further support of the Motion for Summary Judgement (the "MSJ," ECF No. 49) to dismiss all

claims asserted against Defendants by Plaintiffs Quest Solution, Inc. ("Quest"), HTS Image

Processing, Inc. ("HTS Image"), and HTS (USA), Inc. ("HTS") (collectively, "Plaintiffs").

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................................................................ ii

I.      INTRODUCTION ..................................................................................................... 1

II.     PLAINTIFFS' TRADE SECRETS CLAIMS FAIL.............................................. 1

   A.  Defendants Had No Access To Information That Qualifies As A Trade Secret ................ 1

      1.  Plaintiffs Have No Hardware-Related Trade Secrets....................................... 1

      2.  Defendant Had No Access to Any Alleged Software Trade Secrets ............................... 5

      3.  Plaintiffs Have No Vendor-Related Trade Secrets ................................................. 7

      4.  Plaintiffs Have No Customer-Related Trade Secrets.................................................... 10

   B.  The Undisputed Evidence Shows HTS Failed to Take Reasonable Measures to Maintain the Confidentiality of Their Alleged Trade Secrets ......................................................... 12

      1.  Plaintiff Had No Employee Confidentiality Agreements ............................................. 13

      2.  Plaintiff Had No Vendor or Customer Confidentiality Agreements............................. 16

      3.  Plaintiff Had No Coherent or Reasonable Confidentiality Policies .............................. 16

   C.  Plaintiffs Cannot Show Misappropriation ......................................................................... 17

   D.  Plaintiffs Cannot Show Causation or Damages .................................................................. 18

III.    PLAINTIFF'S NON-TRADE SECRETS CLAIMS FAIL .......................................... 18

   A.  HTS's Fiduciary Duty Claim Fails ..................................................................................... 18

   B.  Plaintiffs' Tortious Interference, Unjust Enrichment, and Unfair Competition Claims Fail ............................................................................................................................. 20

   C.  Plaintiffs' Implied Covenant Claim Fails as a Matter of Law ........................................... 20

IV.   CONCLUSION ........................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Denio v. Huntington Beach*,
   74 Cal. App. 2d 424 (1946) ...................................................14

*Diamond Power Int'l, Inc. v. Davidson*,
   540 F. Supp. 2d 1322 (N.D. Ga. 2007) ...................................................11

*DKN Holdings LLC v. Faerber*,
   61 Cal. 4th 813 (2015) ...................................................14

*Grynberg v. Questar Pipeline Co.*,
   70 P.3d 1 (Sup.Ct. 2003) ...................................................13

*Hensel Phelps Constr. Co. v. Dep't of Corr. & Rehab.*,
   45 Cal. App. 5th 679 (2020) ...................................................14

*Mitchell v. Wells Fargo Bank*,
   280 F. Supp. 3d 1261 (D. Utah 2017) ...................................................13

*Phillips v. Sprint PCS*,
   209 Cal. App. 4th 758 (2012) ...................................................14

*Stonewall Ins. Co. v. City of Palos Verdes Estates*,
   46 Cal. App. 4th 1810 (1996) ...................................................14

*StorageCraft Tech. Corp. v. Persistent Telecom Sols., Inc.*,
   No. 2:14CV76 DAK, 2015 U.S. Dist. LEXIS 173753 (D. Utah Sep. 30, 2015) ...................................................17

*Towers, Perrin, Forster & Crosby, Inc. v. Brown*,
   732 F.2d 345 (3d Cir. 1984) ...................................................14

*Vanover v. Cook*,
   260 F.3d 1182 (10th Cir. 2001) ...................................................14

## I.      INTRODUCTION

In their MSJ, Defendants submit several undisputed facts, each of which ***independently*** mandates summary judgment on Plaintiffs' trade secret claims:  (i) Defendants had no access to any information that qualifies as a trade secret; (ii) Plaintiffs failed to take reasonable measures to protect the confidentiality of any alleged trade secrets; (iii) Plaintiffs have no evidence that Defendants used any alleged trade secrets; and (iv) Plaintiffs have no non-speculative evidence of causation or damages.  Summary judgment is mandated if ***any*** these facts, standing alone, is undisputed.  As shown below, they are ***all*** undisputed.  As further shown below, the undisputed facts also mandate summary judgment on Plaintiffs' non-trade secret claims.

## II.     PLAINTIFFS' TRADE SECRETS CLAIMS FAIL

### A.      Defendants Had No Access To Information That Qualifies As A Trade Secret

#### 1.      Plaintiffs Have No Hardware-Related Trade Secrets

In their FAC,[1] Plaintiffs identify their hardware trade secrets as "specifications of HTS' proprietary imaging units … and LPR server devices" and allege that Defendants used these "specifications … to produce RedLPR-branded products."  (FAC ¶ 116.)  Defendants' Statement of Undisputed Material Fact ("SUMF") No. 2 provides that "HTS cannot show any non-public information about the cameras and computers it sells from which HTS derives any economic benefit.  The manufacturers and technical specifications of the cameras and computers sold by HTS are public information and/or industry knowledge."  (MSJ at 19.)  Supporting these undisputed facts, Defendants submitted evidence that: (i) the manufacturer of each HTS device is public information; (ii) the technical specifications of each HTS device is publicly listed on HTS's website; (iii) LPR hardware specifications is basic industry knowledge disclosed by all

---

[1]   Capitalized terms used by not defined herein have the meanings ascribed them in the MSJ.

LPR suppliers, discussed on numerous websites and known by nearly all industry participants; and (iv) HTS does not enter confidentiality agreements with vendors or customers.  (*See* MSJ at 3-5 (citing evidence).)

Plaintiffs dispute ***none*** of these dispositive facts.  In fact, Plaintiffs fail to: (i) identify a single aspect or feature of their hardware that is not publicly disclosed; (ii) deny or dispute Defendants' evidence that LPR hardware specifications is basic industry knowledge; or (iii) identify ***any*** confidentiality agreements with vendors or customers (except the Riverland NDA, which it entered only at ***Riverland's insistence***).  (*See* Oppo.; MSJ at 16-17 (citing evidence).)

---

2   References herein to "Ex. 1-A" though "Ex. 1-V" (i.e., underlined exhibit numbers beginning with a "1") are to the exhibits of the Declaration of Ariel Reinitz in opposition to the MSJ (the "Reinitz Decl.," ECF No. 73-1).  References herein to "**Ex. A__**" thorough "**Ex. D__**" (i.e., **bolded** exhibits number beginning with a letter) are to the exhibits of Defendants' Appendix of Evidence (ECF No. 49-1) submitted in support of the MSJ.

[REDACTED][3]

### 2.      Defendant Had No Access to Any Alleged Software Trade Secrets

SUMF No. 2 provides that "Defendants never learned or used any non-public aspects of HTS' software. In any event, RED's software was independently developed by Riverland." (MSJ at 19.)  Defendants showed that "HTS gave Amit and Barker the same level of access to its software as it gave to customers and end users. HTS maintained the source code and other non-public aspects of its software under lock and key in Israel and never gave Amit or Barker access."  (*Id*. at 5 (citing evidence).)  Plaintiffs do not dispute any of these ***dispositive*** facts.

Instead, Plaintiffs wax poetic about the movie *Back To The Future*.  They point to a

---

[3] Ex. 1-F is not trade secret for the same reasons as Ex. 1-E.  (*See* Reply Amit Decl. ¶ 16.)

***publicly touted*** feature of their

Plaintiffs urge denying the MSJ claiming Defendants do not "***preclude*** the ***possibility*** that [RED's] software incorporates HTS' trade secrets."  (Oppo. at 12 (emphasis added).)  This assertion flips ***Plaintiffs'*** burden of proof on its head.  Plaintiffs' inference gymnastics is speculative, implausible, supported by no evidence, and, moreover, is indeed "preclude[d]" by

the ***undisputed*** fact that Defendants lacked access to nonpublic aspects of Plaintiffs' software.

### 3.      Plaintiffs Have No Vendor-Related Trade Secrets



Further, Plaintiffs claim that their crown jewel "trade secret," their vaunted "Sales

---

[4]   Plaintiffs vaguely assert that a "compilation" can be a trade secret (Oppo. at 23), but present no evidence showing they had such a trade secret, such as how the "compilation" was developed or why the "compilation" is not easily replicable by others.  *See CDC Restoration*, 274 P.3d at 324 (rejecting similar "compilation" arguments as lacking evidentiary support).

Pipeline"—to which they devote no less than 20 paragraphs of their FAC (*see* ECF No. 39 ¶¶ 52-57, 74-80, 84, 87, 90, 118-19, 122, 127)—"includes detailed technical specifications, pricing information, ***cost of goods sold (COGS) information***, and other related parameters" (*id*. ¶ 53). Plaintiff further claim this document "details hundreds of current and future business opportunities HTS is positioning itself to obtain" (*id*. ¶ 52), "includes internal HTS insight – gained from decades of experience and hundreds of industry relationships – regarding HTS' expected likelihood of being selected for a given project, and other related notes" (*id*. ¶ 54), "***is effectively a strategic 'X-ray' of [HTS's] entire business operations and prospects***" (*id*. ¶ 55 (emphasis added)), and "***HTS expended significant effort and expense to preserve and maintain the confidentiality of … its sales pipeline***" (*id*. ¶ 56 (emphasis added).)

What is more, Plaintiffs stated ***more than a year ago*** that they would produce documents responsive to these RFPs, which demand all documents "comprising" or "reflecting" any trade secrets.  (Reply Silver Decl. Ex. O (responses to RFPs 1 and 2).)  While Plaintiffs plainly have many documents besides Ex. 1-V reflecting COGS, the produced none (other than the Sales Pipeline, which is not marked confidential), compelling the inferences that (i) Plaintiffs' did not mark documents reflecting COGS as "confidential" and (ii) Plaintiffs do not believe their

unproduced COGS documents constitute or reflect any trade secrets.

### 4.   Plaintiffs Have No Customer-Related Trade Secrets

SUMF Nos. 6 and 7 provide:  "[¶6] HTS has no secrets related to its customer identities,

relationships, or pricing. These customers are well known and easily identifiable by industry

participants.  [¶7]  RED does business with only five HTS customers and was able to identify

these customers using basic industry resources." (MSJ at 20.) These facts remain undisputed.

Plaintiffs do not even purport to claim their customer identities, or any customer

information other than pricing, is a trade secret.  (*See generally* Oppo.)  As to pricing,

Defendants do not dispute the evidence (submitted with the MSJ) showing as follows:

> HTS had no special methods or formulas to determine this pricing. Instead, HTS
> negotiated customer pricing on an ad hoc, project-by-project basis. HTS routinely
> disclosed its pricing in ***non-confidential*** price quotes distributed to customers and
> potential customers. Its customers and potential customers routinely shared HTS
> pricing with competitors, and routinely shared competitors' prices with HTS. HTS
> knew of, and never prohibited or prevented, such price sharing, which is common
> in the parking industry. HTS also routinely provided customers with ***non-***
> ***confidential*** price lists, knowing customers would share them with others. (**Ex. A**,
> Amit Decl. ¶¶ 44-50; **Ex. A15** (***non-confidential*** price quotes); **Ex. A16** (***non-***
> ***confidential*** price list).)

(MJS at 6.)  Nor to Plaintiffs dispute or deny that "HTS did not require customers to sign

confidentiality agreements" and that HTS "'ha[d] absolutely no agreements or contracts with …

customers.'"  (MSJ at 6 (quoting **Ex. B2**).)  These undisputed facts mandate summary judgment.

As to vendor pricing, Plaintiffs altogether ignore whether its pricing could be a trade

secret in the first place, thus mandating summary judgment regardless of any confidentiality

markings.  (*See supra* Part A.1(b).)  In any event, the two isolated customer documents they

submit with "confidential" stamps—Exs. 1-M and 1-N—only further show that Plaintiffs did not

treat customer pricing (or ***any*** customer communications or information) as confidential.

Ex. 1-M is an "internal" HTS price list that HTS sent to a customer as an attachment to Ex. 1-L (an email transmitting Ex. 1-M) in response to the customer's request for a "price list." While the price list contains "For Internal Use Only" and "Confidential" labels, suggesting it is an "internal" HTS document, HTS never requested confidentiality from the customer, and never mentioned the purpose or effect of any labels.  No reasonable customer receiving this email would understand that HTS was disclosing and demanding confidential treatment of trade secrets.  Instead, the customer would reasonably assume HTS was sharing an "internal" document without demanding confidentiality.  The customer might also view stamps as marketing tools intended to suggest the customer was getting "inside" pricing.  Giving Plaintiffs the benefit of every plausible *and implausible* inference, this document, viewed in isolation, at most establishes that HTS shared "confidential" price lists without specifically demanding confidentiality.[5]  But this document does *not* exist in isolation.  **Ex. A16** is a materially identical price list that Plaintiffs gave to customers without any confidentiality markings whatsoever. Consistent with **Ex. A16**, Plaintiffs do not dispute that "HTS … routinely provided customers with *non-confidential* price lists, knowing customers would share them with others."  (MSJ at 6.)  Ex. 1-M does not show Plaintiffs treated customer pricing as confidential.

---

[5]    *See*, *e.g.*, *Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1333 (N.D. Ga. 2007) (where the plaintiff has distributed to its customers schematic diagrams, repair instructions, product manuals, or similar information—even if they are labeled "proprietary" or "confidential"—the plaintiff's failure to maintain its secrecy precludes trade secret protection.)

P:01449296.5:70024.002                                      11

As with other claimed trade secrets, Plaintiffs previously asked the Court to seal customer emails—**Exs. B3-B6**, **B9**—on the exact basis they now use to claim its customer pricing is a trade secret—that <u>Exs. 1-M</u> and <u>1-N</u> establish "HTS <u>Did</u> Treat Customer Communications and Documents as Confidential."  (*See* ECF No. 57 at 8 (relying on <u>Exs. 1-N</u> and <u>1-M</u>, submitted there as Exhibits "10" and "11").)  Plaintiffs then changed their mind and agreed those alleged "confidential and trade secret" customer communications could be unsealed.  Plaintiffs provide no reason to treat other customer communications differently.

## B.   <u>The Undisputed Evidence Shows HTS Failed to Take Reasonable Measures to Maintain the Confidentiality of Their Alleged Trade Secrets</u>

The following facts stated in the MSJ remain ***undisputed***, mandating summary judgment:

Even if any of Plaintiffs' alleged trade secrets "had been identified and qualified as a trade secret, [Plaintiffs] fail[] to demonstrate the existence of any disputed fact regarding whether adequate precautions were taken to protect the secrecy of such information." *StorageCraft Tech.*, 2015 U.S. Dist. LEXIS 173753, at *23-24 (citing cases). HTS did not enter confidentiality agreements with its vendors, customers, or employees; did not treat business communications or documents with vendors and customers as confidential; freely permitted employees to store and share company files and information how and where employees chose, including on unprotected personal computers and smartphones; maintained no policies regarding storing or transmitting information or documents; did not request that Amit return

---

6   Read in context, the "confidentiality" request in this email simply reflects a salesperson suggesting the customer is getting a good deal.  (Reply Amit Decl. ¶ 23.)

or destroy any documents or information when he resigned and then left HTS; and took no other precautions to protect the confidentiality of any alleged trade secrets. (*See* SUMF ¶ 8; *supra* Parts II.B, II.F, II.H, II.I.) Thus, "it is undisputed that [Plaintiffs] failed to take adequate measures to protect the confidentiality of [their] purported trade secrets." *StorageCraft Tech.*, 2015 U.S. Dist. LEXIS 173753, at *24; *see FormFactor*, 2012 U.S. Dist. LEXIS 79359, at *20-21 (granting summary judgment where plaintiff permitted employees to store files on personal devices and "did not request that [defendant] return any … data when [defendant] tendered his resignation and left the company").

(MSJ at 28.)  In their Opposition, Plaintiffs mention a few isolated facts they claim prevent

summary.  As shown below, they do not.

### 1.      Plaintiff Had No Employee Confidentiality Agreements

Plaintiffs present no evidence supporting their conclusory statement that they "utilized

confidentiality agreements in its dealings with its employees."  Oppo. at 26.  They do not submit

a single confidentiality agreement with a single employee.  Over a year ago, Plaintiffs agreed in

discovery to produce any such documents.  (Reply Silver Decl. Ex.  O (response to RFP 3); *id.*

Ex. Q (response to RFP 23).)  Plaintiffs produced none.  (*See* Reply Silver Decl. ¶ 7 (c)-(d).)

Plaintiffs pretend Amit and Barker's employment agreements contain confidentiality

obligations merely because they require the return of "all [company]…materials and documents"

upon termination."  (Oppo. at 26.)  However, a "court interprets unambiguous contracts as a

matter of law," *Grynberg v. Questar Pipeline Co.*, 70 P.3d 1, 10 (Sup.Ct. 2003), and this

provision is unambiguously ***not*** a confidentiality provision.  (*See* ECF No. 78 (Opposition to

Motion to Seal) at 34 (explaining why this is not a confidentiality provision).)  Even if this

provision were ambiguous—and it is not—the parties' "action[s] under it is often the strongest

evidence of their meaning," *Restatement (Second) of Contracts* § 202, comment g, and the

parties' actions here resolve any doubt.  When Amit left HTS, HTS did not bother asking him to

return any equipment, materials or documents, much less destroy or otherwise protect any confidential materials.  (**Ex. A**, Amit Decl. ¶¶ 70-74.)  When Barker left HTS, HTS requested that he give HTS ***copies*** of his HTS electronic files but permitted him to keep copies of all files and did ***not*** request confidentiality.  (*See* concurrently-filed Reply Declaration of Jeremy James McMichael Barker ¶¶ 2-6; *id*. Ex. M.)  Further, "[a]mbiguous language is construed against the drafter," HTS.  *Mitchell v. Wells Fargo Bank*, 280 F. Supp. 3d 1261, 1286 (D. Utah 2017).

Plaintiffs also tell the Court that Amit and Barker expressly or impliedly accepted the terms of a "2018 Employee Agreement" and "Employee Handbook" by "acknowledging receipt" and continuing to work for HTS.  (Oppo. at 5-7.)  However, Plaintiffs fail to mention that, as thoroughly explained in the Reply Amit Decl., they asserted this exact claim in a prior California Superior Court action and the California Court expressly rejected it after thoroughly considering the evidence.  (*See* Reply Amit Decl. ¶¶ 24-33; *id*. Exs. H-L.)

Plaintiffs are collaterally estopped from relitigating the validity of the 2018 documents.  "Federal courts must give the same preclusive effect to state court judgments that those judgments would be given in courts of the state in which the judgments were rendered."  *Vanover v. Cook*, 260 F.3d 1182, 1187 (10th Cir. 2001) (citation omitted).  "'The preclusive effect of a state court decision is a matter of state law.'"  *Id*. (citation omitted).  California applies collateral estoppel "(1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party."  *DKN Holdings LLC v. Faerber*, 61 Cal. 4th 813, 825 (2015).

A prior order is "final" if it is "'sufficiently firm to be accorded [preclusive] effect.'"  *Stonewall Ins. Co. v. City of Palos Verdes Estates*, 46 Cal. App. 4th 1810, 1840 (1996) (citations

omitted).  An order denying a motion to compel arbitration is sufficiently firm.  *See Phillips v. Sprint PCS*, 209 Cal. App. 4th 758, 759 (2012); *Towers, Perrin, Forster & Crosby, Inc. v. Brown*, 732 F.2d 345, 349 (3d Cir. 1984) (California order denying arbitration is preclusive).  A court order finding an agreement invalid precludes subsequent litigation over the validity of that agreement.  *See Hensel Phelps Constr. Co. v. Dep't of Corr. & Rehab.*, 45 Cal. App. 5th 679, 695 (2020); *cf. Denio v. Huntington Beach*, 74 Cal. App. 2d 424, 432, (1946).

As the parties told the California Court, Plaintiffs had the same burden there, to prove the same facts, as they have here.  (*See* Reply Amit Decl. Ex. J (Mem. of Law In Oppo. to Mot. to Compel Arb. at 6 ("The party moving to compel arbitration has the burden to show the existence of a valid … agreement by a preponderance of the evidence.") (citing cases)).)  Plaintiffs tried to meet their burden there exactly as they try here.  (*See id.* Ex. D (Mot. to Compel Arb. at 6 (arguing "[a] signed agreement is not necessary"; "[a]cceptance may be implied"; "[a]n employee impliedly accepts [a modified employment agreement] by continuing employment after the modification"; and Amit impliedly accepted the 2018 purported agreements by acknowledging receipt and continuing employment) (citing cases)).)  The Court there found Plaintiffs failed to meet their burden, and it expressly found that Amit (and necessarily Barker) never expressly or impliedly accepted the 2018 purported agreements, but instead rejected them. (*See id*. Ex. L.)  Plaintiffs may not relitigate the contract validity issue decided there.

Notably, Plaintiffs' FAC here does not mention, or allege any breach of, the 2018 purported agreements.  (*See* FAC.)  Plaintiffs know those agreements never became valid.

In addition to being estopped, Plaintiffs' claim (premised on their complete mischaracterization of the evidence submitted to the California Court (*cf.* Reply Amit Decl. Exs.

H-L), lack evidentiary support.  Further, even if the purported 2018 agreements became effective, and they did not, they became effective only in *2018*, while Plaintiffs were freely sharing their alleged trade secrets for many *years prior*.

### 2.    Plaintiff Had No Vendor or Customer Confidentiality Agreements

The undisputed evidence disproves Plaintiffs' conclusory assertion that they "utilized confidentiality agreements … with … vendors" (Oppo. at 26) or that they demanded confidentiality from customers (*id*.).  (*See supra* Parts A.1, A.4.)  Notably, Plaintiffs represented over a year ago that they would produce "[a]ny written agreements between Plaintiffs and any PERSON REGARDING maintaining confidentiality of any TRADE SECRET" and they failed to produce any such agreements with vendors or customers (besides the Riverland NDA).  (*See* Reply Silver Decl. ¶ 7(c)-(d); *id*. Ex. N (RFP 3); *id*. Ex. O (response to RFP 3).)

### 3.    Plaintiff Had No Coherent or Reasonable Confidentiality Policies

The undisputed evidence rebuts HTS's conclusory assertion that it "utilized … company [confidentiality] policies."  Oppo. at 27.  Plaintiffs to not dispute that they

> freely permitted employees to store and share company files and information how and where employees chose, including on unprotected personal computers and smartphones; maintained no policies regarding storing or transmitting information or documents; did not request that Amit return or destroy any documents or information when he resigned and then left HTS; and took no other precautions to protect the confidentiality of any alleged trade secrets.

(MSJ at 28 (citing evidence).)  As explained above, the few isolated and apparently random documents with "internal" or "confidential" markings do not exhibits any—and certainly no coherent, reasonable or observed—confidentiality policies.  Plaintiffs' *undisputed* failure to mark as "confidential" the overwhelming majority of their purported "trade secret" documents— including, among many others: (i) their crown jewel "trade secret" Sales Pipeline; (ii) their

alleged "hundreds" of "technical … trade secret" emails with Hitron; and (iii) the countless documents reflecting COGS and customer pricing that Plaintiffs failed to produce and that they withhold form the Court[7]—particularly in light of the other undisputed evidence showing that Plaintiffs took no other confidentiality measures and the inconsistent stories Plaintiffs tell the Court about which documents and information must be sealed, make it "undisputed that [Plaintiffs] failed to take adequate measures to protect the confidentiality of [their] purported trade secrets." *StorageCraft Tech.*, 2015 U.S. Dist. LEXIS 173753, at *24.[8]

**C.     Plaintiffs Cannot Show Misappropriation**

The MSJ shows that Plaintiffs cannot show Defendants ever used any alleged trade secrets because:  (i) RED does business with only one vendor of HTS and Amit's relationship with that vendor preceded his HTS employment; and (ii) RED does business with exactly five HTS customers did not use any HTS information in working with these customers.  (*See* MSJ at

_____

[7]

[8]     Plaintiffs emphasize that "'efforts to maintain … secrecy … need only be reasonable under the circumstances.'" (Oppo. at 27 (citation omitted).)  The undisputed evidence precludes any possibility that Plaintiffs' alleged efforts were reasonable under the circumstances.  *See StorageCraft Tech.*, 2015 U.S. Dist. LEXIS 173753, at *24.

29-30.)  Plaintiffs do not dispute these facts, mandating summary judgment.

**D.**     **Plaintiffs Cannot Show Causation or Damages**

The MSJ shows as follows:

Plaintiffs fail to identify any sales lost due to Defendants' alleged misappropriation. Further, as explained below, even if Plaintiffs could identify lost sales, they have no non-speculative evidence showing such lost sales resulted from Defendants' trade secret misappropriation as opposed to Management's well-documented dishonesty and destruction of customer relationships and/or Defendants' legitimate post-employment competition.

(MSJ at 31.)  The Opposition ignores this point, making it undisputed.

**III.**     **PLAINTIFF'S NON-TRADE SECRETS CLAIMS FAIL**

**A.**     **HTS's Fiduciary Duty Claim Fails**

The MSJ shows that:  (i) Plaintiffs' fiduciary duty claim is premised on alleged trade secret misappropriation; (ii) Plaintiffs have no evidence that Defendants conspired to compete, or did compete, with HTS while they were employment there, and any discussions about competing in the future would in any event not breach any fiduciary duties as a matter of law; and (iii) Plaintiffs have no evidence of disparagement and in any event have no evidence of any damages caused by any alleged disparagement.  (*See* MSJ at 31-36.)  In their Opposition, Plaintiffs submit Ex. 1-R, which they claim shows Amit disparaged HTS.  In the email, a customer complains that HTS failed to deliver products and, in response, Amit sympathizes with the customer, states there was nothing Amit could to do expedite the order (including by emphasizing that "this is the worse situation a sales person can be in" and that other customer order were also delayed), and invites the customer to speak with HTS management.  (Ex. 1-R.)  This email does not create a genuine dispute with respect to HTS's fiduciary duty claim.

HTS also claims a RED sales deck shows a breach of fiduciary duty.  Not so.  Plaintiffs claim RED used this sales deck in November 2020 (Oppo. at 15), ***over two years after Amit and Barker left HTS***.  Defendants indisputably owed no fiduciary duties at this time.

**B.**     **Plaintiffs' Tortious Interference, Unjust Enrichment, and Unfair Competition Claims Fail**

Plaintiffs' claims for tortious interference (Count IV), unjust enrichment (Count V), and unfair competition (Count VI) fail for the reasons explained in the MSJ.  Additionally:  (i) these claims rely on alleged misappropriation of confidential and trade secret information; (ii) as a matter of law, using a sales deck with mild visual similarities to a competitor is not "improper means" sufficient for a tortious interference claim and Plaintiffs present no facts or law suggesting it is (*cf.* Oppo. at 36); and (iii) merely doing business with a competitor's customers—i.e., "competing"—is not either "improper means" (*cf. id.*).

**C.**     **Plaintiffs' Implied Covenant Claim Fails as a Matter of Law**

As shown in the MSJ and above, Amit and Barkers' employment was each governed by a single express written agreement (**Exs. A4** and **B1**, respectively), which unambiguously contained no confidentiality provisions.  Further, the 2018 documents are not valid.  As shown in the MSJ, these facts preclude Plaintiffs' implied covenant claim.  (*See* MSJ at 39-40.)

**IV.**     **CONCLUSION**

Plaintiffs characterize the MSJ quoting *Back To The Future*.  Its Opposition, and this action more generally, is better described as "throw everything at the wall in the hope that something sticks."  As shown above, nothing sticks.  Defendants respectfully request summary judgment on all claims Plaintiff assert against them in this action.

Respectfully Submitted,

DATED:  March 30, 2021          SOLOMON WARD SEIDENWURM & SMITH, LLP


By:     */s/ Levi Y. Silver*
        Levi Y. Silver, *Pro Hace Vice*

        - and --

        Nathan D. Thomas
        Elizabeth M. Butler
        ONES WALDO HOLBROOK &
        McDONOUGH PC

        *Attorneys for Defendants REDLPR, LLC, Sagy*
        *Amit and Jeremy James McMichael Barker*