UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| OMNIQ CORPORATION; HTS IMAGE PROCESSING, INC.; and HTS (USA) INC., <br><br> Plaintiffs, <br><br> v. <br><br> REDLPR, LLC; SAGY AMIT; JEREMY BARKER; and RIVERLAND TECHNOLOGIES LLC, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER IMPOSING SANCTIONS, ADDRESSING REMAINING MOTIONS, AND DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION** <br><br><br> Case No. 2:19-cv-437-CW-DBP <br><br> Judge Clark Waddoups |

## INTRODUCTION

The parties in this long-standing action are or were engaged in the business of license plate recognition ("LPR") technology and systems. Plaintiffs OMNIQ Corporation,[1] HTS Image Processing, Inc., and HTS (USA) Inc. (collectively "HTS")

---

[1] There have been a number of corporate name changes concerning Quest Solution, Inc., which was a named plaintiff in the initial and amended complaint. As noted in the court's August 3, 2023, Memorandum Decision and Order, in November 2019 Quest Solution, Inc. changed its name to OMNIQ Corporation and the court granted an oral motion to substitute OMNIQ Corporation for Quest Solution, Inc. in the caption. *Quest Sol., Inc. v. RedLPR, LLC*, No. 2:19-CV-437-CW-DBP, 2023 WL 11910450, at *45 (D. Utah Aug. 3, 2023).

claim to be leaders in the LPR field.  Amend. Complaint, ¶ 37 (ECF No. 39).

Defendants Jeremy Barker and Sagy Amit are two former employees of HTS who,

after resigning from HTS, formed Defendant RedLPR, LLC as a competing LPR

business.  *See id.* ¶¶ 5–13.  Riverland Technologies LLC, which was added as a

party defendant in the Amended Complaint, is a software and hardware

development company that specializes in LPR-related solutions.  Some members of

Riverland also became members of RedLPR and provided technology and support to

help RedLPR launch and sell its products.  *Quest Sol., Inc. v. RedLPR, LLC*, No.

2:19-CV-437-CW-DBP, 2023 WL 11910450, at *6, 19 (D. Utah Aug. 3, 2023).

Riverland, however, is no longer a party to this action by virtue of a stipulated

dismissal with HTS.  *See* Order (ECF No. 121).[2]

        In its original Complaint and Amended Complaint, HTS alleged that

Defendants misappropriated HTS' trade secrets in violation of the federal Defend

Trade Secrets Act, 18 U.S.C. § 1836, and Utah's Uniform Trade Secrets Act, Utah

Code Ann. § 13-24-1 (the "Trade Secrets Claims").  Amend. Complaint, ¶¶ 146–74

(ECF No. 39).  HTS also alleged that Barker and Amit breached their fiduciary

duties to HTS and breached the implied covenant of good faith and fair dealing, *see*

*id*. at ¶¶ 175–193; 219–30, and that Barker and Amit, along with RedLPR,

---

[2]  Because Riverland is no longer a party, when the court refers to "Defendants" in this
decision, it refers to Jeremy Barker, Sagy Amit, and RedLPR, LLC.

tortiously interfered with HTS' economic relations, engaged in unfair competition, and were otherwise unjustly enriched by their wrongful actions (collectively the "Non-Trade Secret Claims"). *See id.* at ¶¶ 194–204; 205–11; 212–18.

In an opinion filed August 3, 2023, after a comprehensive review of the record, briefing, and oral argument, this court concluded that Barker, Amit, and RedLPR "did not misappropriate any trade secrets" and granted them summary judgment on the Trade Secret Claims. *See Quest Sol., Inc.*, 2023 WL 11910450, at *2. At that time, the court also noted that it would later address the issue of sanctions, *see id.* at *2 n.2, raised in part by Amit's Motion for Rule 11 Sanctions (ECF No. 243), HTS' response (ECF No. 267), and Amit's Reply (ECF No. 279), and the court's May 23, 2022 "Notice of Hearing to Show Cause Why Sanctions Should Not Be Imposed on HTS" (the "OSC") (ECF Nos. 272–274), HTS' responses (ECF Nos. 288–290, 292), and HTS' supplemental authority (ECF No. 295).

Now, after having carefully reviewed the record, the motions, memoranda, exhibits, and authority submitted by the parties, and for the reasons discussed below, the court concludes *sua sponte*[3] that sanctions against HTS and its primary *pro hac vice* counsel Ariel Reinitz are warranted. Additionally, the court denies HTS' Motion for a Temporary Restraining Order (ECF No. 322), but orders Amit to

---

[3] For the reasons discussed below, the court denies Amit's Motion for Rule 11 Sanctions (ECF No. 243) and issues no sanctions based on Amit's motion.

take down a certain YouTube video and imposes sanctions against Amit for violating court orders.  The court grants HTS' Motion to Maintain Seal (ECF No. 324).  The court declines to exercise supplemental jurisdiction over the Non-Trade Secret claims and dismisses them without prejudice.

## FACTUAL BACKGROUND[4]

HTS filed suit against Barker and Amit and others primarily based on its contention that Barker and Amit had access to and misappropriated HTS' purported trade secrets.  HTS asserted its Trade Secret Claims emphatically and without equivocation about a "plot coordinated by Amit and Barker." *Quest Sol., Inc.*, 2023 WL 11910450, at *7.  Yet, as HTS continued to advance its trade secret theory, it and its counsel refused to identify with any sufficiency the alleged "trade secrets" at issue.

**Response to First Set of Interrogatories**

This case was filed on June 24, 2019.  On February 5, 2020, HTS provided its first response to interrogatories.  One interrogatory asked HTS to "[i]identify with specificity each trade secret" that was allegedly misappropriated.  Interrog. Resp. No. 1, at 4 (ECF No. 50-37).  HTS responded as follows:

> HTS' technical trade secrets; HTS' business trade secrets; development information and technical specifications of HTS' proprietary imaging units, including cameras

---

[4]  Because the court's August 3, 2023, opinion provides a comprehensive factual background and context, the court does not repeat the full background here.

> optimized for use in LPR applications, software
> optimized for use in LPR applications, LPR servers, terminals, and other computing
> devices configured and optimized for use in LPR
> applications; HTS' technical know-how; HTS' confidential
> business plans and internal documents; HTS' internal
> 'sales pipeline' documents detailing HTS' current and
> future business opportunities; HTS' pricing information;
> HTS' cost of goods sold (COGS) information and other
> related parameters; HTS' internal insight, gained from
> HTS' experience and industry relationships, regarding
> HTS' expected likelihood of being selected for given
> project(s); HTS' detailed price quotes; HTS' cost margins;
> business opportunities available to HTS; HTS' sales
> margins per customer; parameters used by HTS to prepare
> and submit bids for LPR projects; HTS' customer and
> prospective customer information.

*Id.*[5]  As the court noted in its August 3, 2023, opinion, HTS' response merely

repeated what it asserted in its Complaint, in broad and vague terms, without any

further details to focus on what was at issue.  *Quest Sol., Inc.*, 2023 WL 11910450,

at *18.

In the same set of interrogatories, HTS also was asked to identify specifically:

(1) "the information the trade secret consists of"; (2) "the information thereof that is

not generally known by the public"; and (3) "the information thereof that is not

general industry knowledge."  Interrog. Resp. Nos. 2–4, at 4–6 (ECF No. 50-37).  To

each, HTS cited Defendants back to the block quote above, without providing any

---

[5]  Please note that when the court cites to an electronically filed document, the court's page
number reference is to the page number in the header of the electronically filed document
and not to the page number in the original document, if any.

further detail.[6]  Notably, none of these four interrogatory answers, sworn to by HTS' CEO and signed by its counsel, mentioned an algorithm or the N70 camera. The answers did state sales pipelines were misappropriated, but HTS provided no identification concerning which among the multitude of pipelines were misappropriated.[7]

**Amended Responses to First Set of Interrogatories**

Further discovery efforts to glean specific identification of the trade secrets at issue were equally unavailing.  For example, when HTS amended its interrogatory responses on July 8, 2020, HTS again failed to identify the alleged misappropriated trade secrets sufficiently.  While these amended responses were more verbose, the breadth covered such an extensive scope of technology and business documents that it leaves one wondering if any portion of HTS' business was omitted.  *See generally* Amended Interrog. Resp., at 4–8 (ECF No. 50-39).  Yet, despite the breadth, the responses remained vague and did not comply with HTS'

---

[6]  For Interrogatory No. 2, HTS stated it was "producing responsive documents in its possession, custody, or under its control."  Interrog. Resp., at 5 (ECF No. 50-37).  HTS produced some documents, but did not specify what aspect of them constituted the trade secret.  At a two-day summary judgment hearing in April 2022, the court was still attempting to determine what trade secrets were at issue and why.

[7]  Throughout the pendency of this case, the District of Utah has had in place a standard protective order that automatically applies whenever confidential information is disclosed. *See* DUCivR 26-2.  No court order is needed for it to be effective.  The local rule is designed to facilitate timely responses to discovery requests.  Because a standard protective order was in place at the time HTS responded to discovery, HTS had no basis to withhold the information requested in these interrogatories.

discovery obligations.  Nor did they mention the N70 camera or disclose that an algorithm was at issue.  And the same failure to identify the relevant sales pipelines remained at issue.

Defendants moved for summary judgment on January 15, 2021 (ECF No. 49). HTS filed its opposition on March 5, 2021 (ECF No. 73).  Two days prior to filing its opposition, HTS amended its original interrogatory responses a second time. Second Amend. Interrog. Resp. (ECF No. 75-6).  For the first time, HTS identified that an algorithm was at issues named SeeFusion.  *Id.* at 5, 10.  It also identified the N70 camera and referenced an August 2018 sales pipeline.  *See id.* at 4–5, 13, 17.  Thus, it took almost two years of litigation and the filing of a dispositive motion by Defendants before HTS started to add any details to its trade secret identification.  Yet, its identification still claimed items too broadly and remained too vague about what actually was at issue due to alleged misappropriation.

**October 2018 Sales Pipeline and the Charlotte Airport Project**

Certainly, HTS identified the August 2018 sales pipeline, some specific price lists, and so forth, but through liberal use of the word "including," HTS never limited its trade secret identification only to those items.  Thus, Defendants had to defend against an ever moving target.  For example, during oral argument in April 2022, on Defendants' second motion for summary judgment, HTS argued the October 2018 sales pipeline was at issue.  *Quest Sol., Inc.*, 2023 WL 11910450, at *29.  HTS made this argument despite never specifically identifying that sales

-7-

pipeline in any trade secret identification. Both the defendants and the court were left guessing about which sales pipelines were at issue.

HTS asserted the October 2018 sales pipeline was at issue because it contained information about the Charlotte Airport Project. *Id.* Six months earlier, however, on October 8, 2021, a magistrate judge denied HTS' motion to compel production of documents concerning the Charlotte Airport Project because HTS failed to "connect identifiable trade secrets, and the alleged misappropriation thereof, to its discovery requests." Order Denying Mot. to Compel, at 3 (ECF No. 131). HTS never corrected that issue, but nevertheless continued to press the argument during oral argument on the second summary judgment motion.

Prior to HTS' motion to compel discovery, this court had warned HTS on April 28, 2021, that its trade secret identifications were deficient. *Quest Sol., Inc. v. RedLPR, LLC*, No. 2:19-CV-437-CW-DBP, 2021 WL 1688644, at *3 (D. Utah Apr. 28, 2021). The court also informed HTS about the standards that needed to be met. *Id.* at *2–3. Although HTS modified its trade secret identifications again on May 21, 2021 (ECF No. 116), its identifications still were inadequate and allowed for traps in what was being claimed.[8]

---

[8]  Despite the court's April 28, 2021, opinion concerning the deficiencies in HTS' trade secret identification and directive to correct them, it is the court's view that HTS and its counsel continued to avoid full and clear identification of the trade secrets at issue. Although HTS filed a forty-two-page trade secret identification (ECF No. 116), with 37 pages of additional attachments, the court concluded that HTS' submission continued to leave Defendants and the court guessing about what trade secrets were at issue. Notice of

**Focus on the Algorithm Being Part of HTS' Software**

One of the most concerning traps pertained to the SeeFusion algorithm. Although HTS named the algorithm, and it was a primary focus in briefing, what constituted the algorithm was one of the moving targets in this case. HTS' final trade secret identification had a paragraph pertaining to "[d]esign and development information, technical specifications, and strategic considerations associated with development and deployment of HTS' proprietary OCR and vehicle recognition software solutions." Trade Secret Ident., ¶ 1.C, at 11 (ECF No. 116). The paragraph contains PowerPoint slides entitled OCR Engine – Enhancements. Under that paragraph, subparagraph (vi) claims the following as a trade secret:

> Including HTS' know how regarding the design and deployment of *dual-camera and multi-camera LPR installations configured to utilize HTS' 'SeeFusion' / 'Synergism' algorithms* which provide the ability to take multiple images from multiple cameras and automatically identify the best readable image, which makes HTS' accuracy rates in the U.S. better than most as referenced in: correspondence to Designa on October 12, 2017, correspondence with Access Control Group on April 3, 2018, correspondence with Walker Consultants on June 8, 2018, correspondence with Hunter City on June 12, 2018; correspondence with Admyt on June 14, 2018, *and as*

---

Hr. to Show Cause, at 8–9 (ECF No. 273) (discussing ECF No. 116). It was not until the April 20–21, 2022, summary judgment hearing that HTS expounded on its trade secret contentions. For example, it was only then, after two rounds of summary judgment briefing, that HTS informed Defendants and the court that it was not claiming price lists (except for a few specific price lists) as a trade secret. HTS had an obligation to supplement its discovery responses about what trade secrets were at issue. It did not do so.

> *reflected in slide 51 of FalconEyesLPRCourseMay2014.*
> *pptx (the "Falcon Eyes Presentation") – see below.*

*Id.*, ¶ 1.C.iv, at 14–15 (emphasis added) (quotations and alteration omitted).  The focus of the paragraph and subparagraphs was on the OCR engine and software.  In that context, the algorithm appeared to be part of the software.

While working at HTS in July 2017, Amit asked for in depth training "on the algorithm at play, what is it looking for and why does it require training? (plate Size/size ratio/contrast/fonts/colors/etc???).  Email, at 2 (ECF No. 209-18).  Amit, as an employee of HTS, developed marketing materials about why the SeeFusion algorithm set HTS apart from its competitors, namely, HTS had software that knew how to select the best image for OCR processing.

The correspondence identified in the block quote above are all dated after the July 2017 email seeking training.  The Designa correspondence on October 12, 2017, is an email where Amit explains to several people that HTS' technology takes multiple images, and from those images "our *software* picks the best for OCR."  Email, at 1 (ECF No. 73-8) (emphasis added).  He further states, "[t]he feature unique to our *LPR engine* is the ability to take multiple images from multiple cameras and automatically identify the best readable image."  Email, at 1 (ECF No. 73-8) (emphasis added); *Quest Sol., Inc.*, 2023 WL 11910450, at *34.  In other words,

-10-

the focus of the marketing materials and correspondence was on the OCR engine and software, which appeared consistent with how HTS identified SeeFusion.[9]

How HTS identified the algorithm impacted questions Amit asked during the deposition of Yoram Hofman, HTS' Chief Technology Officer. Both the questions and responses were directed at the algorithm being part of the software package, where it was built in and wrapped and spread across different sections so it could not be copied. *Quest Sol., Inc.*, 2023 WL 11910450, at *35. The CTO testified the algorithm creates a synergism where "'the past history DLL converges results to come up with the final result.'" *Id.* (quoting Hofman Depo., at 99 (ECF No. 220-3)).

**Algorithm in the Context of a Dual-Head Camera**

Besides identifying the algorithm in terms of the OCR engine and software, the trade secret identification also claims the "dual-camera and multi-camera LPR installations configured to utilize HTS' 'SeeFusion' / 'Synergism' algorithms." Trade Secret Ident., ¶ 1.C.vi., at 14. HTS' identification contained Slide 51 from the Falcon Eyes Presentation, which reportedly reflected the algorithm and the synergism of the cameras. *Id.* at 14–15. Slide 51 shows a color camera and an

---

[9]  Even if the SeeFusion algorithm had been part of HTS' software, it did not relieve HTS of producing it as a document. A "document," as understood under the Federal Rules of Civil Procedure, includes "electronically stored information" including "data and data compilations." FED R. CIV. P. 34(a)(1)(A); *see also Apple Inc. v. Samsung Elecs. Co.*, No. 11-1846, 2012 WL 1595784, at *1 (N.D. Cal. May 4, 2012) ("There is, however, no source code exception to the production requirements of [Rule] 34"). Whether it was a DLL file or merely a written page detailing sequential steps, HTS had a duty to produce the algorithm.

infrared camera, which are components of the dual-head camera also depicted on the slide. *Id.* at 15. Such a configuration, where there is one camera sensor for color images and one camera sensor for black and white images, is typical for dual-head cameras. *Quest Sol., Inc.*, 2023 WL 11910450, at *5. A declaration from HTS' CTO further referenced Slide 51 as being part of the training materials for the algorithm. Hofman Decl., ¶¶ 43–44 (ECF No. 116-1).

HTS did not provide the actual algorithm during fact discovery, nor did it provide greater detail about how it operated. This appears to have left Defendants with the understanding that the algorithm was part of the software as they built their defense, took depositions, answered deposition questions, and presented briefing and oral argument to the court. The court had the same understanding. Additionally, based on the trade secret identification, it also appeared that the algorithm applied both to dual-head cameras and multi-camera installations.

**Evolution in What the Algorithm Was**

At the April 20–21, 2022 summary judgment hearing, however, the target moved as to what constituted the algorithm and where it was utilized. The LPR industry has a number of competitors who offer dual-head cameras. In distinguishing HTS' technology from others in the industry, Reinitz asserted dual-head cameras were not at issue. *Quest Sol., Inc.*, 2023 WL 11910450, at *37. Instead, the algorithm only applied to the specific installation of two separate cameras, not housed in the same box, *id.*, and since only HTS and RedLPR used

that configuration, according to HTS' counsel, Defendants must have
misappropriated the algorithm.  Hr. Tr., at 114:16–23 (ECF No. 283).  Besides his
representation being contrary to the evidence in this case, *id.* at *4, 37 n.39, it was
contrary to HTS' trade secret identification.

Moreover, at the April 20–21, 2022 summary judgment hearing, HTS' counsel
stated for the first time that the algorithm was not specific to any coding language
because it only contained the process for implementation by the software.  *Id.* at
*35.  It only was the operational steps explaining what the software should do.
HTS' counsel further represented that the algorithm was "*reflected* in written
materials," such as Slide 51, Hr. Tr. 158:1–4 (ECF No. 283) (emphasis added), but
the algorithm was not in the record before the court.  Hr. Tr., 53:14–25 (ECF No.
277).  Accordingly, following the hearing, the court ordered HTS to provide "a copy
of the document it produced to Defendants that contains HTS' SeeFusion
algorithm."  Notice of Hr. to Show Cause, at 10 (ECF No. 272).  The court further
ordered that "[i]f HTS did not produce the algorithm, HTS should be prepared to
address its actions."  *Id.*

**Production of the Algorithm**

In response to the court's order, HTS provided no copy of what it had
produced during discovery because no written document existed detailing the
algorithm's operational steps.  Instead, HTS provided a new declaration from its
CTO that set forth the algorithm's sequential operation.  The declaration was

-13-

signed and filed on June 28, 2022 (ECF No. 293). By that point, fact discovery had closed, briefing on the second round of summary judgment was done, and a hearing on the motions had been held. Only then did Defendants and the court learn what the algorithm actually was, and that it had never existed in written form prior to that date.

HTS contends it did not have to provide specific details about its trade secrets in response to interrogatories because it informed the defendants that HTS would be "producing responsive documents." Resp. to OSC, at 30 n.27 (ECF No. 290). Yet, not identifying the algorithm sufficiently in the interrogatories, so Defendants and the court could understand what was claimed, left Defendants without any discovery on the matter because there was no document setting forth the algorithm. *Quest Sol., Inc.*, 2023 WL 11910450, at *37. Because the document did not exist in written form until June 28, 2022, there is no evidence Defendants had access to the algorithm's specific operational steps. At most, Amit and Barker merely obtained training about what the algorithm was looking for and why it requires deep learning. That same information could have been shared with any customer to understand HTS' product better.

HTS disputes this point. HTS repeatedly has stated Amit's description of RedLPR's algorithm is the same as HTS', so that is circumstantial evidence Defendants misappropriated the algorithm, and Defendants "all but admit to" misappropriation. *Quest Sol., Inc.*, 2021 WL 1688644, at *3. The court informed

-14-

HTS that its assertions did not show misappropriation.  *Id.*  Describing what an algorithm does in HTS and RedLPR's marketing materials is quite different from knowing what makes up the algorithm.  *See id.*  Nevertheless, HTS continued to make the same argument to the court, without developing further evidence, despite knowing the court had rejected the argument.

**Absence of Evidence**

HTS' CTO did not identify Amit and Barker among those trained on the algorithm, and HTS presented no declaration or affidavit from a trainer detailing what was conveyed to Amit or Barker at training.  Moreover, HTS undertook no forensic analysis despite one of HTS' attorneys querying, prior to this suit being filed, whether a forensic examination of RedLPR's products should occur.  *Quest Sol., Inc.*, 2023 WL 11910450, at *8.  A forensic exam could have determined whether RedLPR's product used the same operational steps for license plate recognition as HTS' algorithm.  HTS declined to do such an exam, and never developed adequate evidence despite continuing to press its trade secret position with the court.  Thus, even after inquests from the court and repeated discovery demands from Defendants, HTS did not present sufficient facts to establish that Baker and Amit had access to the SeeFusion algorithm and/or misappropriated it.

To the contrary, HTS' counsel reported that Hofman, HTS' CTO, was the "person charged with protecting the secrecy of the algorithm."  Hr. Tr., at 158:10–13 (ECF No. 283).  Despite this fact, HTS never provided any testimony or evidence

-15-

that Hofman (or anyone under his charge) provided the algorithm to Amit or Barker.  Rather, in Hofman's May 21, 2021, declaration, he only claimed that some "internal training to relevant HTS personnel" was given on the algorithm, and in doing so identified only Slide 51 of the Falcon Eyes Presentation as the training material.  *Id.* at ¶¶ 43–45 (ECF No. 116-1.  Hofman did not identify Amit or Barker as among the "relevant" personnel who received confidential, non-public algorithm training on the actual operations steps versus merely being trained on information that could be shared with customers.

In his final June 28, 2022, declaration, wherein Hofman identified the algorithm's sequential steps for the first time, Hofman asserted that only he and HTS' "technical team developed and refined this algorithm."  Hofman Decl., ¶ 30 (ECF No. 293).  Hofman did not identify Barker and Amit as being part of that team.  Thus, neither in his May 2021 declaration, nor in his June 2022 declaration, did HTS' CTO identify Barker and Amit among those who knew the algorithm.  This is in keeping with the representation of HTS' counsel that HTS disseminated information about the algorithm only "to its employees on a need to know basis" to protect it.  Hr. Tr., at 158:5–9 (ECF No. 283).  Barker and Amit did not need to know the algorithm.

**No Withdrawal of Contentions**

In 2022, the court learned about the nature of HTS' pre-filing investigation that formed the basis for its claims.  HTS built much of its initial case on suspicion,

-16-

speculation, and strong emotion because RedLPR was competing against it in the same field. *Quest Sol., Inc.*, 2023 WL 11910450, at *10–16. To the extent an item may have been a trade secret under proper circumstances, it became apparent that HTS lacked evidence to meet the elements of trade secret misappropriation, including, but not limited to, protecting certain items so lackadaisically that they lost whatever protected status they may have had. *Id.* at *45–53.

As this litigation progressed it should have been clear to HTS and its counsel that they had no factual basis to support their Trade Secret Claims, particularly HTS' algorithm contention. But rather than withdraw their contentions, HTS continued to press them, resisted discovery on the issues, and vigorously contested Defendants' motions for summary judgment concerning the Trade Secret Claims.

Additionally, despite acknowledging during the April 2022 oral argument on summary judgment that HTS lacked evidence to support some of its trade secret contentions, it did not supplement its discovery responses before the hearing, it did not disclose at the hearing the contentions that were no longer at issue, and it did not at any time after the hearing identify what trade secret allegations were no longer at issue.

**Other Troubling Conduct**

Outside of the conduct above, other aspects of how this litigation has been conducted have troubled the court. Among these is HTS' counsel's conduct at depositions. For example, the court uncovered during its review of the deposition of

Shai Lustgarten that Ariel Reinitz—HTS' counsel—objected over 200 times during

a three-hour deposition.  Notice of Hr. to Show Cause, at 12 (ECF No. 273).  Many of

these objections were unnecessary and lacked merit and appear to have been

intended to hinder Sagy Amit's examination of the witness.[10]  This is particularly so

because Amit—a non-lawyer—was proceeding pro se.

Plaintiffs suggest in their response to the OSC that none of this matters

because, in their view, "Mr. Amit obtained responsive answers to *nearly* all his

questions."  Resp. to OSC, at 45 (ECF No. 290) (emphasis added).  But it does

---

[10]  There are almost too many examples to present, but among the standouts are the
following:  Reinitz's objection to Amit's question "When did you start with Micronet?" as
"vague" and calling for a "legal conclusion."  Lustgarten Depo., at 14:22–24 (ECF No. 220-
4); Reinitz's objection to the question "Did you relocate to the US with Micronet?," as
"vague," and after that question was answered in the affirmative to the follow-up question,
"Did Micronet pay for your relocation?," as "[p]resumes facts not in evidence" *id.* at 15:3–11;
Reinitz's objection that the question "What was your role, Mr. Lustgarten, at Micronet?" as
"[c]alls for legal conclusion." *Id.* at 16:3–6.  To be clear, Reinitz's willingness to utter
baseless objections was not just limited to the topic of Micronet.  When questions about
Suzie Rawlings were posed to Mr. Lustgarten, such as "Did she ever sign a document for
you as a notary public in Utah?," Reinitz objected to this question on the baseless ground
that it "[c]alls for legal conclusion." *Id.* at 32:14–17.  Reinitz doubled up on his meritless
position by also objecting to the question, "Did she ever sign a declaration in any lawsuits
for your company?" as also calling for a "legal conclusion." *See id.* at 32:19–22.  Reinitz's
hindering and vexatious conduct continued as when Mr. Lustgarten identified a company
called "Quest Marketing" as having submitted an RFP, Amit appropriately asked him,
"What is Quest Marketing?," to which Reinitz objected that the question was "[v]ague," and
"[c]alls for legal conclusion." *Id.* at 35:17–23.  And when Amit asked if Mr. Lustgarten was
"the CEO of Quest Marketing?," Reinitz again baselessly objected that the question called
for a "legal conclusion." *Id.* at 36:1–3.  Finally, for this brief summary, Reinitz twice
objected that the factual question, "What [was] the HTS revenue in 2017?" on the ground
that it "calls for a legal conclusion." *Id.* at 53:24–54:2, 55:1–3.  Many other similar
meritless objections were interposed.

-18-

matter.  More was expected and required of Reinitz.  In the court's determination, Reinitz's actions needlessly prolonged the deposition and appear to have been intended to harass and intimidate Amit, all of which are improper.  Additionally, his conduct did not conform to Utah's Standards of Professionalism and Civility—standards he was obligated to comply with by virtue of his *pro hac vice* admission—which instruct that a lawyer at a deposition "shall not attempt to obstruct the interrogator" and that "lawyers shall engage only in conduct that would be appropriate in the presence of a judge."  *See* Utah Standards of Professionalism and Civility, ¶ 18, available at https://www.utcourts.gov/en/about/courts/appellate-courts/civility.html; *see also* DUCivR 83-1.1(d)(1).

HTS' conduct, through its counsel, also was inappropriate concerning the Riverland settlement agreement.  Resolution by settlement, to avoid financial burdens and other costs, is favored.  Settlement of a case, therefore, is not the issue.  What is at issue is that the settlement contains no provision for Riverland to cease and desist using technology and other information allegedly provided by Amit and/or Barker to Riverland.

Throughout this litigation, HTS has pointed to a non-disclosure agreement that Amit signed on behalf of HTS Americas Inc. between Riverland and that entity.  HTS has asserted to the court that it shows Amit shared trade secrets with Riverland.  Moreover, HTS brought Riverland into this suit on the basis of evidence pertaining to a dual head camera, with a Riverland decal, that purportedly

incorporated HTS' trade secrets.  Amend. Complaint, at 19–20 (ECF No. 33-5) (showing redlines to indicate where Complaint was being amended).

To this day, HTS has maintained these positions with the court.  If such positions were legitimate, and the trade secrets had the value that HTS has represented, the Riverland settlement would have contained provisions to ensure Riverland either ceased all use of the trade secrets or leased the technology. Instead, it merely sought to ensure Riverland conducted no business with Defendants—thereby crippling RedLPR.[11]  *See Quest Sol., Inc.*, 2023 WL 11910450, at *41–42, 48 (discussing settlement agreement and the court's conclusions). RedLPR was unable to withstand the crippling effects of the settlement agreement and this litigation.  It is now out-of-business, and does not compete against HTS, exactly as HTS intended.

It is the above conduct[12]—conduct that breached counsel's duties as lawyers and officers of the court and violated the established rules of this court—that warrants the imposition of sanctions.

---

[11]  Although it appears that Riverland and/or its members wished to terminate its affiliation with RedLPR, there is a difference between terminating an ownership interest versus being unable to transact any LPR business, indefinitely, with Defendants.

[12]  The court does not attempt to detail herein all the conduct HTS and Reinitz engaged in that constituted abusive litigation practices.

## LEGAL STANDARDS AND DUE PROCESS

A federal court faced with the misconduct or impropriety of a litigant or counsel has available a variety of rules and sanctions that it may rely upon to discourage abuse of the judicial process. Among these are Rule 11(b) and (c) and Rule 26(g) of the Federal Rules of Civil Procedure. Additionally, the court has inherent power to issue sanctions. The form of such sanctions may be monetary or nonmonetary, and the sanction may be imposed on the parties, the attorneys, or both, depending on the type of sanctionable conduct and the authority used to support the sanction.

*1. Rule 11 Sanctions*

The sanctions available under Rule 11 were designed to require attorneys to make "a reasonable inquiry into the law and facts" before signing pleadings, written motions, or other documents," and to make "litigants stop-and-think before initially making legal or factual contentions." *See* FED R. CIV. P. 11 advisory committee note to 1993 amendment, Subdivisions (b) and (c) (quotations omitted).[13] This obligation exposes "litigants to potential sanctions" if they continue "insisting upon a position

---

[13] Rule 11's purpose "is to deter baseless filings in district court." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 393 (1990). "Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, legally tenable, and not interposed for any improper purpose." *Id.* (quotations omitted). This is not limited to the initial pleadings. It applies to any briefings.

after it is no longer tenable." *Id.* Thus, when "evidentiary support" for a factual contention is "not obtained after a reasonable opportunity for further investigation or discovery," a litigant has "a duty under the rule not to persist with that contention." *Id.* This makes clear that the duties imposed under Rule 11 are ongoing and "are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have merit." *Id.*

In determining what sanction may be imposed under Rule 11, the court has wide discretion, which is only restrained by the principle that any sanction imposed should be no more severe "than reasonably necessary to deter repetition of the conduct by the offending person or comparable conduct by similarly situated persons." *Id.* Rule 11 sanctions may be imposed upon a specific attorney, the law firm representing a party, or the party. *See* Fed. R. Civ. P. 11(c)(3), (5). The court may enforce Rule 11 on its own, that is *sua sponte,* without any motion from a party. S*ee id.*(c)(3); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 n.8 (1991).

However, when the court acts *sua sponte* it may not impose a monetary sanction unless it first issues an order to show cause before doing so (as the court did here). *See* Fed R. Civ. P. 11(c)(5)(B). Although other monetary sanctions are permitted, when acting *sua sponte*, the court may not impose the sanction of attorney fees. *See id.*(c)(4) (noting attorney fees may be awarded upon motion only). The requirement for a show cause order provides procedural protections when a

court acts *sua sponte*, *In re Engle Cases*, 283 F. Supp. 3d 1174, 1209 (M.D. Fl 2017)

(citing Fed. R. Civ. P. 11(c)(3)), as does the preclusion of awarding attorney fees.

And in reviewing whether sanctions are warranted under Rule 11(b), the court will

examine the actionable conduct under an "objective standard of reasonableness"

lens. *In re Byrd, Inc.*, 927 F.2d 1135, 1137 (10th Cir. 1991).

HTS contends *sua sponte* sanctions under Rule 11 must be considered under a

subjective bad faith standard. Resp. to Notice, at 17, 18 n.11, 82 n.94 (ECF No. 290).

HTS quotes two cases from the Second Circuit in support of its contention. *Id.* at 17.

More relevant than Second Circuit cases for persuasive authority, is a Tenth Circuit

case concluding that a  magistrate judge "applied the correct Rule 11 standards" when

the magistrate judge applied an "objectively reasonable inquiry" in determining the

appropriateness of *sua sponte* sanctions under Rule 11. *In re Allen*, 248 F. App'x 874,

882 (10th Cir. 2007).

Rule 11 does not specify that subjective bad faith is required before *sua

sponte* sanctions may be imposed. *In re Engle Cases*, 283 F. Supp. 3d at 1211. This

is so even though a 1993 Advisory Committee Note states orders to show cause "will

ordinarily be issued only in situations that are akin to contempt of court," Fed R.

Civ. P. 11 advisory committee note, Subdivisions (b) and (c); *see also McComb v.

Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) (noting willfulness is not required

for civil contempt). Indeed, Rule 11 was amended in 1983 to remove a subjective

standard and replace it with an objective standard. *Id.* at 1214 (citing Fed. R. Civ.

-23-

P. 11 advisory committee note to 1983 amendment). Moreover, after the court in the *Engle Cases* engaged in "careful research" across circuits, it was "not aware of any other circuit court of appeals, beyond the Second Circuit, holding that *sua sponte* Rule 11 sanctions require a showing of subjective bad faith."[14] *Id.* at 1213.

In light of the clear weight of authority, the position taken by HTS's counsel in the response to the Notice of Hearing to Show Cause demonstrates a lack of candor to the court. This has been an ongoing problem with HTS and Reinitz, and it is particularly concerning when it occurred again in HTS' response to the Notice of Hearing to Show Cause.

2. *Rule 26(g) Sanctions*

Rule 26(g) sanctions were promulgated to deter "excessive discovery and evasion by imposing a certification requirement that obliges each attorney to stop and think about the legitimacy of a discovery request, a response thereto, or an objection." *See* FED. R. CIV. P. 26 advisory committee note to 1983 amendment, Subdivision (g). The "Rule allows the court to impose sanctions on the signer of a discovery response when the signing of the response is incomplete, evasive or

---

[14] The court in the *Engle Cases* applied an objective bad faith standard that required finding a litigant pursued a knowingly or recklessly frivolous claim or obstructed litigation based on Eleventh Circuit law. *In re Engle Cases*, 283 F. Supp. 3d at 1214. In the Tenth Circuit, the standard differs in that it is based on objective reasonableness. *See In re Allen*, 248 F. App'x at 882. Even if the standard required a finding of bad faith, however, the court concludes that standard has been met in this case both due vexatious conduct and for continuing to pursue claims, that after a reasonable inquiry and discovery, were without foundation.

objectively unreasonable under the circumstances." *St. Paul Reinsurance Co. v. Com. Fin. Corp.*, 198 F.R.D. 508, 515 (N.D. Iowa 2000) (citations omitted). A signature on a discovery response becomes a certification that the response to interrogatories or requests for production of documents conforms to Rule 26(g) requirements and is not evasive or misleading. *See id.* (citing *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1372 (11th Cir. 1997); *Malautea v. Suzuki Motor Corp.*, 987 F.2d 1536, 1545 (11th Cir. 1993, *aff'g Malautea v. Suzuki Motor Corp.*, 148 F.R.D. 362, 374 (S.D. Ga. 1991)) (other citations omitted).

"Rule 26(g) imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 and Rule 37." *Schmelzer v. IHC Health Srvs., Inc.*, Case No. 2:19-cv-965, 2022 WL 16646456, at *5 (D. Utah Feb. 10, 2022) (quotations and citations omitted). "[T]he party resisting the discovery has the burden to establish that the requested discovery does not come within the scope of relevance as defined under Rule 26(b)(1) . . . ." *Cardenas v. Dorel Juvenile Group, Inc.*, 232 F.R.D. 377, 382 (D. Kan. 2005).

A Rule 26(g) sanction may be imposed where, for example, an interrogatory response contains an incomplete answer when responsive information was readily available upon reasonable investigation. *See, e.g., Heller v. City of Dallas*, 303 F.R.D. 466, 494 (N.D. Tex. 2014) (imposing Rule 26(g)(3) sanction where counsel certified an incomplete interrogatory answer that reflected a lack of reasonable inquiry). Sanctions also may be imposed when one makes boilerplate objections to a

discovery request because such objections are frivolous and obstructionist.  *St. Paul Reinsurance Co.*, 198 F.R.D. at 514–15.  Additionally, when one responds to a request for production, the party "must supplement or correct its response in a timely manner if the party learns that in some material respect the response is incomplete or incorrect."  *Voggenthaler v. Maryland Square, LLC*, No. 2:08-CV-01618, 2010 WL 11579075, at *2 (D. Nev. Mar. 2, 2010).  Sanctions may be imposed if a party does not do so.

Sanctions may be imposed upon the signer of the document, upon the party on whose behalf the document was signed, or both.  *See* FED R. CIV. P. 26(g)(3).  Like Rule 11, the standard for sanctions under Rule 26(g) is an objective one.  *See In re Byrd*, 927 F.2d at 1137; *see also* FED. R. CIV. P. 26(g) advisory committee note to 1983 amendment, Subdivision (g).  And again, like Rule 11, the sanction that may be imposed should be "no greater than necessary to cure the prejudice caused by the discovery violation."  *See LKQ Corp. v. Kia Motors Am., Inc.*, 345 F.R.D. 152, 160 (N.D. Ill. 2023) (quotations and citations omitted).

However, unlike Rule 11, if the court finds a Rule 26(g) violation has occurred "without substantial justification," the imposition of some sanction is mandated.  *See* FED. R. CIV. P. 26(g)(3).  Substantial justification means "'justified in substance or in the main'—that is, justified to a degree that could satisfy a reasonable person" and entails a "reasonable basis in both law and fact."  *See Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citations omitted).  That said, the Tenth Circuit has adopted

the approach of other federal courts considering sanctions under Rule 26(g)(3) and "applied case law applicable to Fed. R. Civ. P. 11." *See In re Byrd, Inc.*, 927 F.2d at 1137.

Like Rule 11, sanctions can be imposed under Rule 26(g) by the court *sua sponte. See, e.g., Chambers*, 501 U.S. at 42 n.8 (noting that "[t]he court generally may act *sua sponte* in imposing sanctions under the Rules"); *see* FED R. CIV. P. 26(g)(3) (noting the court may act "on motion or on its own"). But unlike Rule 11, when acting *sua sponte* under Rule 26(g), the court may, among other things, also impose a sanction of attorney fees. *See* FED. R. CIV. P. 26(g)(3) ("The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation.").

### 3. Inherent Power Sanctions

A federal court also has inherent power to sanction a litigant that has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. at 45–46 (quotations and citations omitted). When considering a sanction under its inherent power, the court will apply a subjective "bad faith" requirement. *See id.* at 49. A court may sanction the party or its counsel. *Id.* at 43, 46. Sanctions may include dismissal with prejudice of all claims. *Id.* at 45. Sanctions also may award attorney fees, but only insofar as the fees were incurred because of the sanctionable conduct. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017).

Courts have recognized this inherent power to impose sanctions when, for example, "a relevant filing, motion, or pleading contains a mix of frivolous and nonfrivolous assertions." *U.S. v. Akers*, 76 F.4th 982, 991–92 (10th Cir. 2023) (noting same principle applies in Rule 11 context), and where it was found that there was an effort to withhold evidence during discovery. *See Goodyear Tire & Rubber Co.*, 581 U.S. at 104–05. The United States Supreme Court has recognized that this inherent power "includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process," *see id.* at 108 (quotations and citation omitted), but that this power must be used "with restraint and discretion." *Id.* at 108 n.5 (quotations and citation omitted). Moreover, the court "must comply with the mandates of due process" by providing the litigant with notice and an opportunity to be heard. *Chambers*, 501 U.S. at 50 (citation omitted).

What constitutes due process "depends upon the severity of the considered sanctions: 'The due process concerns posed by an outright dismissal are plainly greater than those presented by assessing counsel fees against lawyers.'" *G.J.B. & Assocs., Inc. v. Singleton*, 913 F.2d 824, 830 (10th Cir. 1990) (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980)). "Yet prior to imposing fees and costs upon an attorney for whatever reason, the district court should provide the attorney with an opportunity to fully brief the issue. An oral or evidentiary

hearing, however, is not required."[15]  *Id.* (citing *Braley v. Campbell*, 832 F.2d 1504, 1514–15 (10th Cir. 1987) (en banc)).

Notably, the court may impose sanctions under its inherent power even if there are applicable procedural rules, such as Rule 11 or Rule 26, that permit sanction of the same conduct.  *See Chambers*, 501 U.S. at 49–50.  In *Chambers*, the Supreme Court acknowledged that a court is not forbidden from sanctioning bad faith conduct "simply because that conduct could also be sanctioned under the statute or the Rules," but it noted that the court "ordinarily should rely on the Rules rather than the inherent power."  *Id.* at 50.  Nevertheless, "if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power."  *Id.*

---

[15]  Although a United States Supreme Court has stated that a hearing is required before imposing attorney fees, *see, e.g., Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980) (stating "[l]ike other sanctions, attorney's fees certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record"), the Tenth Circuit has not interpreted that case as always requiring a hearing before attorney fees may be imposed under the court's inherent authority.  *See G.J.B. & Assocs.*, 913 F.2d at 830.  Instead, the existing record may be sufficient to show that attorney fees are warranted.  In other words, due process may or may not warrant a hearing depending on the circumstances of that case.  *See, e.g., Sec. & Exch. Comm'n v. Digital Licensing Inc.*, No. 2:23-cv-0482, 2024 WL 1157832, at *32–33 (D. Utah Mar. 18, 2024) (imposing attorney fees and costs under court's inherent authority, after issuing an order to show cause and considering written responses, but without holding a hearing).  HTS' briefing points to caselaw from other jurisdictions to the contrary, Second Resp. to OSC, at 2 (ECF No. 292), but HTS and its counsel's obligation is to inform the court about caselaw from the relevant circuit.  HTS and its counsel failed to do so.

*4.  Absence of an Evidentiary Hearing*

On June 24, 2022, the court vacated an evidentiary hearing it had initially

scheduled on the OSC.  Order (ECF No. 291).  In response, HTS and its counsel

asserted that if the court imposes sanctions, without conducting an evidentiary

hearing, it would be improper.  Second Resp. to OSC, 1–3 (ECF No. 292).  "There is,

however, no requirement under Rule 11 or Rule 26(g) for the court to conduct an

evidentiary hearing.  When a court exercises its inherent authority, whether a

hearing is needed depends on the circumstances of the case and the sanctions at

issue, as discussed above.

There is no dispute that the court is acting *sua sponte*.  The court provided

HTS and its counsel with notice about what was at issue, and it scheduled a hearing

to afford them an opportunity to respond.  Notice of Hr. to Show Cause (ECF Nos.

272–274).  HTS and its counsel elected to respond to the OSC by filing an 85-page

document that also contained 39 pages of exhibits, and then still sought to have an

evidentiary hearing as well.  HTS' Responses to OSC (ECF Nos. 289, 290).

As the Tenth Circuit has recognized, the opportunity to be heard does not

mandate that an oral or evidentiary hearing be held.  *See G.J.B. & Assocs., Inc. v.

Singleton*, 913 F.2d at 830; *White v. Gen. Motors Corp.*, 908 F.2d 675, 686 (10th

Cir.1990) *cert. denied*, 498 U.S. 1069 (1991) (stating "[t]he opportunity to fully brief

the issue is sufficient to satisfy due process requirements").  Based on the sanctions

imposed below and the opportunity to fully brief the issues, which HTS and its

-30-

counsel had,[16] the court concludes HTS received sufficient due process.  *See White*, 908 F.2d at 686.

Immediately after the court cancelled the hearing, HTS and its counsel filed an additional 6-page response that again addressed some of the issues raised in the OSC and advanced HTS' argument on why it believed an evidentiary hearing was required.  (*See* ECF No. 292.)  HTS relied on several authorities that address the need for a hearing if the court imposes the sanction of dismissal.  Although the court contemplated dismissal, as no such sanction is being awarded in this case, those cases are inapposite.  The court, therefore, proceeds with its sanctions analysis.

## ANALYSIS

### I. SANCTIONS

#### A. Amit's Rule 11 Motion

As stated above, Amit filed a Motion for Rule 11 Sanctions.  Rule 11 has a safe harbor provision that requires a motion to be served on the relevant party, at least twenty-one days prior to filing the motion, to allow the relevant party to correct alleged wrongdoing.  The Tenth Circuit Court of Appeals has concluded,

---

[16]  Amit also was afforded an opportunity to show cause why he should not be sanctioned, and he filed a brief in response.  *See Quest Sol., Inc. v. RedLPR, LLC*, No. 2:19-CV-437-CW-DBP, 2024 WL 455058, at *4 (D. Utah Feb. 6, 2024); Amit's Resp. (ECF No. 328).

"the plain language of subsection (c)(1)(A) requires a copy of the actual motion for sanctions to be served on the person(s) accused of sanctionable behavior at least twenty-one days prior to the filing of that motion." *Roth v. Green*, 466 F.3d 1179, 1192 (10th Cir. 2006); *see also Rusk v. Fid. Brokerage Servs.*, 850 F. App'x 657, 658–59 (10th Cir. 2021) (holding that "substantial compliance" with the safe harbor service provision "fails legally because our precedent requires service of the actual motion to be filed; warning letters are insufficient") (citing *Roth*, 466 F.3d at 1192)).

HTS contends Amit's motion should be denied and may not be considered because, among other things, Amit served an incomplete version of his Rule 11 motion on HTS.[17]  Mem. in Opp'n to Amit's Mot., at 29–31 (ECF No. 267).  HTS is correct.  Amit served two Rule 11 motions on HTS, but neither motion was the same as the one that Amit filed with the court.  *Cf* ECF Nos. 267-18, 267-19 *with* ECF No. 243.  Accordingly, the court denies Amit's Rule 11 motion (ECF No. 243) and no sanctions are awarded based on that motion.

---

[17]  To support its argument, HTS relies on several unpublished district court decisions from the Ninth Circuit.  Mem. in Opp'n to Amit's Mot., at 30–31 & nn.26–29 (ECF No. 267).  District courts in that circuit differ on whether an identical document is required to meet the safe harbor provisions. *See Slovak v. Golf Course Villas Homeowners' Ass'n*, No. 3:13-cv-569, 2020 WL 929515, at *7 (D. Nev. Feb. 26, 2020) (citing cases coming to contrary conclusion on whether service of an incomplete motion satisfies the safe harbor requirement).  Besides the lack of consistency among district courts in that circuit, the cases also are not controlling in this circuit.

**B.    HTS' Argument Against Sanctions**

Next, the court addresses HTS' citation to *USA Power, LLC v. PacificCorp.*, 2010 UT 31, 235 P.3d 749, whereby it claims that sanctions cannot be imposed because there was at least some circumstantial evidence that Defendants may have misappropriated its trade secrets.  HTS' Resp. to OSC, at 25 & n.19 (ECF No. 290). In *USA Power*, the Utah Supreme Court concluded that, in opposing a motion for summary judgment, a plaintiff could offer circumstantial evidence of trade secret misappropriation in order to defeat a summary judgment motion.  *USA Power, LLC*, 2010 UT 31, ¶¶ 1, 50, 52.  But *USA Power* does not shield HTS from sanctions.

As a threshold matter, *USA Power* did not involve any sanctions, let alone any power under the Federal Rules of Civil Procedure to issue sanctions.  *USA Power* only addressed a Utah trade secrets claim and not a federal trade secrets claim.  Additionally, there was no dispute in *USA Power* that the defendant actually received three binders that contained all the alleged trade secret information.  *Id.* ¶ 52.

In that circumstance, the Court held "that a jury can infer misappropriation," under Utah law, when a plaintiff presents "circumstantial evidence that shows access to information similar to the trade secret at issue." *Id.* ¶ 50.  Both access and similarity must be shown. *Id.* ¶¶ 48–49 (stating the "[C]ourt implicitly adopted the access and similarity rule" previously, and "similarities alone do not constitute misappropriation"); *see also Hammerton, Inc. v. Heisterman*, No. 2:06-cv-806, 2008

WL 2004327, at *9 (D. Utah May 9, 2008) (stating circumstantial evidence showing access to a trade secret and "similarity in the respective designs or products" may establish misappropriation of a trade secret).

In this case, HTS failed to show Defendants had access to the SeeFusion algorithm. Repeatedly the court explored whether the algorithm was available to Defendants and repeatedly HTS failed to establish that it was. As the court has stated, while the features and functionality of the algorithm—information that was public and admittedly not a trade secret—may have been disclosed to Defendants, HTS never disclosed, to borrow a phrase, the "secret sauce" or the actual steps of the SeeFusion algorithm to Defendants. *USA Power* is therefore inapplicable as to the SeeFusion algorithm. Additionally, HTS most certainly did not detail or produce the algorithm during fact discovery, which in itself is sanctionable conduct.

As for the N70 camera, HTS asserts the similarities between its N70 camera and RedLPR's product constituted circumstantial evidence of misappropriation of that trade secret. The similarities are not surprising because both parties used the same camera sold publicly by Hitron. And to the extent HTS asserted it was the modifications to the standard camera that were similar, the court addressed that the combination of features was known in the industry, which cannot sustain a trade secret misappropriation claim. *Quest Sol., Inc.*, 2023 WL 11910450, at *23–26, 51–52. HTS chose to paint with broad brush strokes when it asserted HTS and RedLPR's products were similar. More was required. It had to make adequate

disclosure in its discovery responses about what aspect of the N70 combination constituted the trade secret.  It also had to show that a trade secret was at issue as it continued to press the N70 combination claim to the court.  Consequently, HTS' argument about circumstantial evidence is insufficient to avoid sanctions.

### C.    Rule 11 Sanctions

In its pleadings and motions HTS, through its counsel, contended that Barker and Amit misappropriated HTS's trade secrets.  Past the point when it should have been apparent that HTS' contention lacked merit, HTS continued to press its position.[18]  For example, although HTS' motion to compel production of documents pertaining to the Charlotte Airport Project was denied because HTS failed to "connect identifiable trade secrets, and the alleged misappropriation thereof, to its discovery request," Order Denying Mot. to Compel, at 3 (ECF No. 131), HTS continued to press its position that Defendants misappropriated trade secret information pertaining to that project.  It also continued to press its position about price lists without connecting them to the misappropriation of trade secrets.  *Quest Sol., Inc.*, 2023 WL 11910450, at *31–33.

As for the SeeFusion algorithm, since 2021, HTS has relied on its claim that because Defendants described a "special sauce" that allowed the best license plate

---

[18]  "When it becomes apparent that discoverable evidence will not bear out the claim, the litigant and his attorney have a duty to discontinue their quest."  *Avirgan v. Hull*, 932 F.2d 1572, 1582 (11th Cir.1991) (quotations and citation omitted).

image to be selected, Defendants must have been using HTS' unique algorithm, which purportedly does something similar. Although the court rejected that argument in April 2021, HTS persisted in subsequent briefing and oral argument to present the same contention. It did so knowing that Barker and Amit never had access to a written document containing the SeeFusion algorithm because no such document existed—a fact not disclosed until after the April 20–21, 2022, summary judgment hearing.

Additionally, HTS made no effort to develop evidence to show what training, if any, Barker and Amit actually received on the algorithm.[19] The declaration from HTS' CTO merely declares that some relevant employees received training to give them "a deeper understanding of HTS' technologies." Hofman Decl., at ¶¶ 43–44 (ECF No. 116-1). The CTO omitted identifying Barker and Amit as being among those to whom he or others provided training on each of the algorithm's sequential steps,[20] and the declaration does not detail the nature of that training other than point to Slide 51 of the Falcon Eyes Presentation.

---

[19]  The court recognizes HTS presented an email that contained a request from certain HTS employees for training on various topics, including Amit's request for training on the algorithm. Evidence of what training actually occurred, however, was not presented.

[20]  Since Hofman was the person charged with protecting the algorithm, and the algorithm was disclosed only on a need to know basis, Hr. Tr., at 158:5–9 (ECF No. 283), the CTO's omission in reporting that Barker and Amit were among those who received training on the algorithm's sequential steps is telling. Hofman made a general reference even though he well knew that Barker and Amit are defendants in this case and what was at issue. Under such circumstances, it would be an impermissible to assume Barker and Amit must have

The reference to Slide 51 does not provide HTS with any succor.  First, the Falcon Eyes Presentation is a training document dated from 2014, which was two years before Amit became an employee.  *See Quest Sol., Inc.,* 2023 WL 11910450 at *36.  Second, the training material referred to a dual-head camera, which according to Reinitz's representations to the court, no dual-head camera contains the algorithm.  *Id.* at *36–37 (record citations omitted).  Third, Slide 51 is only a graphic representation that contains no detail or textual discussion as to the SeeFusion algorithm.[21]  As such, Slide 51 did not and could not provide any factual support to establish that Amit and Barker had access to the SeeFusion algorithm.

At the time that HTS was representing to the court that the Riverland NDA showed Amit shared HTS' trade secret information with Riverland, including the SeeFusion algorithm, HTS was withholding the fact that the algorithm did not exist in written form.[22]  Since the algorithm did not exist in written form and there was

_____

been among the relevant personnel who received training on the algorithm's sequential steps.  Barker and Amit knew what the algorithm did, but they did not know the trade secret.

[21]  Nor would it have been expected to include such detail if the Falcon Eyes Presentation was shared externally like other HTS presentations because that would defeat any trade secret claim had a trade secret in fact been divulged in the presentation.

[22]  HTS contends the court held the NDA was sufficient to defeat the first motion for summary judgment, so the court cannot in hindsight alter its conclusion.  Had HTS informed the court that the SeeFusion algorithm did not exist in written form, the court's analysis would have been different.  HTS cannot rest its argument on the court's prior ruling when HTS and its counsel withheld relevant information from the court.

no evidence to show Barker and Amit received training on each sequential step of

the algorithm, that should have given HTS pause over whether it could prove access

to the algorithm.

Lest HTS asserts it thought that RedLPR's marketing materials constituted

circumstantial evidence of misappropriation, HTS knew the court had rejected that

argument by April 28, 2021.[23]  Thus, even though Defendants referred to a "special

sauce" in their marketing materials and described how their LPR system also used

an algorithm, which may have given HTS and its counsel an initial reason to

suspect that Defendants were misappropriating the SeeFusion algorithm,[24] it

should have become apparent after even a minimal investigation that Defendants

could not have misappropriated the algorithm and that the NDA did not support its

---

[23]  That Defendants may have described their competing product and process in a manner
that suggested an equivalency or similarity to HTS' products and processes does not make a
trade secret claim in this case.  HTS could have presented affidavits from trainers to show
what training Barker and Amit received.  It also could have developed forensic evidence to
show use of the algorithm.  It did neither.  It merely pointed to similar functions, without
showing that the functions were carried out by the same sequential steps of the SeeFusion
algorithm.  *See Quest Sol., Inc.*, 2021 WL 1688644, at *4 (stating "knowledge about a
product feature does not equate to knowing the algorithm behind the feature" and that it is
not what the algorithm does but how it does it that constitutes the trade secret).  HTS also
did not show access.

[24]  Amit testified during his deposition that, during the pendency of the case, he put
information on LinkedIn to see if HTS would pick up on it and move "the goal post" about
what HTS was claiming as a trade secret.  Amit Depo., at 250:9–22 (ECF No. 219-1).
Regardless of whether Amit may have presented his products in a manner to draw HTS'
attention, that fact did not relieve HTS from its obligations to conduct a reasonable
investigation concerning access to the algorithm.

claim.[25]  HTS continued to make arguments in briefings and at oral argument after

the point it should have stopped.

The court notes the potential factors to consider when determining sanctions

include, in part, the following:

> Whether the improper conduct was willful, or negligent;
> whether it was part of a pattern of activity, or an isolated
> event; whether it infected the entire pleading, or only one
> particular count or defense; whether the person has
> engaged in similar conduct in other litigation; whether it
> was intended to injure; what effect it had on the litigation
> process in time or expense; whether the responsible person
> is trained in the law; what amount, given the financial
> resources of the responsible person, is needed to deter that
> person from repetition in the same case; what amount is
> needed to deter similar activity by other litigants.

Fed. R. Civ. P. 11 advisory committee note to 1993 amendment.  The court

concludes that HTS and its counsel's conduct was not merely negligent.  It was done

in bad faith, and it was part of a pattern in this litigation.  The conduct impacted

the length and expense of the proceedings, and it was done by a sophisticated party

and experienced counsel.  This conduct, in part, eventually led to the failure of

Defendants' business.  Were this not a *sua sponte* motion, the court would conclude

that attorney fees were warranted as a sanction.  Although the court cannot impose

---

[25]  In the court's Notice of Hearing to Show Cause, it questioned HTS' prefiling
investigation.  Subsequently, the court concluded that HTS' prefiling investigation did not
"support what Plaintiffs asserted in their Complaint and the Alert Letter."  *Quest Sol., Inc.*,
2023 WL 11910450, at *16.

attorney fees under Rule 11, the rule does permit ordering HTS and its counsel to pay a limited "penalty into court." Fed. R. Civ. P. 11(c)(4). For its misconduct under Rule 11(b)(1) and (b)(3), the court orders HTS to pay a $5,000 penalty to the court. The court further orders Reinitz to pay a $5,000 penalty to the court, for a total penalty of $10,000.[26]

### D.    Rule 26(g) Sanctions

The primary focus of this litigation has been on HTS' contention that Defendants misappropriated HTS' trade secrets. HTS filed its first pleading on June 24, 2019. Complaint (ECF No. 2.) Despite these misappropriation contentions (and the obvious importance of identifying what actual trade secrets were at issue in a "trade secrets" case), when HTS was asked in an interrogatory to "[i]identify with specificity each trade secret" that was allegedly misappropriated, HTS' interrogatory response did not do so. It merely repeated the same generalized items stated in its Complaint. Further discovery efforts to obtain more specificity were unavailing. It took almost two years, and the filing of a dispositive motion against HTS, before HTS even put a name to a camera. HTS' failure to identify its trade secrets adequately permeated these proceedings, and harmed Defendants' ability to defend against HTS' claims.

---

[26] Courts have approved a Rule 11 penalty greater than this amount. *See, e.g.*, *MHC Inv. Co. v. Racom Corp.*, 323 F.3d 620, 627–28 (8th Cir. 2003) (affirming $25,000 *sua sponte* sanction under Rule 11).

Additionally, similar to the problematic objections made during deposition, HTS, through its counsel, also made problematic objections when responding to discovery requests.  For example, HTS was asked to "[s]tate all facts supporting the following allegation in paragraph 107 of the Complaint: RedLPR utilized HTS' technical trade secrets, including specifications of HTS' proprietary imaging units, software application, and LPR server devices to produce RedLPR-branded products, each of which is virtually indistinguishable from a product offered by HTS." Interrog. Resp. No. 24 (ECF No. 251-2).  HTS objected that the terms "state" "all facts" and "supporting" were vague and ambiguous.  *Id.*

The remainder of HTS' response also was incomplete.  It stated, "the referenced paragraph of the Complaint is based *in part* on a review of technical information and documents posted on www.redlpr.com."  *Id.* (emphasis added). HTS disclosed "in part."  It did not disclose the full basis for a contention it made in its Complaint.

HTS also did not supplement its discovery responses appropriately.  When HTS asserted in response to Interrogatory No. 2 that HTS was "producing responsive documents" to "identify specifically the information the trade secret consists of," (ECF No. 50-37 at 4–5), HTS had a duty to supplement that response after it alleged misappropriation of the SeeFusion algorithm because there was no written document to produce.  That was critical information to know, and HTS' failure to disclose the absence of such a written document resulted in wasted efforts

seeking for its production. Moreover, it impacted Defendants' ability to defend against HTS' assertion that Defendants had access to the algorithm.

Neither HTS nor its counsel have offered any substantial justification for failing to timely and fully provide accurate discovery response or failing to supplement its responses appropriately. The discovery responses were vague, incomplete, inaccurate, and evasive as to the identification about what trade secrets were at issue. HTS failed to respond properly to document requests, and the court expressly finds that HTS and counsel's signatures on HTS' interrogatory responses were a false certification that, to the best of their knowledge and belief, formed after a reasonable inquiry, the responses as to trade secret identification were consistent with the rules, warranted by law, and reasonable.

HTS' Rule 26(g) violations resulted in damages beyond merely incurring attorney fees to meet and confer. HTS' incomplete and evasive responses impacted depositions and briefing on dispositive motions. It left Defendants and the court guessing about what was at issue, and it wasted time and resources. It left Defendants without needed information to defend against HTS' Trade Secret Claims. Due to its pervasive impact, all attorney fees, costs, and expenses resulting from HTS' failure to disclose its trade secrets and adequately supplement its responses are awarded as a sanction.[27]

---

[27] The court is aware that more recently Amit has appeared *pro se* in this action. As such, he would not be entitled to recover attorney fees, and the court would not award him any

### E.    Inherent Authority Sanctions

#### i.    *HTS and Its Counsel's Conduct*

Like a jilted lover, HTS, with the aid of its attorneys, sought revenge against

former employees Barker and Amit for creating a competing company.  Lacking the

armament of binding non-compete agreements, HTS attacked by initiating and

weaponizing this overreaching lawsuit in an effort to brand Barker and Amit as

trade secret thieves and destroy their fledgling company, RedLPR.

Indeed, on October 18, 2019, soon after initiating this action, HTS' counsel,

Ariel Reinitz, sent out a letter under his signature and on his law firm's letterhead

to persons in the LPR industry that claimed (1) HTS had "conducted an internal

investigation" and discovered that Barker and Amit, while employed at HTS, had

"engaged in a wide-ranging campaign of unlawful conduct"; (2) that Barker and

Amit had "spent months secretly misappropriating HTS' technical and business

trade secrets," and (3) that the "stolen trade secrets are the foundation upon which

RedLPR was built and currently operates."  Industry Lttr. (ECF No. 49-34).  The

letter further informed the recipients a case was pending in federal court, that HTS

sought $25 million in damages, and it warned that those "who utilize RedLPR's

---

attorney fees for work done during those *pro se* periods.  However, there was a time when
Amit was represented by counsel.  To the extent that Amit can establish fees he incurred
while he was represented by counsel that relate to HTS' Rule 26(g) violations, he should
submit a motion and declaration establishing the same as discussed in the Conclusion and
Order below.

offerings . . . may be exposed to liability." *Id.* Despite such assertions, HTS never sought an injunction to halt Defendants' use.

In its April 28, 2021, opinion, the court expressed concern that HTS may be "using these proceedings to harm a competitor based on mere supposition," and that the court did not take lightly "[i]mproper use of litigation." *Quest Sol., Inc.*, 2021 WL 1688644, at *5. The court's concern was heightened by the fact that although Reinitz's letter purported to claim that evidence was found during the investigation showing trade secrets were stolen, it was "troubling that HTS has failed to identify its trade secrets appropriately and is now asserting it needs [additional] discovery to prove misappropriation and use of HTS' technology." *Id.* at *5.

As outlined above, HTS and its attorneys improperly delayed identifying exactly what trade secrets were allegedly misappropriated. HTS and its attorneys also continued to maintain misappropriation claims against Defendants even though they (1) failed to disclose the algorithm did not exist in written form; (2) had an inadequate basis on which to assert Defendants had access to the algorithm; (3) had not tied in the October 2018 sales pipeline properly or its pricelists; and (4) had failed to protect its alleged trade secrets with any degree of care. Additionally, the changing positions about what constituted the SeeFusion algorithm and how it was implemented in products was deceptive. Reinitz's overuse of objections in Lustgarten's deposition was done to harass and obstruct. And, the Riverland

settlement agreement shows just how untenable HTS' claims were about misappropriation.

Examining HTS' and its counsel's conduct as a whole, the court concludes that HTS' and its counsel's conduct amounts to bad faith conduct that is both objectively and subjectively unreasonable and vexatious.  Their conduct improperly prolonged and enlarged the dispute, imposed undue burdens and costs on Defendants, and wasted judicial time and resources.  The court further concludes HTS and its counsel's continued assertions as to misappropriation in their summary judgment oppositions was objectively and subjectively unreasonable and vexatious.

### ii.    *Defendants' Conduct*

Although the court has concluded that HTS and Reinitz's acted in bad faith, whether additional sanctions should be imposed under the court's inherent authority is informed by Defendants' conduct as well.  Despite Amit being a *pro se* litigant, he clearly has been warned and ordered not to disclose certain sealed information.  *Quest Sol., Inc.,* 2024 WL 455058, at *4.  The court issued an order to show cause on February 6, 2024, why Amit "should not be sanctioned for violating multiple court orders."  *Id.*  In or around this same time, however, Amit further disregarded this court's orders and improperly posted information on YouTube.  *See* Mot. for TRO (ECF No. 322) (detailing the issue).  While Amit may have his own opinions about what should be in the public domain, he is not free to disregard this

court's orders.[28]

On another note, during the first round of summary judgment briefing in 2021, including on a Rule 56(d) motion, HTS asserted that Defendants had failed to produce some relevant documents. The court admonished all parties that they had "to adhere to disclosure requirements." *Quest Sol., Inc.*, 2021 WL 1688644, at *4. Nevertheless, the court noted "that HTS must first disclose its claimed trade secrets, with the required detail, before it is entitled to discovery on trade secret matters from the defendants." *Id.* Thereafter, HTS amended its trade secret identifications, but as discussed above and in the court's August 3, 2023, HTS did not disclose its trade secrets sufficiently. Moreover, HTS has no motion before the court seeking discovery sanctions, and there are insufficient facts to show Defendants' conduct warrants *sua sponte* sanctions for failing to produce documents.

The court also addresses RedLPR's preparation for its Rule 30(b)(6) deposition. The deposition transcript shows neither Defendants nor Barker and RedLPR's counsel had an understanding about what a Rule 30(b)(6) deposition was. Typically, failing to prepare adequately for a such a deposition would warrant imposition of cost and fees on Defendants and/or their counsel. Reinitz, however, is

---

[28]  "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum in their presence, and submission to their lawful mandates." *Chambers*, 501 U.S. at 43.

an experienced litigator, and his conduct during the deposition was not appropriate. Rather than sanctioning Defendants or HTS, the court concludes the parties' respective conduct cancels out sanctions being awarded.

### iii.    Balancing of Factors

Although the court has concluded that HTS and Reinitz engaged in bad faith conduct, the court must balance whether to impose additional sanctions for such conduct. The court takes into consideration the sanctions it is imposing under Rule 11 and Rule 26(g) in making this determination. It further takes into account Amit's conduct in disregarding court orders. While Amit's emotions are both explainable and understandable in light of HTS and its counsel's conduct, Amit's conduct is not justifiable. Accordingly, as to Amit, the court imposes no additional sanctions against HTS to redress Amit's attorney fees, costs, and expenses beyond that stated above under Rule 26(g).

Whether Barker and RedLPR should receive additional redress for their attorney fees, costs, and expenses depends in part on what is awarded for the Rule 26(g) violations. Following submission of the materials requested in connection with the Rule 26(g) sanctions, the court will reexamine whether the Rule 11, Rule 26(g), and nonmonetary sanction (discussed below), are "up to the task" to deter HTS and its counsel from engaging in bad faith conduct again. *See Chambers*, 501 U.S. at 50.

Although the court does not now award attorney fees under its inherent authority, it concludes a nonmonetary sanction is appropriate. The nonmonetary sanction pertains to the letter HTS and its counsel sent to the LPR industry in October 2019. As noted above, the letter asserted that following an "internal investigation," HTS learned that Defendants had misappropriated HTS' trade secrets, that there was a pending federal lawsuit on the matter, and that anyone using RedLPR's products could be subject to liability. Development of the evidence showed the allegations in the letter to be baseless, and that HTS has misused the litigation process.

To redress this harm to Defendants, HTS and its counsel are ordered to provide a complete copy of this Memorandum Decision and Order to every person or entity that received Mr. Reinitz's October 18, 2019, letter within 30 days of the date this Memorandum Decision and Order is docketed. HTS and its counsel are ordered to file, under penalty of perjury, a declaration certifying their compliance with this directive at the close of that same 30-day period.[29]

---

[29] The court notes that as a signer of both the discovery at issue and summary judgment papers, local counsel for HTS also had obligations under Rule 11 and Rule 26. While the court has not, in this Memorandum Decision and Order, imposed any sanctions under those Rules on local counsel, the court has not foreclosed any such sanction. Should additional information come to the court's attention concerning local counsel's role in drafting the discovery responses or the summary judgment motions, the court may revisit this issue. *See St. Paul Reinsurance Co. v. Com. Fin. Corp.*, 198 F.R.D. 508, 516 n.5 (N.D. Iowa 2000).

## II.    REMAINING MOTIONS

### A.    Motion for a Temporary Restraining Order and Sanctions Against Amit

On February 23, 2024, HTS filed a motion seeking "a temporary restraining order and preliminary injunction to enjoin the ongoing dissemination of confidential information this Court has ordered sealed." Mot. for TRO, at 1 (ECF No. 322). As discussed above, Amit has violated multiple court orders, and his posting on YouTube is a further violation.

HTS, however, has not shown irreparable harm. Moreover, HTS has not shown that it has availed itself of the procedures to take down improper conduct posted to YouTube, although those procedures are posted publicly. This again calls into question the adequacy of HTS' actions to protect its information. Because HTS has failed to meet the elements for a temporary restraining order, the court denies the motion.

That said, the court does have inherent authority to order Amit to comply with this court's rulings. Under that authority, the court orders Amit to remove the YouTube video, and to file documentation with the court that certifies the video has been removed on or before March 14, 2025. Besides disallowing Amit's attorney fees, costs, and expenses beyond those awarded under Rule 26(g), as a further penalty for violating this court's order, the court orders Amit to pay $500 into the

court.  The court expressly warns Amit that if he continues to violate this court's

orders,[30] the court has the authority to order prison time.

### B.    Motion to Maintain Seal

HTS filed its Motion for Temporary Restraining Order under seal.  HTS

moved for the document to remain under seal because it contains a hyperlink to the

offending YouTube video.  Mot. to Maintain Seal, at 1 (ECF No. 324).  Although

HTS has not shown irreparable harm to warrant a temporary restraining order,

maintaining its motion under seal is proper to avoid providing a direct link to the

offending video.  Accordingly, the motion is granted (ECF No. 324).  Upon Amit

providing certification that the video has been removed from YouTube, the court

will unseal the motion for temporary restraining order.

## III.    DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION

HTS' Trade Secret Claims have been the main focus of this litigation.  As

stated above, HTS also has asserted Non-Trade Secret Claims.  The court requested

supplemental briefing concerning those claims to determine if they may be disposed

of pursuant to Rule 56(f)(2).  At that time, HTS' federal trade secret claim was still

pending, which was the basis for this court's jurisdiction.  *See* Amend. Complaint,

---

[30]  The court presently is maintaining certain documents under seal to afford HTS a
meaningful opportunity to file an appeal.  Once the sealed documents no longer meet the
requirements for being sealed, the court will order the documents to be unsealed and made
available to the public.  At that point, the orders for Amit not to publish certain information
will become moot.

¶ 28 (ECF No. 39).

Now, that there is no federal claim pending before this court, the Non-Trade Secret Claims will predominate these proceedings. Those claims have been before the court only due to federal supplemental jurisdiction under 28 U.S.C. § 1367. Section 1367 permits a court to "decline to exercise supplemental jurisdiction" when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The court's discretion is not unlimited. *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 906 (7th Cir. 2007). Nevertheless, for the reasons stated below, the court concludes declining to exercise supplemental jurisdiction is appropriate in this case.

The Tenth Circuit has stated, "[i]f federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline to exercise jurisdiction by dismissing the case without prejudice."[31] *Bauchman v. W. High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997) (quotations and citation omitted). The Seventh Circuit has identified three situations where supplemental jurisdiction should be retained. *Williams Elecs. Games, Inc.*, 479 F.3d at 907. They are: (1) if dismissal would bar refiling due to a statute of limitations, (2) if "substantial federal judicial resources have already been expended on the resolution of the supplemental

---

[31] "[T]his statement does not establish a mandatory rule to be applied inflexibly in all cases." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Nevertheless, it provides a substantial ground for dismissal in this case because no trial has been set.

claims"; and (3) if "it is obvious how the claims should be decided." *Id.* (citations omitted).  None of the conditions apply here.

Section 1367(d) has tolled the statute of limitations on the Non-Trade Secret Claims, so the claims may be refiled in state court if HTS still wishes to pursue them.  The court has not expended substantial judicial resources on resolving the Non-Trade Secret Claims because the Trade Secret Claims have predominated these proceedings.  Additionally, it is not obvious how the Non-Trade Secret Claims should be decided, despite additional briefing, and the court believes a state court is in the best position to decide the state claims.  Moreover, should the claims proceed, expert discovery on damages has not occurred, and resolving the claims on the merits or proceeding to trial will be a significant expenditure of resources for this court.  Taking into account Tenth Circuit and Seventh Circuit law, the court declines to continue exercising supplemental jurisdiction over the Non-Trade Secret Claims, and hereby dismisses them without prejudice.

## CONCLUSION AND ORDER

For the reasons discussed above, the court finds that monetary sanctions against HTS and its *pro hac vice* counsel under Rule 11 are warranted.  The court hereby sanctions HTS the sum of $5,000 payable into the court. HTS' counsel, Ariel Reinitz, is also separately ordered to pay $5,000 into the court as a sanction.  The penalty shall be paid within 30 days of this order being docketed.

The court expressly finds HTS' Rule 26(g) violations are without substantial

justification, and that sanctions are appropriate against HTS and its counsel for

such violations.  The court directs Defendants to file a motion with supporting

declarations establishing the attorney fees, costs, and expenses they incurred as a

result of HTS' Rule 26(g) violations.  Defendants must present evidence sufficient to

support the award, including identifying the time and money spent as a result of

the violations, separate from any time or money spent on any other claims or

issues.[32]  Defendants' motion is to be filed within 30 days of the date this

Memorandum Decision and Order is docketed.  If it wishes to do so, HTS may file a

memorandum in opposition.  HTS' responsive memorandum must be filed no later

than 21 days after Defendants' motion is filed, and it is subject to local page

limitations.  DUCivR 7-1(4)(D)(i).  If they wish to do so, Defendants may file a reply

memorandum, within 14 days thereafter, and the reply is subject to local page

limitations.  *Id.*

Further, the court finds that a nonmonetary sanction is also warranted under

the court's inherent authority.  HTS and its counsel are ordered to provide a

---

[32]  Because the attorney fees, costs, and expenses are to compensate for violating Rule
26(g), "fees that would have been incurred without the misconduct," are not recoverable.
*See Goodyear Tire & Rubber Co.*, 581 U.S. at 108 (stating rule in inherent authority
context, but noting additional procedural rules would be required to punish rather than
compensate). Defendants should therefore determine what attorney fees, costs, and
expenses could have been avoided if HTS and/or HTS' counsel had not violated Rule 26(g).

complete copy of this Memorandum Decision and Order to every person or entity that received Mr. Reinitz's October 18, 2019, letter within 30 days of the date this Memorandum Decision and Order is docketed.  HTS and its counsel are ordered to file, under penalty of perjury, a declaration certifying their compliance with this directive at the close of that same 30-day period.[33]  The court expressly finds these sanctions, and those stated below against Amit, are not more severe than reasonably necessary to deter repetition of this conduct or deter conduct by others who are in similar circumstances.

For the remaining motions, the court DENIES the motion for temporary restraining order filed by HTS (ECF No. 322).  The court GRANTS the Motion to Maintain Seal (ECF No. 324).  The court ORDERS Amit to remove the YouTube video, and file documentation that certifies it has been removed by March 14, 2025. The court further ORDERS Amit to pay into the court a penalty of $500 for violating the court's orders.  Such penalty shall be paid within 30 days of this Memorandum Decision and Order being docketed.

---

[33]  The court notes that as a signer of both the discovery at issue and summary judgment papers, local counsel for HTS also had obligations under Rule 11 and Rule 26.  While the court has not, in this Decision and Order, imposed any sanctions under those Rules, the court has not foreclosed any such sanction.  Should additional information come to the court's attention concerning local counsel's role in drafting the discovery responses or the summary judgment motions, the court may revisit this issue.  *See St. Paul Reinsurance Co. v. Com. Fin. Corp.*, 198 F.R.D. 508, 516 & n.5 (N.D. Iowa 2000).

Finally, the court declines to exercise supplemental jurisdiction over the Non-Trade Secret Claims (Counts III through VII), and hereby dismisses them without prejudice.  All claims against Riverland were previously dismissed without prejudice.  Accordingly, no claim remains pending in this case.  This case shall remain open, however, until the sanctions issues are fully resolved, and a final judgment is entered.

SO ORDERED AND DATED this 17th day of February, 2025.

BY THE COURT:

Clark Waddoups
United States District Judge